**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| CVS PHARMACY, INC., CAREMARK RX, L.L.C., ADVANCED CARE SCRIPTS, INC., CAREMARK ARIZONA MAIL PHARMACY, LLC, CAREMARK ARIZONA SPECIALTY PHARMACY, L.L.C., CAREMARK FLORIDA MAIL PHARMACY, LLC, CAREMARK FLORIDA SPECIALTY PHARMACY, LLC, CAREMARK ILLINOIS SPECIALTY PHARMACY, LLC, CAREMARK KANSAS SPECIALTY PHARMACY, LLC, CAREMARK MASSACHUSETTS SPECIALTY PHARMACY, LLC, CAREMARK NEW JERSEY SPECIALTY PHARMACY, LLC, CAREMARK NORTH CAROLINA SPECIALTY PHARMACY, LLC, CAREMARK TENNESSEE SPECIALTY PHARMACY, LLC, CAREMARK TEXAS MAIL PHARMACY, LLC, CAREMARK, L.L.C., CAREMARKPCS PENNSYLVANIA MAIL PHARMACY, LLC, CARECENTER PHARMACY, L.L.C., CENTRAL RX SERVICES, LLC, CORAM ALTERNATE SITE SERVICES, INC., CVS CAREMARK ADVANCED TECHNOLOGY PHARMACY, L.L.C., CVS RX SERVICES, INC., EXPRESS PHARMACY SERVICES OF PA, L.L.C., HOLIDAY CVS, L.L.C., I.g.G. OF AMERICA, LLC, PROCARE PHARMACY DIRECT, L.L.C., PROCARE PHARMACY, L.L.C., TENNESSEE CVS PHARMACY, L.L.C., SILVERSCRIPT INSURANCE COMPANY, and COVENTRY HEALTH AND LIFE INSURANCE COMPANY, <br><br>        Plaintiffs, <br><br>    v. <br><br> TENNESSEE BOARD OF PHARMACY; SHANEA MCKINNEY, MARLIN BLANE, DAVID BROWN, JAKE BYNUM, BROOKE MILLS, MATTHEW PHILLIPS, MELISSA | Civil Action No. _____ |

1

BORUFF, REBECCA LEINART, and NICHOLE FOSTER, in their official capacities as members of the Tennessee Board of Pharmacy; LUCY SHELL, in her official capacity as Executive Director of the Tennessee Board of Pharmacy; and JONATHAN SKRMETTI, in his official capacity as Attorney General of the State of Tennessee,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs CVS Pharmacy, Inc., Caremark Rx, L.L.C., Advanced Care Scripts, Inc., Caremark Arizona Mail Pharmacy, LLC, Caremark Arizona Specialty Pharmacy, L.L.C., Caremark Florida Mail Pharmacy, LLC, Caremark Florida Specialty Pharmacy, LLC, Caremark Illinois Specialty Pharmacy, LLC, Caremark Kansas Specialty Pharmacy, LLC, Caremark Massachusetts Specialty Pharmacy, LLC, Caremark New Jersey Specialty Pharmacy, LLC, Caremark North Carolina Specialty Pharmacy, LLC, Caremark Tennessee Specialty Pharmacy, LLC, Caremark Texas Mail Pharmacy, LLC, Caremark, L.L.C., CaremarkPCS Pennsylvania Mail Pharmacy, LLC, CareCenter Pharmacy, L.L.C., Central Rx Services, LLC, Coram Alternate Site Services, Inc., CVS Caremark Advanced Technology Pharmacy, L.L.C., CVS Rx Services, Inc., Express Pharmacy Services of PA, L.L.C., Holiday CVS, L.L.C., I.g.G. of America, LLC, ProCare Pharmacy Direct, L.L.C., ProCare Pharmacy, L.L.C., and Tennessee CVS Pharmacy, L.L.C. (collectively, "CVS"); and Plaintiffs SilverScript Insurance Company and Coventry Health and Life Insurance Company (collectively, "Affiliated Medicare Sponsors"), allege as follows:

## INTRODUCTION

1. Nearly one and a half million Tennesseans rely on CVS to fill more than 26 million prescriptions across 136 brick-and-mortar pharmacies in the State—pharmacies that also employ

2

thousands of Tennesseans. And nearly 70,000 more Tennesseans, particularly the elderly and severely ill, depend upon CVS's mail-order pharmacies to fill about one million prescriptions and ship them to their doorsteps. For years, independent pharmacies in Tennessee, and the lawmakers who own or support them, have complained about this lawful competition. Rather than compete for that business on the merits, they have enlisted the Tennessee General Assembly (the "General Assembly") to drive CVS and other out-of-state competitors from the market.

2. During the last week of the legislative session, the General Assembly passed a new law in an effort to accomplish that goal. Senate Bill ("SB 2040"), signed into law by the Governor (the "Act"), imposes an outright ban on the operation of pharmacies affiliated with pharmacy benefit managers ("PBMs") and health insurance issuers in the State. The targeted pharmacies are all affiliated with national healthcare companies, which operate retail outlets in Tennessee, and supply mail-order and specialty-pharmacy services that fill prescriptions for Tennesseans, including in connection with nationwide employee benefit plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). By contrast, the Act will have no impact upon the current operations of the favored independent pharmacies, other than by seeking to shutter their competition in the State.

3. The Act will force CVS to close 136 retail and specialty pharmacies within Tennessee and deprive Tennesseans from receiving CVS's mail-order pharmacy services. It will put thousands of Tennesseans that CVS employs out of work and make the nearly 1.5 million Tennesseans that CVS serves find a new way to get their medicine. To what end? The Act's stated goals are to expand "patient choice" and "rural and community pharmacy access." But a law that will close over 160 pharmacies (including the 136 CVS retail and specialty pharmacies), eliminate thousands of jobs, ban certain out-of-state pharmacies (like CVS) from providing mail-order

3

pharmacy services, and force over a million patients to find new providers neither expands patient choice nor increases access to pharmacy services. It does precisely the opposite.

4. The Act's effect is entirely inconsistent with a purported interest in the welfare of Tennesseans, but it serves the Act's true purpose perfectly: protecting local pharmacies against out-of-state competitors. As the General Assembly knows, the Commerce Clause of the U.S. Constitution prohibits state laws that discriminate against interstate commerce. So instead of openly targeting out-of-state pharmacies, the Act targets PBMs as a proxy. That proxy is remarkably precise: every single PBM-affiliated pharmacy in the State impacted by the Act is an out-of-state company (like CVS, Express Scripts, or Optum), yet not a single in-state entity is covered by the Act. And most unaffiliated pharmacies in the State, the independent pharmacies, are in-state entities. As a matter of common sense, banning the out-of-state pharmacies will necessarily steer more patients to the local independents.

5. Tennessee was not the first State to try this evasion. It is instead following the same playbook that Arkansas tried, and failed, to implement last year. In 2025, Arkansas enacted a law to prohibit PBM-affiliated pharmacies from operating within the State under the guise of combating the purported conflicts of interest that arise from PBMs' affiliation with local pharmacies. There, too, the law operated with surgical efficacy in banning only out-of-state pharmacies from the Arkansas market. And, like here, the Arkansas law received vigorous support from independent pharmacies and local lawmakers who expected it to shift billions of dollars from out-of-state competitors to local independent pharmacies.

6. A federal court in Arkansas saw through this ploy and preliminarily enjoined the Arkansas law. *See Express Scripts, Inc. v. Richmond*, 2025 WL 2111057 (E.D. Ark. July 28, 2025). The District Court recognized that Arkansas could not evade the constitutional prohibition

4

against economic protectionism by using PBM-affiliation as a proxy to expel out-of-state companies. Arkansas could readily address its professed concerns for PBM conflicts of interests by enforcing the antidiscrimination laws on its books that already ensured that independent pharmacies received the same terms from PBMs as affiliated pharmacies. And the District Court faulted Arkansas lawmakers who had boasted that the law would help their in-state pharmacies at the expense of large, national pharmacy chains like CVS. The Court therefore concluded that the Arkansas law likely violated the dormant Commerce Clause and enjoined it.

7. But Arkansas's experience did not deter Tennessee from trying the same ploy. To the contrary, the General Assembly embraced the Arkansas law in all relevant respects, right down to borrowing the same metaphor of describing PBM affiliation as akin to a "fox guarding the henhouse." The Act's supporters even boasted that the Act "align[s] Tennessee with Arkansas Act 624."

8. The only notable difference in Tennessee's law confirms that local protectionism motivated it. As originally introduced, the Act adopted the exact same proxy as Arkansas, prohibiting PBM and pharmacy affiliation. But that construct would have swept in RxPreferred Benefits—the only Tennessee-based PBM—which also happens to be "owned and operated" by local independent pharmacists. The Tennessee Pharmacists Association ("TPA"), a local association representing the interests of in-state pharmacies, helped address this issue by "working with the bill sponsors to provide amendatory language to meet the needs of additional stakeholders." Now, only the out-of-state PBM-affiliated pharmacies that are also affiliated with a health insurance issuer are expelled from Tennessee. That change has nothing to do with the stated purpose of the Act. But it does ensure that the in-state pharmacy owners and the sole in-state PBM with which they are affiliated would be protected from enforcement—even though they

5

carry the same alleged conflict of interest the bill supposedly sought to eliminate. TPA subsequently explained that it provided amendments to "address concerns" from "key pharmacy stakeholders," which for the *Tennessee* Pharmacists Association includes only in-state pharmacies.

9. Unsurprisingly, as was true in Arkansas, Tennessee has no credible explanation for why the Act is necessary. Tennessee already has antidiscrimination laws on its books that prevent PBMs from favoring affiliated pharmacies. If anything, the pretense is even starker in Tennessee, because the State already maintains one of the most comprehensive regulatory regimes for PBMs and PBM-affiliated pharmacies. For instance, Tennessee law already requires PBMs to reimburse nonaffiliated pharmacies at the same or higher rate than affiliated pharmacies, and it prohibits PBMs from steering patients to affiliated pharmacies rather than nonaffiliated pharmacies. Tennessee's existing regulatory regime protects and promotes independent pharmacies, and they in fact have grown in market share over the past five years in the State. There is thus no legitimate reason motivating Tennessee from banning PBM-affiliated pharmacies from the State. Instead, the law reflects naked protectionism, just as in Arkansas.

10. But Tennessee lawmakers did try to learn one thing from Arkansas's experience: what not to say on the floor of the State legislature. Senator Harshbarger, the manager of his family's independent pharmacy, author and staunch proponent of the Act, proclaimed that he had "tr[ied] to learn from what Arkansas" did and studied "the court cases," and that he had looked for "potential loopholes" in the Arkansas federal court's decision that could enable Tennessee to achieve the same, equally unlawful goals. But Tennessee cannot achieve the same unlawful goal by simply trying to keep quieter about the law's true intent. After all, as the Supreme Court has repeatedly explained in similar contexts, "[w]hat cannot be done directly cannot be done

6

indirectly" because "[t]he Constitution deals with substance, not shadows." *SFAA v. President and Fellows of Harvard College*, 600 U.S. 181, 230 (2023).

11. In any event, notwithstanding Senator Harshbarger's best efforts, the Act's advocates still frequently said the quiet part out loud. On multiple occasions, lawmakers made plain that the Act was designed to benefit Tennessee's independent pharmacies at the expense of out-of-state competitors. House Speaker Sexton trumpeted that lawmakers should support the Act because it would "protect independent pharmacies in [their] community" and "keep independents in business." Likewise, Representative Fritts viewed the law as a "good way to stand up for our [i.e., Tennessee's] small independent pharmacies," determining that these "local independent pharmacies" needed the State's protection to avoid being "force[d] . . . out of business." And Senator Yager implored his colleagues to "vote for independent pharmacies."

12. In fact, Senator Harshbarger himself said much the same thing in a confidential memorandum distributed to members of the General Assembly. He explained that the Act would address "big PBMs," who were putting "hometown pharmacies at risk," and assured fellow lawmakers concerned for lost jobs that "[l]ocal ownership actually creates jobs by keeping pharmacy revenues within the community instead of corporate headquarters out of state." There could hardly be a more candid admission that the Act sought to redirect revenue from out-of-state corporations to local in-state businesses. The Act's fiscal note even emphasized that disposal of the out-of-state PBM-owned pharmacies "will result in increases in both business revenue and expenditures in the state."

13. There is a reason why many of these key Tennessee lawmakers enthusiastically advocated for a law to expel out-of-state pharmacies from Tennessee. Several of them, including the lead sponsors of this Act, will be personally enriched if it goes into effect. Senator Harshbarger

7

manages his family's independent pharmacy. Senator Reeves, one of the Act's co-sponsors, owns a healthcare company that dispenses infused drugs and competes with CVS pharmacies. The wife of Representative Scarbrough, the lead sponsor in Tennessee's lower chamber, co-owns a drug store that's a short walk from a CVS pharmacy.

14. The role played by these conflicted legislators in adopting this discriminatory law did not go unnoticed by the trade association that supports them. Anthony Pudlo, the CEO of the TPA, recently advised on a podcast that other States could follow Tennessee's lead by putting "a lot of pharmacists" or "spouses of pharmacists" in the "General Assembly." After all, the independent pharmacists in Tennessee's General Assembly were the "key champions" that caused the "stars to align."[1] Mr. Pudlo did not hide the protectionist aims of this legislation.

15. In banning PBM-affiliated pharmacies like CVS from Tennessee, the Act harms free commerce between the States and conflicts with the foundational principles of fair-market competition that underpin the Union. The Act picks economic winners and losers, paving the way for in-state pharmacies (and the lawmakers and their families who own them) to earn a windfall overnight following the expulsion of CVS and other out-of-state competitors from the Tennessee market. Indeed, as Representative Lafferty openly acknowledged, the Act could lead to "local pharmacies buying CVS locations," for pennies on the dollar no doubt.

16. That's because companies such as CVS, which are based out of state and are affiliated with PBMs, will be forced to stop serving Tennesseans. CVS's business model is predicated on serving nationwide prescription drug plans for clients, which include health plans, unions, private employers, and government plans that have Tennessee residents as members. CVS also uses the efficiencies that flow from its PBM affiliation to pass along lower prices and more

---

[1] Independent Rx Forum, *Unmaking the Middleman: Tennessee's Fair Rx Act*, Spotify (May. 5, 2026) (statement of Anthony Pudlo).

convenient services for customers. Thus, if the Act goes into effect as scheduled on July 1, 2028, CVS will have to cease not only its operations across 134 retail pharmacies in the State, but also its mail-order and specialty-pharmacy services. In fact, the law will likely shut down a substantial portion of all mail-order and specialty-pharmacy prescriptions flowing into the State because most such providers are out-of-state pharmacies with PBM affiliations and require a Tennessee pharmacy license to ship prescriptions into Tennessee.

17. The costs will also ripple beyond Tennessee's borders. Many employer-sponsored and federal government-sponsored health benefit plans must design networks for beneficiaries across the 50 States. Those plans often rely upon a mail-order pharmacy that can provide lower prices and services to employees nationwide. Yet under this new law, networks will need to be modified in Tennessee-specific ways. And if other States follow Tennessee's lead, then it may become impracticable for employers and the federal government to administer uniform nationwide plans through a parquetry of differing rules from different jurisdictions.

18. The Act violates the U.S. Constitution in multiple, independent ways. First, the law violates the dormant Commerce Clause because it discriminates purposefully and in practical effect, raising the unavoidable inference that it flouts the "antidiscrimination principle" that lies "at the very core" of the dormant Commerce Clause. *Energy Michigan, Inc. v. Michigan Pub. Serv. Comm'n*, 126 F.4th 476, 486 (6th Cir. 2025) (internal quotation marks omitted).

19. The law's history and context confirm that the unlawfully protectionist purpose of shoring up Tennessee's independent pharmacies motivated the General Assembly. The legislature's members said as much. And the Act's proponents openly admitted that they wanted to "align" Tennessee's law with Arkansas's law. Like Arkansas, Tennessee passed this law for

9

the same unlawful purpose.  As Representative Stevens put it during a House Floor session, "the crux of [Tennessee's] legislation" is "to protect local pharmacies."

20.     The law's practical effects blatantly favor in-state interests and prove that Tennessee's legislature achieved its purpose.  The Act bars *only* out-of-state pharmacies from participating in the Tennessee marketplace.  After their expulsion from Tennessee, their business will move to the remaining pharmacies.  And the majority of remaining pharmacies will consist of Tennessee's in-state independent pharmacies.

21.     The law also separately violates the dormant Commerce Clause because the burdens that it imposes on interstate commerce are clearly excessive in relation to the putative local benefits, which are already accomplished by existing Tennessee law.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

22.     Second, the Act violates the U.S. Constitution's Supremacy Clause because it is preempted by multiple federal statutes.  For starters, the law impermissibly interferes with the uniform nationwide administration of employee benefit plans governed by ERISA.  It does so by preventing those plans from relying on PBM-affiliated pharmacies (including mail-order pharmacies) in Tennessee, even though many plan sponsors have relied on this integrated model to meet their participants' needs.  The Act will blow up existing pharmacy networks in Tennessee by suddenly banning over 160 pharmacies from operating in the State, forcing ERISA plan administrators to adopt a new network structure unique to Tennessee that is anchored by independent pharmacies. That impermissibly regulates a central matter of plan administration.  It will also block access for patients in Tennessee to drugs that ERISA plans currently cover, which will not only diminish the benefits for those patients but also force plans to consider changing their prescription-drug benefits or drug formularies to cover alternative treatments, if any are available.

Under settled case law interpreting ERISA's broad express preemption provision, the Act is thus preempted as a law that "relate[s] to" such ERISA plans. 29 U.S.C. § 1144(a).

23. In addition, the Act is preempted by the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA") because it seeks to regulate Medicare Advantage and Medicare Part D plans that Congress intended for federal standards to exclusively govern. 42 U.S.C. §§ 1395w-26(b)(3), 1395w-112(g). And because the Act will impair or alter access to drugs currently covered by Medicare Part D plans, it directly conflicts with the Medicare requirement that plans must provide convenient access to covered Part D drugs as well as Medicare's extensive regulation of drug coverage and formulary development requirements. *See* 42 U.S.C. § 1395w-104(b); 42 C.F.R. § 423.120(a).

24. Third, the Act would effect a taking of CVS's private property—specifically, its 136 retail and specialty pharmacies in Tennessee—without just compensation by the State. If the Act goes into effect, then CVS will be forced to attempt to sell its many Tennessee locations all at once, and on the State's timeline. Depressed sale prices are practically guaranteed in those circumstances, if qualified buyers can even be found at all. And if those sales cannot be arranged, then the economic value of CVS's property will plummet further still.

**JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because CVS's causes of action arise under the Constitution and laws of the United States, including the dormant Commerce Clause, the Supremacy Clause, ERISA, the MMA, and the Takings Clause.

26. This Court has personal jurisdiction over Defendants because Defendants' principal place of business is within the Middle District of Tennessee.

11

27. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to these claims occurred in this District and Defendants reside within the State of Tennessee.

28. The Court has authority to award relief against the Defendants under 42 U.S.C. § 1983. The Court also has jurisdiction under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908). *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002). Further, the Court may award injunctive relief under 28 U.S.C. § 1651 and declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

### A. Plaintiffs[2]

29. CVS Pharmacy, Inc. ("CVS Pharmacy") is a Rhode Island corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Pharmacy, directly and through its subsidiaries, operates a chain of more than 9,000 retail pharmacies across the United States, including 134 retail locations in Tennessee, and also provides mail pharmacy fulfillment through its Caremark subsidiaries and dozens of other pharmacies located outside Tennessee. CVS Pharmacy has several groups of subsidiaries that are licensed to provide pharmacy services, including CVS Specialty, which operates specialty pharmacies and specialty mail-order pharmacy services. CVS Pharmacy is a direct and wholly owned subsidiary of CVS Health Corporation ("CVS Health").

30. Caremark Rx, L.L.C. ("Caremark") is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. Caremark Rx, L.L.C.,

---

[2] Although each of the below-described subsidiaries (other than the Affiliated Medicare Sponsors) is the holder of the relevant Tennessee license, Plaintiffs collectively refer to the licensed entities in the remainder of the complaint as "CVS" solely for convenience. The complaint references Caremark, however, when discussing the PBM in particular.

12

through its operating subsidiaries and affiliates, operates a PBM that conducts business in all 50 States. Caremark Rx, L.L.C. is a direct subsidiary of CVS Pharmacy.

31. Advanced Care Scripts, Inc. is located at 6251 Chancellor Drive, Orlando, Florida 32809. Advanced Care Scripts, Inc. holds a non-resident pharmacy license in Tennessee. Advanced Care Scripts, Inc. is an indirect subsidiary of Caremark.

32. Caremark Arizona Mail Pharmacy, LLC is located at 4755 South 44th Place, Phoenix, Arizona 85040. Caremark Arizona Mail Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark Arizona Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

33. Caremark Arizona Specialty Pharmacy, L.L.C. is located at 2700 West Frye Road, Chandler, Arizona 85224. Caremark Arizona Specialty Pharmacy, L.L.C. holds a non-resident pharmacy license in Tennessee. Caremark Arizona Specialty Pharmacy, L.L.C. is an indirect subsidiary of Caremark.

34. Caremark Florida Mail Pharmacy, LLC is located at 9310 SouthPark Center Loop, Orlando, Florida 32819. Caremark Florida Mail Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark Florida Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

35. Caremark Florida Specialty Pharmacy, LLC is located at 7930 Woodland Center Blvd., Tampa, Florida 33614. Caremark Florida Specialty Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark Florida Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

36. Caremark Illinois Specialty Pharmacy, LLC is located at 800 Biermann Court, Mount Prospect, Illinois 60056. Caremark Illinois Specialty Pharmacy, LLC holds a non-resident

13

pharmacy license in Tennessee. Caremark Illinois Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

37. Caremark Kansas Specialty Pharmacy, LLC is located at 11162 Renner Blvd., Lenexa, Kansas 66219. Caremark Kansas Specialty Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark Kansas Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

38. Caremark Massachusetts Specialty Pharmacy, LLC is located at 25 Birch St., Milford, Massachusetts 01757. Caremark Massachusetts Specialty Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark Massachusetts Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

39. Caremark New Jersey Specialty Pharmacy, LLC is located at 180 Passaic Ave., Fairfield, New Jersey 07004. Caremark New Jersey Specialty Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark New Jersey Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

40. Caremark North Carolina Specialty Pharmacy, LLC is located at 10700 World Trade Blvd., Raleigh, North Carolina 27617. Caremark North Carolina Specialty Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark North Carolina Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

41. Caremark Tennessee Specialty Pharmacy, LLC is headquartered at 8370 Wolf Lake Dr., Bartlett, Tennessee 38133. Caremark Tennessee Specialty Pharmacy, LLC holds a resident pharmacy license in Tennessee. Caremark Tennessee Specialty Pharmacy, LLC is an indirect subsidiary of Caremark.

42. Caremark Texas Mail Pharmacy, LLC is located at 7034 Alamo Downs Pkwy., San Antonio, Texas 78238. Caremark Texas Mail Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. Caremark Texas Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

43. Caremark, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. Caremark, L.L.C. holds four non-resident pharmacy licenses in Tennessee. Caremark, L.L.C. is a direct subsidiary of Caremark.

44. CaremarkPCS Pennsylvania Mail Pharmacy, LLC is located at 1 Great Valley Blvd., Wilkes Barre, Pennsylvania 18706. CaremarkPCS Pennsylvania Mail Pharmacy, LLC holds a non-resident pharmacy license in Tennessee. CaremarkPCS Pennsylvania Mail Pharmacy, LLC is an indirect subsidiary of Caremark.

45. CareCenter Pharmacy, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. CareCenter Pharmacy, L.L.C. holds two resident pharmacy licenses in Tennessee. CareCenter Pharmacy, L.L.C. is a direct subsidiary of CVS Pharmacy.

46. Central Rx Services, LLC is located at 1451 Center Crossing Rd., Las Vegas, Nevada 89144. Central Rx Services, LLC holds a non-resident pharmacy license in Tennessee. Central Rx Services, LLC is an indirect subsidiary of Caremark.

47. Coram Alternate Site Services, Inc. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. Coram Alternate Site Services, Inc. holds three resident and three non-resident pharmacy licenses in Tennessee. Coram Alternate Site Services, Inc. is an indirect subsidiary of Caremark.

48. CVS Caremark Advanced Technology Pharmacy, L.L.C. is located at 1780 Wall St., Mount Prospect, Illinois 60056. CVS Caremark Advanced Technology Pharmacy, L.L.C.

15

holds a non-resident pharmacy license in Tennessee. CVS Caremark Advanced Technology Pharmacy, L.L.C. is an indirect subsidiary of Caremark.

49. CVS Rx Services, Inc. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Rx Services, Inc. holds a non-resident pharmacy license in Tennessee. CVS Rx Services, Inc. is a direct subsidiary of CVS Pharmacy.

50. Express Pharmacy Services of PA, L.L.C. is located at 620 Epsilon Drive, Pittsburgh, Pennsylvania 15238. Express Pharmacy Services of PA, L.L.C. holds a non-resident pharmacy license in Tennessee. Express Pharmacy Services of PA, L.L.C. is a direct subsidiary of Caremark.

51. Holiday CVS, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. Holiday CVS, L.L.C. holds a non-resident pharmacy license in Tennessee. Holiday CVS, L.L.C. is a direct subsidiary of CVS Pharmacy.

52. I.g.G. of America, LLC is located at 7150 Columbia Gateway Drive, Columbia, Maryland 21046. I.g.G. of America, LLC holds a non-resident pharmacy license in Tennessee. I.g.G. of America, LLC is an indirect subsidiary of Caremark.

53. ProCare Pharmacy Direct, L.L.C. is located at 105 Mall Boulevard, Monroeville, Pennsylvania 15146. ProCare Pharmacy Direct, L.L.C. holds a non-resident pharmacy license in Tennessee. ProCare Pharmacy Direct, L.L.C. is a direct subsidiary of CVS Pharmacy.

54. ProCare Pharmacy, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. ProCare Pharmacy, L.L.C. holds two non-resident and one resident pharmacy licenses in Tennessee. ProCare Pharmacy, L.L.C. is a direct subsidiary of CVS Pharmacy.

55. Tennessee CVS Pharmacy, L.L.C. is headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. Tennessee CVS Pharmacy, L.L.C. holds 134 resident pharmacy licenses in Tennessee. Tennessee CVS Pharmacy, L.L.C. is a direct subsidiary of CVS Pharmacy.

56. SilverScript Insurance Company is a Tennessee corporation with its principal place of business at 1021 Reams Fleming Boulevard, Franklin, Tennessee 37064. SilverScript Insurance Company sponsors SilverScript Choice (PDP), a Medicare Part D plan. SilverScript Insurance Company is an indirect subsidiary of Caremark.

57. Coventry Health and Life Insurance Company is a Missouri corporation with its principal place of business at 5661 Telegraph Road, Suite 4B, St. Louis, Missouri 63129. Coventry Health and Life Insurance Company sponsors Aetna Medicare Dual Select Choice (PPO D-SNP), Aetna Medicare Dual Choice (D-SNP), Aetna Medicare Value Plus (PPO), Aetna Medicare Giveback Choice (PPO), Aetna Medicare Premier Plus (PPO), Aetna Medicare Elite (PPO), and Aetna Medicare Freedom (PPO), which are Medicare Advantage Prescription Drug plans. Coventry Health and Life Insurance Company is an indirect subsidiary of CVS Pharmacy.

## B. Defendants

58. The Tennessee Board of Pharmacy has its principal place of business at 665 Mainstream Drive, Nashville, Tennessee 37243.

59. Shanea McKinney, Pharm.D.; Marlin Blane, Pharm.D., J.D.; David Brown, Pharm.D.; Jake Bynum; Brooke Mills, Pharm.D.; Matthew Phillips, Pharm.D.; Melissa Boruff, Pharm.D.; Rebecca Leinart, Pharm.D.; and Nichole Foster, CPhT-Adv., are the individual members of the Board of Pharmacy, which has its principal place of business at 665 Mainstream Drive, Nashville, Tennessee 37243. Each Board of Pharmacy member is being sued solely in his or her official capacity.

60. Lucy Shell, PharmD, DPh, is the Executive Director of the Board of Pharmacy, with a principal place of business at 665 Mainstream Drive, Nashville, Tennessee 37243. Shell is being sued solely in her official capacity.

61. Jonathan Skrmetti is the Attorney General of the State of Tennessee with a principal place of business at 500 Charlotte Ave, Nashville, TN 37219. Skrmetti is being sued solely in his official capacity.

62. Defendants, and those subject to Defendants' supervision, direction, and/or control, are responsible for the implementation and enforcement of the Act.

**C.     A Justiciable Controversy Exists Between CVS And Defendants**

63. An actual case or controversy has arisen between the parties. The Act will become effective on July 1, 2028. Absent injunctive relief, CVS must take drastic steps to comply with the Act. There is no feasible corporate structure—absent CVS's complete corporate separation from Caremark or Aetna—that can preserve CVS's ability to hold a pharmacy license in Tennessee while continuing to provide PBM and health insurance services to patients and plan sponsors in 49 other States. CVS has already taken preparatory steps to comply with the Act, and it cannot delay taking further steps given the complexity of unwinding CVS's business in Tennessee and the Act's impending effective date.

**FACTS**

**A.     Delivery Of Prescription Drug Benefits To Patients**

64. The process of getting prescription drugs into the hands of patients who take them involves multiple entities. Manufacturers research, develop, and bring drugs to market. Wholesalers purchase these drugs and distribute them to pharmacies and health care providers. Meanwhile, plan sponsors—such as health plans, employers, unions, and government plans—

18

provide the coverage that most Americans rely upon to obtain pharmacy services and prescription drug benefits.

65.    PBMs play a critical role in this system by interfacing between these various entities.  They contract with plan sponsors to manage a plan's prescription drug benefits, negotiate drug rebates with manufacturers, and create pharmacy networks and process prescription claims for patients at the plan sponsor's direction.  By providing such support and administrative assistance for plan sponsors, PBMs lower costs for patients and simplify the process by which Americans obtain their medicine.  Practically all plan sponsors outsource pharmacy benefit services to PBMs.  Without PBMs, every company in America would need to individually hire staff to build and maintain networks of tens of thousands of pharmacies, negotiate discounts with hundreds of pharmaceutical companies, develop and maintain IT and payment systems for real-time processing of prescription claims, study medical literature for formulary development, and offer member and provider support services, among others tasks.  Instead of taking on all that, companies hire PBMs to perform these highly specialized services that reduce drug costs for their members.

66.    Present-day pharmacies exist in multiple forms.  A "retail pharmacy" is a physical, brick-and-mortar store that dispenses prescription drugs, over-the-counter medications, and other healthcare products to members of the community.  At a retail pharmacy, patients generally collect their prescriptions in person.  Many retail pharmacies, like those operated by CVS, also sell goods like groceries and convenience items to customers.  Some CVS stores also include Minute Clinics, which provide convenient and affordable healthcare services for Tennesseans.

67.    A "mail-order pharmacy" is a pharmacy that distributes prescription medications directly to patients by mail.  Mail-order pharmacies offer a convenient and efficient solution for

19

many patients who cannot easily or regularly pick up their prescriptions in person at a retail pharmacy. For that reason, mail-order services are disproportionately needed by severely ill patients, elderly patients, or patients who live in rural communities or inner-city communities without convenient pharmacies. Plan sponsors that cater to such patients thus view mail-order pharmacies as a particularly important pillar of pharmacy network design.

68. A "specialty pharmacy" is a pharmacy that provides specialty medications and related clinical services for patients with complex, serious, and potentially chronic health conditions such as cancer, multiple sclerosis, or autoimmune disorders. These medications are typically expensive because, among other things, they tend to require specialized handling, including refrigeration, controlled distribution, or other detailed logistics to maintain their safety and effectiveness. Specialty medications often involve complex dosing regimens and methods of administration, such as injection or infusion, and require ongoing clinical monitoring due to potential side effects and the need for careful management of treatment. Patients using specialty medications frequently require significant education, support, and coordination with healthcare providers to ensure appropriate use. In addition, many specialty medications are subject to manufacturer-imposed limited distribution networks that restrict which pharmacies may dispense them. As a result, a patient's access to these medications often requires network participation and coverage determinations.

69. When a patient uses a pharmacy to fill a prescription, the pharmacy works with the PBM to determine coverage and the patient's financial responsibility under the benefit plan. The pharmacy will then fill the prescription using drugs it has purchased. Once the prescription is filled, the PBM reimburses the pharmacy for the benefit plan at a predetermined rate above the amount paid by the patient.

20

70.     PBMs, which are operated by CVS, Cigna, and United Healthcare, among others, help their clients manage their prescription drug benefits in a variety of ways.  One of those services involves maintaining pharmacy networks.  Pharmacies contract with PBMs to be included in these networks and provide competitive rates of reimbursement based on the prescriptions they fill.

71.     Clients use PBMs to support the network design adopted in their benefit plans.  Typically, these contracts require a certain number of covered retail pharmacies within a certain geographic range from the members.  Clients can also decide to use a narrow network or a preferred network.  In these networks, participating pharmacies agree to charge lower reimbursement rates in return for receiving a greater volume of prescriptions.  For a preferred network, the client creates a benefit design where the member copay is reduced to incentivize members to fill their prescriptions at preferred network pharmacies and allow plans to reduce their prescription drug costs.  Pharmacies are often willing to join preferred networks as a trade-off, agreeing to reduced reimbursement rates to attract a larger number of customer beneficiaries.

72.     In addition to maintaining pharmacy networks, PBMs negotiate rebates, discounts, and other price concessions with drug manufacturers.  These savings are then passed through to the PBM's clients according to the terms of a preexisting agreement between the PBM and the client.

73.     Courts have recognized the benefits PBMs bring, including by "secur[ing] lower prices" and "reduc[ing] costs to beneficiaries."  *McKee Foods Corp. v. BFP Inc.*, 173 F. 4th 242, 251-252 (6th Cir. 2026) (internal quotation marks omitted).  Government sources and economic

studies similarly indicate that PBMs improve efficiency and lower drug costs by aggregating patient purchasing power and aligning incentives across the pharmaceutical supply chain.[3]

74. Pharmacies typically do not serve members of only one PBM. Instead, they participate in multiple networks through multiple PBMs. The average CVS pharmacy, for instance, participates as an independent, unaffiliated pharmacy in the networks managed by over 40 other PBMs—including Express Scripts and OptumRx, Caremark's two largest competitors— and negotiates contracts with all of those PBMs, just like other pharmacies do. In fact, a substantial portion of CVS Pharmacy's business comes from dispensing prescriptions to members enrolled in plans administered by more than 40 other PBMs that have no affiliation with CVS.

75. PBMs are commonly affiliated with pharmacies, including retail, mail-order, and specialty pharmacies, that serve health plans and patients nationally. Such partnerships can generate even greater efficiencies and further reduce patient costs through, among other things, bulk purchasing, better coordination of care and clinical services, expanded pharmacy access and options, the elimination of third-party markups, and other economies of scale.[4]

76. But independent pharmacies continue to play a significant role in pharmaceutical care. There are more independent pharmacies operating today than there were in 2007. The National Council for Prescription Drug Programs ("NCPDP") is a not-for-profit, standards development organization with over 1,500 members across the pharmacy services industry. NCPDP maintains a dataset tracking of real-world pharmaceutical data that is relied upon for claims processing within the healthcare system and for other purposes. NCPDP's data reflects that

---

[3] U.S. Gov't Accountability Off., GAO -24-106898, *Prescription Drugs: Selected States' Regulation of Pharmacy Benefit Managers* 1-2 (2024); Dennis W. Carlton et al., *PBMs and Prescription Drug Distribution: An Economic Consideration of Criticisms Levied Against Pharmacy Benefit Managers* (2025).

[4] *See* Patricia M. Danzon, *Pharmacy Benefit Management: Are Reporting Requirements Pro- or Anticompetitive?*, 22 INT'L J. ECON. BUS. 245, 249-50 (2015); Casey B. Mulligan, *The Value of Pharmacy Benefit Management* 16, NAT'L BUREAU ECON. RSCH. (July 2022), tinyurl.com/2p9r57kr.

22

between 2007 and 2021, there was a 13.5% increase in the number of independent pharmacies nationwide.

77. Data maintained by the National Community Pharmacists Association ("NCPA") also shows that independent pharmacies' gross margins and market share have remained relatively stable since 2007. NCPA data shows that as of 2025, independent pharmacies nationwide accounted for 36% of all retail pharmacies—far larger than any individual PBM-affiliated pharmacy and larger than each other retail pharmacy type (*i.e.*, traditional chains, supermarkets, and mass merchants). In 2024, independent pharmacies dispensed about $100 billion worth of prescription drugs nationwide, including billions of dollars in revenue from Tennessee patients.

78. Tennessee is already a particularly favorable State for independent pharmacies. Over the past decade, the State has enacted many new regulations that tend to favor independent pharmacies relative to PBM-affiliated pharmacies and other chain pharmacies. This thumb on the scale has already materially changed the landscape. There are more independent pharmacies today in Tennessee than in 2020. And low-volume independent pharmacies, in particular, have grown 20% since Tennessee has implemented a new reimbursement rate (one of the highest in the country), ensuring that these pharmacies will always receive at least the actual acquisition cost of the drug, which all independent pharmacies must receive, plus a dispensing fee. *See* Tenn. Code. Ann. § 56-7-3206.

**B. CVS Serves Tennessee Patients**

79. CVS is proud of its significant contributions to Tennessee's economy. CVS employs over 6,000 Tennesseans, and the company supports more than twice as many Tennesseans once indirect and induced jobs are taken into account. All told, CVS estimates that it contributed over $4.2 billion to the State's economy in 2024, and the company paid nearly $300 million in state and local taxes.

23

80. CVS currently operates 134 retail pharmacies in Tennessee. In 2025, these retail locations filled 26.5 million prescriptions for 1.4 million Tennesseans. And 25 of these retail pharmacies feature Minute Clinics, which are CVS-operated walk-in clinics that provide high-quality care for common family illnesses. CVS also operates a distribution center in Knoxville that employes hundreds of Tennesseans.

81. Under Tennessee law, a retail pharmacy must maintain a license from the Board of Pharmacy. Tenn. Comp. R. & Regs. 1140-01-.08(1); *see* Tenn. Code Ann. § 63-10-204(36). All 134 CVS retail pharmacies maintain licenses to provide pharmacy services in Tennessee. CVS's distribution center also maintains a license from the Board of Pharmacy, which it needs to operate.

82. CVS also offers mail-order pharmacy services to Tennessee patients. CVS's mail-order pharmacy facilities are not located in Tennessee. Instead, all pharmaceutical products delivered through CVS's mail-order business to Tennessee residents are shipped into the State from pharmacies located in other States. In 2025, CVS filled nearly one million mail-order prescriptions for nearly 70,000 patients in Tennessee.

83. Tennessee law requires mail-order pharmacies based outside the State to maintain a license from the Board of Pharmacy to distribute prescriptions within the State. Tenn. Comp. R. & Regs. 1140-01-.08(3); *see* Tenn. Code Ann. § 63-10-210.

84. CVS also operates two specialty pharmacies in Tennessee, which collectively employ over 800 Tennesseans. Over the last year, CVS's specialty pharmacies filled 354,000 specialty prescriptions for 49,000 patients in Tennessee.

85. Like retail and mail-order pharmacies, specialty pharmacies must hold pharmacy licenses and comply with Tennessee laws and regulations governing pharmacy services. Tenn. Comp. R. & Regs. 1140-01-.08(1).

24

86. Without the necessary licenses, CVS pharmacies cannot dispense medications in the State.

87. Finally, Tennessee law also requires that PBMs maintain a license to operate in the State, which Caremark does. As a condition of its license, Caremark must abide by Tennessee laws and regulations that govern not only its conduct as a PBM generally, but also its interactions with pharmacies. *See infra* Section D.

**C.      The Act's Prohibition On PBM-Affiliated Pharmacies**

88. The Act adds a new section to Title 63 of the Tennessee Code. That section provides that, starting on July 1, 2028, a "person or entity" cannot "[d]irectly or indirectly own, operate, control, or direct the operation of" a pharmacy, a health insurance issuer, and a PBM. Tenn. Code Ann. § 63-10-3[](b). The Act defines PBM to have the same meaning as in § 56-7-3102, and specifies that the term does not include "a hospital or health-system pharmacy." *Id.* § 63-10-3[](a)(6), (d)(1). It defines "[h]ealth insurance issuer" to have the same meaning as defined in § 56-7-2802. *Id.* § 63-10-3[](a)(4).

89. The Act has three exceptions. First, it "does not apply to an FDA-designated orphan drug with limited distribution, or to a drug that is subject to an FDA-required risk evaluation and mitigation strategy (REMS) that includes limited distribution." Tenn. Code Ann. § 63-10-3[](d)(3). Second, it "does not prohibit an employer from owning or operating a pharmacy or administering pharmacy benefits solely for its own employees, retirees, and dependents under an employee benefit plan." *Id.* § 63-10-3[](i). Third, it "does not apply to pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program." *Id.* § 63-10-3[](j).

90. Pharmacies that are affiliated with a PBM may receive a one-time extension to operate until December 31, 2028, but only if they can demonstrate to the Board of Pharmacy's

25

satisfaction that they are pursuing a "bona fide sale" to an "unaffiliated entity."  Tenn. Code Ann. § 63-10-3[](e).  The Board of Pharmacy can grant an extension, "not to exceed six (6) months, upon proof of substantial progress toward completion of" a divestiture.  *Id.*

91.     The Board of Pharmacy is authorized to promulgate rules to effectuate the Act and can refer potential violations to the Attorney General.  Tenn. Code Ann. § 63-10-3[](f)(2).  The Attorney General is authorized to enforce the Act.  *Id.* § 63-10-3[](f)(1).  Pharmacies in violation of the Act are subject to civil penalties of up to $10,000 per violation per day.  *Id.* § 63-10-3[](f)(3).

92.     In crafting the Act, the General Assembly tracked Arkansas's earlier effort to expel out-of-state pharmacies, but sought to avoid the more obvious discriminatory remarks that supported the District Court's grant of a preliminary injunction finding the law unconstitutional.  *See Express Scripts, Inc. v. Richmond*, 2025 WL 2111057 (E.D. Ark. July 28, 2025).  The Act's Senate sponsor, Senator Harshbarger, proudly noted that he would "try to learn from what Arkansas has done" and that he had studied the Arkansas litigation to determine whether "there [are] potential loopholes" that Tennessee could exploit to accomplish the same result.[5]

93.     But Senator Harshbarger's search apparently came up empty.  The Act replicates the Arkansas law in nearly every material respect and achieves the same practical effect of expelling out-of-state competitors from the market.  Aside from adding the health insurance issuer language to protect favored Tennessee businesses, the main difference is that the Act's preamble tries to disguise the General Assembly's true objective.  Rather than openly championing the interests of local pharmacies, the preamble claims that the bill "eliminat[es] the conflict of interest inherent when a pharmacy benefits manager both sets and receives reimbursement." Tellingly, that

---

[5] Jeff Keeling, *Crowe decries 'dark money' ads calling him out on pharmacy bill*, WJHL TRI-CITIES (Apr. 8, 2026), https://www.wjhl.com/news/your-local-election-hq/crowe-decries-dark-money-ads-calling-him-out-on-pharmacy-bill/.

has nothing to do with owning a health insurer. Nor can that supposed purpose be reconciled with an in-state PBM, which is owned by local independent pharmacists, being carved out of the Act's scope.

94. But even the preamble's ostensibly consumer-facing language betrays its true aim. The General Assembly's stated goals of "promoting patient choice" and "protecting rural and community pharmacy access" conflict with the law's actual and obvious effect of reducing patient choice and narrowing pharmacy access in rural communities by banning PBM-affiliated pharmacies. And the preamble's assurance that the Act should "not be construed to prohibit any duly licensed, unaffiliated pharmacy from providing mail-order, specialty, or delivery-based services under new, unaffiliated ownership" makes the point explicit. The Act seeks to transfer pharmacy services from out-of-state competitors to local independents.

95. If the Act goes into effect, it will expel over 160 PBM-affiliated pharmacies (including 136 CVS-affiliated pharmacies) from operating in Tennessee.

**D.      The Act's Pretextual Professed Benefits**

96. The Act's stated purpose is to "eliminat[e] the conflict of interest inherent when a pharmacy benefits manager both sets and receives reimbursement" and to prevent "steering of patients to PBM-owned entities."

97. The problem with these claimed purposes is that Tennessee already has existing PBM laws that fully address all of these purported issues. For instance, with respect to PBMs' claimed conflicts of interest, Tennessee already prohibits PBMs from preferring affiliated pharmacies by requiring that non-affiliated pharmacies receive the same reimbursement as affiliated pharmacies for the same goods or services. Tenn. Code Ann. § 56-7-3118(d).

98. In addition, Tennessee sets more general price floors for reimbursement, requiring PBMs to reimburse all pharmacies an amount at least equal to the actual cost for that pharmacy's

27

dispensing of the prescription drug. *Id.* § 56-7-3206(c)(1). And Tennessee also requires PBMs to pay a minimum dispensing fee to low-volume pharmacies of $13.16 per prescription. *Id.* § 56-7-3206(f). Finally, Tennessee prohibits PBMs from engaging in spread pricing—charging a health plan more than what it reimburses a pharmacy for a medication and retaining the difference. *Id.* § 56-7-3206(b).

99. With respect to steering, Tennessee prohibits PBMs from implementing plan designs that require or incentivize patients to utilize an affiliated pharmacy. Tenn. Code Ann. § 56-7-3120(b). Also, a PBM cannot prohibit any pharmacy in the State from participating in its network if the pharmacy agrees to the same network terms and conditions. *Id.* § 56-7-3121(b).

100. Tennessee law also establishes strong oversight and enforcement mechanisms for these mandates. For example, PBMs must implement a process for aggrieved pharmacies to appeal reimbursement decisions. Tenn. Code Ann. § 56-7-3206(c)(2)(A). These internal appeal procedures must follow strict regulatory requirements that are approved by the Commissioner of the Department of Commerce and Insurance ("Commissioner"). *Id.* § 56-7-3206(c)(2)(B); Tenn. Comp. R. & Regs. 0780-01-95-.03(5). If an appeal is upheld, the PBM must increase the reimbursement amount for both the appellant and "similarly situated pharmacies." Tenn. Code Ann. § 56-7-3206(c)(3); Tenn. Comp. R. & Regs. 0780-01-95-.04(3)–(4). If the appeal is denied, the PBM must facilitate the pharmacy's efforts to obtain the drug at a lower cost. Tenn. Code Ann. § 56-7-3206(c)(4); Tenn. Comp. R. & Regs. 0780-01-95-.04(5). Further, a pharmacy that alleges it did not receive at least its actual cost for a drug after resolution of the internal appeal has the right to appeal the PBM's decision to the Commissioner. Tenn. Code Ann. § 56-7-3206(g)(2); Tenn. Comp. R. & Regs. 0780-01-95-.06. And "all costs associated with conducting an appeal . .

28

. including the expense of the Department, shall be paid by the applicable PBM." Tenn. Comp. R. & Regs. 0780-01-95-.06(11).

101. PBMs are also subject to audits by the Commissioner to "ensure compliance with" these laws and regulations. Tenn. Code Ann. § 56-7-3101; Tenn. Comp. R. & Regs. 0780-01-95-.11(1). During an audit, the Commissioner may review the PBM's documents and examine personnel under oath. Tenn. Comp. R. & Regs. 0780-01-95-.11(2)–(3). If an audit reveals any violations, then the PBM must take action to cure the violation. *Id.* § 0780-01-95-.11(9). In addition, the Commissioner may fine the PBM a substantial sum for a violation. *See* Tenn. Comp. R. & Regs. 0780-01-95-.16(2).

102. Given the flawed factual predicates underlying the Act, the pervasive regulation of PBMs under Tennessee law, and the ample remedial mechanisms available to address any legitimate concerns, it is impossible to conclude anything but that the General Assembly's asserted justifications for prohibiting PBM-affiliated pharmacies in Tennessee are pretextual.

**E. The Act's Discriminatory Purpose**

103. The legislative history and the public record reveal that the Act was enacted to protect local independent pharmacies from out-of-state competition.

104. House Speaker Cameron Sexton, in a committee meeting, urged his colleagues to support the bill, explaining that it would "protect independent pharmacies in [their] community" and "keep independents in business."[6]

105. In a House Floor session and in a committee meeting, Representative Fritts described the law as a "good way to stand up for our [i.e., Tennessee's] small independent

---

[6] Robert Schmad, *Tennessee lawmakers push bill that could make them, and their donors, richer by triggering CVS closures,* WASHINGTON EXAMINER (Mar. 10, 2026), https://vip-stage.washingtonexaminer.com/news/investigations/4483377/tennessee-lawmakers-donors-pharmacies-bill-triggering-cvs-closures/.

pharmacies," apparently determining that these "local independent pharmacies" needed the State's protection to avoid being "force[d] . . . out of business."

106. In a House committee meeting Representative Kumar likewise described the Act as a way for the State to "preserv[e]" independent pharmacies "against the big chains," noting that the law would "restore" the "balance" that existed before a "number of neighborhood pharmacies" in the State closed.

107. Senator Harshbarger too, in a confidential memorandum to members of the General Assembly, was equally revealing on this point. In responding to concerns that the Act would cause job losses, Senator Harshbarger assured his colleagues that "[l]ocal ownership actually creates jobs by keeping pharmacy revenues within the community instead of corporate headquarters out of state." In other words, the Act seeks to redirect revenue from out-of-state companies to in-state businesses—the textbook definition of economic protectionism prohibited by the dormant Commerce Clause.

108. On social media, Senator Harshbarger repeated the same lines. He envisioned that the Act would prevent "local pharmacies" from being "squeezed out."[7]

109. Senator Crowe also emphasized that the Act "protects our community family pharmacies."[8]

110. And in a Senate Floor session, Senator Yager "urge[d]" his colleagues to "vote for independent pharmacies."

111. Many of the bill's proponents failed to heed Senator's Harshbarger's call to learn from the Arkansas case and simply admitted openly that the Act discriminated between in-state

---

[7] Bobby Harshbarger, FACEBOOK (Feb. 26, 2026), https://www.facebook.com/people/Bobby-Harshbarger-for-TN-Senate-District-4/100065133746037/.

[8] *Crowe pushes back on 'misleading' ad over drug pricing bill*, ELIZABETHTON STAR (Apr. 6, 2026), https://elizabethton.com/2026/04/06/crowe-pushes-back-on-misleading-ad-over-drug-pricing-bill/

and out-of-state pharmacies. In a February 25, 2026 Senate Health and Welfare Committee meeting, Johnetta Blakely, whose Tennessee-based practice dispenses prescriptions in competition with PBM-affiliated pharmacies, described the "independent pharmacist" as "the lifeblood of many rural Tennessee communities," and noted that "rural communities deserve to keep" these "local pharmacie[s]." She praised the Act for helping to "maintain these pharmacies in our communities." She complained about prescriptions being "filled outside of our State," claiming that "[t]hose pharmacists are not helping patients in our communities and certainly not in rural communities."

112. At the same Senate Health and Welfare Committee meeting, a local pharmacist speaking in support of the Act said that "this legislation strengthens community pharmacies." When asked by legislators what "practical effect[s]" he anticipated the Act would produce, he said that it would likely "provide more opportunities for a rural independent community pharmacy to be able to be open."

113. On March 4, 2026, another proponent of the Act told the House Insurance Subcommittee that PBMs were a "threat to survival of the locally owned pharmacies."

114. The Tennessee Pharmacists Association, which represents the in-state pharmacies that stand to gain the most from such protectionist legislation, was a major driver of the Act. In addition to donating significant funds to many of the Act's sponsors, the TPA published a brochure urging voters to ask their representatives "to support local pharmacies" by telling them to "vote YES on SB 2040." It agreed that the Act was needed to "save" the "Hometown Pharmacy."

115. And in an opinion piece published in *The Tennessean*, Anthony Pudlo, the CEO of the TPA, noted that the Act would "finally restore fairness" between "corporate behemoths" and

31

the "local pharmacies" they are "shuttering."[9]  Such rhetoric reveals that the Act was enacted to protect in-state pharmacies from out-of-state competition.

116.  Further evidence comes in the form of the overt comparisons that the Act's supporters made between the Act and the Arkansas law.  Although a federal court had held that the Arkansas law must be preliminarily enjoined for discriminating against interstate commerce, the TPA specifically praised the Act because it "[a]lign[s] Tennessee with Arkansas Act 624."[10]

117.  Opponents of the Act also called out its transparently protectionist aims.  A representative of the Pharmaceutical Care Management Association told the House Insurance Committee on March 10, 2026 that the Act "appear[ed] to provide preferential treatment to some in-state businesses over businesses that reside out of the State" and was akin to the "government picking winners and losers."  He inquired rhetorically, "[W]ho is this law intended to benefit? Is it the Tennessee patients or pharmacy owners here in the State?"  It is clear it is the latter, several of whom also hold seats in the Legislature.

118.  The opponents also blasted the bill for its similarities with the Arkansas law.  In a House floor session, Representative Robert Stevens argued that Tennessee was going to "end up in the same type of lawsuit that Arkansas ended up in" and "probably be on the losing end."  That would be so because, as Senator John Stevens explained, the law purposefully sought to "protect independent pharmacies in [the Tennessee] community."  Representative Mitchell echoed these concerns, stating that "we're gonna be in federal court, and we're gonna lose."

---

[9] Anthony Pudlo, *Restoring fairness to Tennessee's rigged pharmacy market*, THE TENNESSEAN (Apr. 6, 2026), https://www.tennessean.com/story/opinion/contributors/2026/04/06/big-pbms-fairrxact-tennessee-pharmacies-disappear/89463998007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=undefined&gca-ft=0&gca-ds=sophi.

[10] Drew C. Robinson, *Legislation aims to aid local pharmacies, restrict PBMs*, CITIZEN TRIBUNE (Apr. 5, 2026), https://www.citizentribune.com/news/politics/legislation-aims-to-aid-local-pharmacies-restrict-pbms/article_cc823c3e-92dc-4a0d-8e5d-a516bc0c765b.html.

**F. The Act's Effect On CVS's Pharmacy Operations And Patients It Serves**

119. CVS Health is the ultimate parent of Caremark, a licensed PBM, along with CVS Pharmacy and Aetna Inc., a health insurance issuer.

120. It is not logistically or economically feasible for CVS Health to rearrange its business structure to comply with the Act while continuing to provide pharmacy services in the State. Compliance would require restructuring CVS's corporate form so that one entity does not "[d]irectly or indirectly own, operate, control, or direct the operation of" Caremark, Aetna, and CVS Pharmacy. But such affiliation is inherent in the nature of CVS's business. CVS Health provides PBM services and operates thousands of pharmacies around the country. And restructuring would require the company to unwind its acquisition of either Caremark or Aetna, which were both reviewed and approved by federal regulators and became fully integrated into the business enterprise many years ago.

121. Thus, if the Act goes into effect, then CVS will have to either close or divest its pharmacies in Tennessee. This forced divestiture would include CVS's 134 retail pharmacies. In 2025 alone, those pharmacies served nearly 1.5 million patients, filling about 26 million prescriptions.

122. The Act will also force the closure or sale of the retail locations in their entirety—not just the pharmacy operations. That is because CVS's retail business model depends entirely on the pharmacy business to drive foot traffic to its retail stores.

123. Similarly, the Act will also, as a practical matter, force CVS to shutter its 25 Minute Clinics, which provide preventative and urgent care services to Tennesseans throughout the State at a convenient location and for an affordable price. These Minute Clinics served hundreds of thousands of Tennessee patients last year.

33

124. The Act will also require CVS to cease its mail-order pharmacy operations in the State. In 2025, CVS entities filled nearly one million mail-order prescriptions that were delivered to nearly 70,000 patients in Tennessee. CVS is one of the leading mail-order pharmacies at both the state and national levels, leveraging its nationwide scale to negotiate discounts against powerful drug manufacturers for the benefit of patients.

125. Such closures will have a significant impact on the nationwide ERISA plans that rely upon the mail-order pharmacy operations. Some plan sponsors require members to fill certain prescriptions by mail because it is more cost effective. Mail-order fulfillment also promotes patient adherence to pharmaceutical care, and some plan sponsors may choose to encourage or require the use of mail-order fulfillment. For other plans, members choose to fill their prescriptions by mail for reasons including capacity, cost, or convenience. Some members may not be able to travel regularly to a physical pharmacy to fill their prescriptions because they live too far away from one or because of a physical or medical limitation. Other members might elect to use a mail-order pharmacy because it is more affordable than filling a prescription at a retail pharmacy. And many members simply enjoy the convenience of having their prescription delivered to their front door.

126. The Act also will force CVS to close its specialty pharmacies in Tennessee. For patients with complex and chronic conditions who require a specialty medication with special handling or administration, pharmacists play a particularly sensitive role. They provide personalized support to patients, and often coordinate closely with care teams, including nurses, doctors, and care managers to answer questions, monitor treatment, and provide resources to support the patients and help them manage their condition.

34

127. Over the last year, CVS's specialty pharmacies filled 354,000 specialty prescriptions for 49,000 patients in Tennessee. Among those prescriptions, 70,300 (roughly 20%) were for limited distribution drugs or exclusive distribution drugs, specialty medications distributable only by select pharmacies that satisfy the drug manufacturers' stringent requirements.

128. Only certain pharmacies can meet the requirements for these products, which typically treat high-risk patient populations and need high-touch services to maximize the safety and efficacy of the drug. For example, manufacturers may require selected specialty pharmacies to possess accreditations from recognized organizations, dedicated employees trained in rare conditions associated with the product, advanced data and analytics capabilities, around-the-clock patient support services, and the ability to serve the entire patient population throughout the country. Unlike PBM-affiliated pharmacies with national scale, local pharmacies typically lack the capabilities and expertise needed to serve these complex patients.

129. The Act does not apply to an "FDA-designated orphan drug with limited distribution, or to a drug that is subject to an FDA-required risk evaluation and mitigation strategy (REMS) that includes limited distribution." Tenn. Code Ann. § 63-10-3[](d)(3). But not all specialty medications fall within this definition.

130. Approximately 70% of the limited distribution drugs CVS specialty pharmacies offer do not fall under this exception. An even larger percentage of CVS specialty pharmacies' overall drug offerings are not within the exception. In any event, even if CVS were able to keep its specialty pharmacies located in Tennessee open dispensing only the small fraction of specialty medications that the Act allows or mail them into the State, the Act seemingly prohibits even this because it appears that it would still deny the specialty pharmacies a license simply due to the corporate structure of CVS.

35

131.     That creates a serious problem for Tennessee patients who rely on specialty drugs that fall outside the Act's exceptions.  Many of these drugs are distributed only by the targeted-out-of-state pharmacies.  In fact, dozens of these specialty drugs are currently distributed solely by companies that the General Assembly has expelled from the Tennessee market.  These drugs are needed to treat severe diseases and illnesses such as cancer and drug-resistant HIV, yet the Act bars the only pharmacies that currently can distribute them in Tennessee from doing so.  For example, CVS is the primary provider of Sunlenca, a treatment option for people living with multi-drug resistant HIV.  Sunlenca is neither subject to a REMS nor an FDA-designated orphan drug. The same holds true for Balversa, a drug used to treat patients suffering from locally advanced or metastatic bladder cancer.  CVS will no longer be permitted to distribute Sunlenca or Balversa in Tennessee once the Act takes effect, and patients who are dependent on the drugs could lose access to these life-altering treatments in Tennessee.

132.     Even assuming specialty pharmacies affected by the Act could remain in business, the carveout for specialty medications will still disrupt the lives of many patients in the State. Consider, for instance, those patients who suffer multiple diseases that travel together.  Some of those diseases might require medications subject to Risk Evaluation and Mitigation Strategies ("REMS")[11] or other orphan drugs that can be filled only through a specialty pharmacy, while other associated diseases require separate drugs that must, under the Act's terms, be filled at a different pharmacy.  Some of the REMS and orphan drugs require concomitant medications. Under these circumstances, the Act will likely force some of the sickest patients in Tennessee to visit multiple pharmacies to fill their needs, if they can get access at all.  Clinical support services will also be more fragmented, leading to worse care and more adverse events for patients.

---

[11] REMS are FDA-required safety programs for high-risk medications that ensure the benefits outweigh the risks by managing serious, adverse events.

133. Many of the patients affected by the closure of CVS's pharmacy operations are Medicare participants. Over the last year, CVS retail pharmacies filled 9.3 million prescriptions for 240,000 Medicare beneficiaries in Tennessee. Over the same time period, CVS mail-order pharmacies filled over 488,000 prescriptions for 25,000 Medicare beneficiaries in Tennessee. CVS specialty pharmacies filled over 54,000 prescriptions for 6,700 Medicare beneficiaries in Tennessee over the last year, including 15,400 prescriptions for limited distribution and exclusive distribution drugs. Some limited distribution and exclusive distribution drugs without competitive alternatives available were prescribed to Tennesseans, distributed solely by the impacted out-of-state entities, are covered by Medicare Part D plans, and not carved out by the Act.

134. The impact of these changes on CVS, its employees, Caremark's clients, and the patients they serve will be substantial. The Act will place at risk approximately $3.7 billion in annual Tennessee revenue and will result in hundreds of millions of dollars in losses, including over $400 million in asset write-offs and impairment associated with CVS's Tennessee operations. These losses include the destruction of substantial physical and intangible assets and long-term lease commitments tied to CVS's integrated pharmacy operations.

135. The closure of CVS pharmacy operations in Tennessee will hurt communities across the State. CVS employs more than 6,000 Tennesseans, and many of them will lose their jobs if CVS is forced to close its pharmacies in the State.

136. The Tennessee Department of Finance and Administration, which administers state and local government employee benefit plans, estimates that the Act will cause cost increases to Tennessee and its pharmacy plans of about $29.1 million annually. TennCare, Tennessee's Medicaid program, expects to see cost increases of over $60 million annually. The closure of CVS's Tennessee pharmacies will likewise increase costs for private Tennessee employers and

37

plan sponsors. The reduction of both existing and future pharmacy competition, decreased pharmacy access for patients, and blocking of healthcare services are further expected to result in higher healthcare costs and worse health outcomes for Tennesseans. As the Commissioner of Finance & Administration testified at a Finance Ways and Means Committee Meeting, "[m]ost of this cost is incurred by having fewer retail pharmacies in the network."

137. Each of the nearly 1.5 million Tennesseans who relied on CVS retail pharmacies to fill prescriptions in 2025 will face the disruption of being told they need to secure pharmacy services elsewhere going forward. The same is true of the nearly 70,000 patients who rely on CVS's mail-order pharmacy service to deliver their prescription drugs to them, and the more than 49,000 patients who use CVS's specialty pharmacies.

**G.      The Act Benefits Hometown Pharmacies To The Detriment Of Out-Of-State Pharmacies**

138. All of the pharmacies affected by the Act are owned by out-of-state companies. If the Act is permitted to go into effect, those companies will be obliged either to cease operations or divest, and to leave their millions of patients looking to fill tens of millions of prescriptions elsewhere. Of course, that is entirely the point. The Act is intended to provide Tennessee's in-state pharmacies with the opportunity to obtain hundreds of millions of dollars in market share overnight, either by purchasing CVS's stores at a forced-sale discount or by taking in the patients whose established pharmacies had been driven from the market.

139. Despite claiming to oppose conflicts of interest, several of the State's lawmakers, including certain key Senate sponsors of the bill, stand to personally enrich themselves and their family members from the enforcement of the Act. For example, Senator Harshbarger, the author and lead sponsor of the Act, manages his family-owned independent pharmacy—the very type of business he promised would benefit from the Act by "keeping pharmacy revenues within the

38

community instead of corporate headquarters out of State." Senator Reeves, one of the Act's co-sponsors, owns a healthcare company that dispenses infused drugs and competes with CVS pharmacies. Senator Haile, the Speaker Pro Tempore and one of the Act's co-sponsors, used to own an independent pharmacy in Tennessee. He also served as a board member of American Pharmacy Cooperative, Inc., which sells products and services to independent pharmacies and states that its "mission is to represent the economic and professional interests of independent pharmacies[.]". And Lt. Gov. McNally, a retired hospital pharmacist, co-sponsored the Act, which includes a carveout for hospital pharmacies. *See* Tenn. Code Ann. § 63-10-3[](d)(1).

140. Unsurprisingly, most of the Act's Senate sponsors received campaign donations directly from the trade associations representing the in-state pharmacies that stand to profit from the Act. Senators Harshbarger, Reeves, and Haile and Lt. Gov. McNally all received campaign donations from the American Pharmacy Cooperative, which exists to "protect and promote the interests of independent pharmacy." Senators Reeves, Haile, and Yager and Lt. Gov. McNally all received campaign donations from the Tennessee Pharmacists Association, a fierce local advocate of the Act. Several lawmakers have also "accepted thousands of dollars more from individual independent pharmacists and pharmacies."[12]

141. The sponsors in the General Assembly's lower chamber have conflicts as well. The wife of Representative Scarborough, who is the lead House sponsor of the Act, co-owns a drug store down the street from a CVS. The wife of Speaker Sexton, one of the Act's co-sponsors, is a pharmacist and member of the TPA.

142. In fact, one of the chief advocates for the Act admitted that the best way to pass this legislation is to elect legislators who stand to personally profit from it. Anthony Pudlo, CEO of

---

[12] Schmad, *supra* note 5.

the TPA, recently advised on a podcast that other States could follow Tennessee's lead by putting "a lot of pharmacists" or "spouses of pharmacists" in the "General Assembly." After all, he explained that the independent pharmacists in Tennessee's General Assembly were the "key champions" that caused the "stars to align."[13] Mr. Pudlo was content to say the quiet part out loud.

**H.  The Act Disrupts Pharmacy Networks For Hundreds Of Employer-Sponsored Benefit Plans That Provide Pharmacy Coverage In Tennessee**

143.  There are roughly 1,500 Caremark-serviced ERISA plan clients who provide coverage in Tennessee. As many as 830,000 Tennesseans use these Caremark-serviced ERISA plans to access much-needed pharmaceutical medications. The Act threatens to disrupt this access in contravention of ERISA's clear prohibition on state laws that relate to employee benefit plans.

144.  Many Caremark-serviced ERISA plan clients tailor their benefit plan designs to address their members' access to costly medications, particularly medications needed to treat chronic conditions such as high blood pressure or high cholesterol. For example, many employers prefer plan designs that incentivize or require members with chronic conditions to order 90-day supplies at mail-order pharmacies, and plan designs that require members who need costly specialty drugs to obtain them exclusively from specialty pharmacies across the nation.

145.  The Act will dramatically disrupt these programs in Tennessee. For example, there are plans that design their specialty networks to narrowly include only a handful of specialty pharmacies that primarily mail prescriptions from a few pharmacies throughout the nation. These pharmacies located outside Tennesee need a pharmacy license to ship medicine into Tenneseee. For maintenance medication programs, many of the pharmacies where members can receive the discounted mail-order rates will not be able to serve Tennessee patients as a result of the Act. If

---

[13] Independent Rx Forum, *Unmaking the Middleman: Tennessee's Fair Rx Act*, Spotify (May. 5, 2026) (statement of Anthony Pudlo).

the Act is allowed to proceed, then plan members will lose access to their current pharmacy networks, causing significant disruption for plan administrators and members alike.

146. The Act's impact on employee benefit plans, which the Act makes specific reference to, will be significant—especially for regional or national employers and their ability to offer or administer uniform benefits to employees across the country. Under the Act, employee benefit plans will be forced to either create Tennessee-specific carve outs or to rearrange their pharmacy networks to meet Tennessee's outlier requirements. In other words, the Act allows Tennessee to dictate how ERISA plans design their benefits and pharmacy networks by removing key PBM-affiliated pharmacies as viable plan options, disrupting administrability and infringing upon a central matter of plan administration. This is exactly what ERISA was enacted to prevent.

147. And certain Tennesseans depend on select limited distribution and exclusive distribution drugs that are covered by ERISA plans and distributed solely by the impacted out-of-state entities. Because the Act prohibits the PBM-affiliated pharmacies from serving Tennessee patients, it will effectively prevent ERISA plans from providing coverage to certain drugs that they otherwise would cover.

148. If other States pass laws like the Act, the resulting impact on the administration of nationwide employee benefit plans would be profound. And that is no empty concern. Senate co-sponsor Tom Hatcher predicted on social media that "if Tennessee passes this law, it could become a blueprint for PBM reform across the country."[14]

---

[14] Tom Hatcher, FACEBOOK (Mar. 15, 2026, 8:15 AM), https://www.facebook.com/profile.php?id=100095765461206.

41

## I. The Act's Disruption Of Pharmacy Networks For Medicare Advantage Plans And Medicare Part D Plans

149. Caremark provides pharmacy benefit management services to Medicare Advantage Prescription Drug ("MA-PD") plans and standalone Medicare Part D plans that operate in Tennessee.

150. Federal law imposes detailed requirements on MA-PD and Part D plans to ensure that beneficiaries have adequate access to covered prescription drugs, and PBM-administered pharmacy networks are a central mechanism by which plans satisfy those requirements. The Act would undermine that framework by effectively excluding PBM-affiliated pharmacies from participating in those networks within Tennessee.

151. Excluding those pharmacies would materially affect plan operations and beneficiary access. PBM-affiliated pharmacies play a significant role in the delivery of prescription drug benefits under many Medicare plans, including as "preferred pharmacies" in certain Part D networks. Beneficiaries who use preferred pharmacies typically receive lower cost-sharing for the same medications than they would at non-preferred pharmacies. By removing PBM-affiliated pharmacies from these networks, the Act would deprive Tennessee beneficiaries of those lower-cost options.

152. In addition, Medicare Part D plans cover select limited distribution and exclusive distribution drugs that are currently distributed solely by the PBM-affiliated pharmacies. Expelling the PBM-affiliated pharmacies will block access to these covered Medicare Part D drugs in Tennessee.

153. Congress enacted a comprehensive federal regime governing Medicare Advantage and Part D plans, including standards governing pharmacy networks, beneficiary access, formularies, and drug coverage. That framework does not permit States to impose categorical

42

restrictions on the use of PBM-affiliated pharmacies in the administration of Medicare benefits. Nor does it permit a State to limit access to covered drugs or interfere with plans' drug formulary decisions.

## CLAIMS FOR RELIEF

## COUNT I

### (Violation of dormant Commerce Clause)

154.    CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

155.    Under the Articles of Confederation, "each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 571 (1997).  But this latitude proved self-destructive as the States engaged in a protectionist race to the bottom that "cut[] off the very life-blood of the nation." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019) (quotation and citation marks omitted).  One of the central reasons for the adoption of the Constitution was to reverse this economic balkanization. *See id.* at 516 ("[W]hen the Constitution was sent to the state conventions, fostering free trade among the States was prominently cited as a reason for ratification.").

156.    More than a century of settled Supreme Court precedent has reinforced the anti-protectionism principles that the Founders embedded in the Commerce Clause. *Tenn. Wine & Spirits*, 588 U.S. at 516-18.  That precedent holds that a State may not use "its regulatory power to protect its own citizens from outside competition." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980).  "[N]o State may use its laws to discriminate purposefully against out-of-state economic interests." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 364 (2023).

157. A law is discriminatory under the dormant Commerce Clause if it "differentiat[es] between 'in-state and out-of-state economic interests' to benefit the former and burden the latter." *Energy Mich., Inc.*, 126 F.4th at 486 (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (2005)). The Sixth Circuit "recognize[s] three ways a state law can violate the antidiscrimination rule: facially, purposefully, or in practical effect." *Id.* at 487. A statute discriminates facially if it "'expressly' differentiates to favor in-state 'commerce or entities' at the expense of out-of-state comparators." *Id.* (quoting *Truesdell v. Friedlander*, 80 F.4th 762, 769 (6th Cir. 2023)). A statute discriminates purposefully if "the purpose of the legislation was to discriminate against out-of-state interests." *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 803 (6th Cir. 2005). A statute discriminates in effect if it "create[s] new market conditions that depend on geography." *Energy Mich.*, 126 F.4th at 487. If a law discriminates against interstate commerce in any of these three ways, it "is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 370 (6th Cir. 2013) (quoting *Dept. of Revenue of Ky. v. Davis,* 553 U.S. 328, 328 (2008)).

158. The Act discriminates against interstate commerce in its purpose.

159. In determining whether a law was enacted with a discriminatory purpose, the Sixth Circuit considers "not only . . . the statute itself, but also the legislative history and legislative intent." *Am. Beverage Ass'n*, 735 F.3d at 371. The legislative history reveals the lawmakers' efforts to protect local independent pharmacies from out-of-state competition. Indeed, they openly described the law as a "good way to stand up for [Tennessee's] small independent pharmacies," deeming these "local independent pharmacies" in need of the State's protection to avoid being "force[d] . . . out of business." They sought to "preserve" the "neighborhood pharmacies" against the "big chains." And the bill's proponents exhibited animus toward pharmacists "outside of our

44

state" and predicted that the Act would "provide more opportunities for . . . independent community pharmac[ies]."

160. A law's discriminatory intent can also be inferred if the legislator's stated purpose is not "legitimate" or can "be adequately served by nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988). Both are true here. The Act's stated purpose is to "eliminat[e] the conflict of interest inherent when a pharmacy benefits manager both sets and receives reimbursement" and to prevent "steering of patients to PBM-owned entities." Despite that stated purpose, the Act cleanly carves out an in-state PBM that is "owned and operated" by local independent pharmacists from its scope. And Tennessee law already addresses the purported issues, and there is no additional evidence that any such problem exists. Indeed, consistent with Tennessee law, Caremark on average reimburses independent pharmacies in Tennessee at a higher rate than it does CVS pharmacies. And nearly half of Caremark's in-network pharmacies in Tennessee are independent.

161. Further, not only *could* the General Assembly's purpose be served by nondiscriminatory alternatives—it *is*. Tennessee laws already on the books bar PBMs from disfavoring nonaffiliated pharmacies in both reimbursement and plan design. And the State enforces those laws, including against CVS. The State's reliance on a heavy-handed ban on PBM-affiliated pharmacies altogether when it has nondiscriminatory and tailored alternatives already in place confirms that Tennessee's true goal was to shore up its local pharmaceutical industry at the expense of out-of-state competitors.

162. The Act also discriminates against interstate commerce in its effect.

163. The Act bars only out-of-state businesses from participating in the Tennessee marketplace. The State has not pointed to a *single* Tennessee-based pharmacy that will be affected

by the Act's prohibition. By contrast, 136 CVS retail and specialty pharmacies will close, and many out-of-state pharmacies that offer mail-order services will be prohibited from delivering medicine to Tennessee. As these entities are forced out of the market, in-state pharmacies will swiftly reap the windfall.

164. It is true the Act permits some out-of-state pharmacies to continue operating in Tennessee. But the benefits to some out-of-state firms "cannot be viewed separately from the much greater disadvantages that [a law] imposes on out-of-state [companies]." *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 13 (1st Cir. 2010); *see Energy Mich.*, 126 F.4th at 487 (noting that the "magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred") (quotation marks omitted).

165. In addition, even "a neutral law can still violate the dormant Commerce Clause if its interstate burdens exceed its local benefits under the 'balancing' test from *Pike*, U.S. 137 (1970)." *Truesdell* v. *Friedlander*, 80 F.4th 762, 764 (6th Cir. 2023). Under the *Pike* test, "the extent of the burden [on interstate commerce] that will be tolerated will . . . depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.

166. The Act imposes a significant burden on interstate commerce. It will force over 160 out-of-state pharmacies to close or divest, including CVS's 136 retail and specialty pharmacies. The Act will also require CVS and other out-of-state pharmacies to cease their mail-order pharmacy operations in the State.

167. This immense burden on interstate commerce cannot be justified by the Act's putative local benefits, as those aims could easily be promoted with a lesser impact on interstate activities. Indeed, Tennessee law already solves for the supposed problem the Act is purportedly

46

designed to rectify—the alleged harms that may follow when PBMs negotiate reimbursement rates with affiliated and unaffiliated pharmacies and the purported steering of patients to PBM-affiliated entities. Under Tenn. Code Ann. § 56-7-3118, PBMs are already prohibited from reimbursing affiliated pharmacies less than they reimburse non-affiliated pharmacies. And under Tenn. Code Ann. § 56-7-3120, PBMs are already prohibited from allowing certain plans to implement designs that require or incentivize patients to utilize an affiliated pharmacy.

168.    Because the Act discriminates against interstate commerce in its purpose and effect for no legitimate reason, it violates the dormant Commerce Clause.

**COUNT II**

**(ERISA Preemption)**

169.    CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

170.    ERISA includes a sweeping clause that preempts "any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

171.    Under this broad express preemption provision, ERISA preempts state laws that have any "connection with or reference" to ERISA plans. *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96-97 (1983). State laws are impermissibly connected with employee benefit plans if they implicate an "area of core ERISA concern"—for example, if they "require providers to structure benefit plans in particular ways," govern a central matter of plan administration, or interfere with nationally uniform plan administration. *Egelhoff v. Egelhoff*, 532 U.S. 141, 147-148 (2001); *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86-87 (2020); *see Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320-21 (2016); *see also McKee Foods Corp.,* 173 F.4th at 269 (holding ERISA preempted Tennessee law that restricted pharmacy network design and interfered with plan

47

administration).  Separately, a state law makes impermissible "reference to" ERISA plans where it "singles out ERISA employee welfare benefit plans for different treatment" by express reference. *Mackey v. Lanier Collection Agency & Serv., Inc*., 486 U.S. 825, 829-30 (1988).  The Act is preempted under both prongs.

172.    By prohibiting PBM-affiliated pharmacies from operating in Tennessee (with few exemptions), the Act categorically eliminates specific plan design options that the Sixth Circuit and the Tenth Circuit have recognized as "key benefit designs for an ERISA plan." *McKee Foods Corp.*, 173 F.4th at 264; *PCMA v. Mulready*, 78 F.4th 1183, 1198 (10th Cir. 2023).  The "scope and extent of a plan's pharmacy network" is "a central matter of plan administration," *id.*, and many ERISA-covered plans specifically choose designs incorporating PBM-affiliated pharmacies, whether retail, mail-order, specialty, or all of the above, to offer 90-day mail-order prescription fulfillment for maintenance medications, to channel specialty drugs through dedicated specialty pharmacies with the clinical infrastructure to manage complex therapies, and to yield cost savings for both plan sponsors and patients.  The Act takes these options off the table for virtually any plan that intends to offer coverage in Tennessee, effectively eliminating plan sponsors' discretion to shape benefits for their employees as they see fit.

173.    In response, employers that provide coverage across the nation will need to either incur the administrative costs of carving out Tennessee or alter their plans and the terms or scope of the plans' existing service provider arrangements to fit the State's specifications.  Either result is an impermissible intrusion on an area exclusively governed by federal law.  And if other States pass similar laws, it will be nearly impossible for plans to maintain the nationally uniform plan administration that is necessary for multi-state employers.  To accommodate competing jurisdictional obligations, sponsors of nationwide plans will need to redesign employee benefits,

including their pharmacy networks, on a state-by-state basis. That is an untenable result that runs directly contrary to ERISA's emphasis on supporting plan administrators, which must design benefits for employees across multiple jurisdictions.

174. The Act is independently preempted because it makes impermissible "reference to" ERISA plans. The Act's employer carveout provides that the Act "does not prohibit an employer from owning or operating a pharmacy or administering pharmacy benefits solely for its own employees, retirees, and dependents under an employee benefit plan." Tenn. Code Ann. § 63-10-3[](i). The term "employee benefit plan" is ERISA's precise statutory term of art. *See* 29 U.S.C. § 1002(3). By incorporating that term to define the boundaries of its own regulatory reach, the General Assembly legislated with direct reference to ERISA plan structures, drafting exceptions keyed to ERISA plan relationships. A state law that draws regulatory distinctions based on the existence of ERISA plans "refers to" those plans within the meaning of ERISA's preemption clause. *See Mackey*, 486 U.S. at 829-30; *Shaw*, 463 U.S. at 96-97. Moreover, the carveout's narrow scope underscores the Act's preemptive reach: it preserves only the case of a single employer operating a captive pharmacy for its own employees, not the far more common arrangement in which a plan sponsor contracts with a PBM to deliver benefits through an affiliated pharmacy network.

175. The Act also directly interferes with substantive plan benefits and drug coverage decisions. Some drugs that Tennesseans rely upon are covered by ERISA plans and distributed exclusively by the PBM-affiliated pharmacies. By barring the out-of-state entities from serving the Tennessee market, Tennesseans in these plans will lose drug access or be forced to travel to another State to obtain these drugs. As a result, the Act blocks access in Tennessee to drugs that

49

ERISA plans currently cover, forcing plans to consider modifications to drug coverage, if any alternatives are available, to specially accommodate Tennessee patients.

176. Because the Act intrudes on substantive plan design decisions, makes impermissible reference to ERISA-covered plans, and interferes with nationally uniform plan administration, it is expressly preempted by ERISA. *See* 29 U.S.C. § 1144(a).

## COUNT III

### (Medicare Preemption)

177. CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

178. The Medicare program provides federally funded health insurance benefits to individuals aged 65 and older and certain younger individuals with disabilities or specified conditions. The Medicare program originally consisted of two parts: Part A (for inpatient care) and Part B (for physician services, outpatient care, and other specified healthcare services). In 1997, Congress created Part C of the Medicare program, originally known as the Medicare+Choice program, under which beneficiaries could obtain Part A and Part B benefits through private managed care plans.

179. In 2003, Congress established the Medicare prescription drug benefit through the MMA. See Pub. L. No. 108-173, 117 Stat. 2066 (2003). The program, referred to as Medicare Part D, went into effect on January 1, 2006.

180. Medicare Part D provides subsidized prescription drug coverage to Medicare beneficiaries. Beneficiaries may obtain Part D coverage either through a stand-alone PDP or through an MA-PD plan. *See* 42 U.S.C. § 1395w-101(a).

181. Medicare's prescription drug benefit scheme employs "a market-based model under which marketplace competition ensures that enrollees receive low prices for prescription drugs." Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4244 (2005). Medicare beneficiaries obtain Part D coverage through private plan sponsors offering PDPs or MA-PD plans. *See* 42 U.S.C. § 1395w-101(a). Part D and MA-PD plan sponsors negotiate with pharmacies for competitive pricing and service arrangement. *See* 42 U.S.C. § 1395w-102(d) (requiring Part D plan sponsors to provide Part D beneficiaries "with access to negotiated prices"). These sponsors often act through PBMs in negotiating pricing and network arrangements. In turn, Part D and MA-PD plan sponsors compete for beneficiaries by offering different coverage options, with different ranges of potential out-of-pocket expenses.

182. In order to ensure that Medicare Advantage (including MA-PD) and Medicare Part D plans and benefits are subject to uniform federal rules, Congress adopted a broad express preemption provision. That preemption provision states: "The standards established under this part shall supersede any state law or regulation (other than state licensing laws or state laws relating to plan solvency) with respect to [Medicare Advantage and Part D plans] which are offered by [Medicare Advantage and Medicare Part D plan sponsors] under this part." 42 U.S.C. § 1395w-26(b)(3); *see also* 42 U.S.C. § 1395w-112(g) ("The provisions of sections 1395w-24(g) and 1395w-26(b)(3) of this title shall apply with respect to [Part D plan] sponsors and prescription drug plans under this part in the same manner as such sections apply to [Medicare Advantage] organizations and [Medicare Advantage] plans under part C [of this subchapter]."). This provision does not require a conflict between federal and state standards for preemption to apply. Instead, in enacting this provision, Congress "expand[ed] the scope of express Medicare preemption from conflict preemption to field preemption." *PCMA v. Wehbi,* 18 F.4th 956, 970-71 (8th Cir. 2021);

51

*Mulready*, 78 F.4th at 1206 ("[T]he sweeping Part D preemption clause is akin to field preemption[.]") (quotation marks omitted).

183. Congress intended federal regulation of such plans to be exclusive, broadly foreclosing state laws that could interfere with uniform, nationwide administration. *See* H.R. Rep. No. 108-391, at 557 ("[T]he [Medicare Advantage] program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency.").

184. Federal law also sets forth a comprehensive and detailed regulatory framework governing operation of MA-PD and Part D plans. *See, e.g.,* 42 C.F.R. § 423. These standards regulate core aspects of plan administration, including formulary design, beneficiary cost-sharing, negotiated drug pricing, pharmacy network competition, and beneficiary access to covered drugs. In practice, Part D and MA-PD sponsors administer these functions directly or through downstream entities such as PBMs, subject to extensive federal oversight.

185. The Act is not a mere licensing law. It directly impairs access in Tennessee to many drugs covered by Medicare Part D plans for the sickest and most vulnerable seniors. Medicare Part D plans cover many drugs distributed exclusively by CVS or other PBM-affiliated pharmacies. By barring these out-of-state entities from dispensing prescriptions in Tennessee through retail or mail, these seniors would need to travel to another State to obtain these drugs. As a result, the Act blocks access to drugs that Medicare Part D plans currently cover, directly conflicting with the Medicare requirement that plans must provide convenient access to covered Part D drugs.

186. Because the Act attempts to regulate a field that Congress has expressly occupied and directly conflicts with Medicare requirements, it is preempted by federal law.

52

## COUNT IV

## (Takings Clause)

187. CVS repeats and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

188. The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.

189. The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Accordingly, even where the government does not physically appropriate property, a regulation that "goes too far" in diminishing the value or use of property constitutes a compensable taking. *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Murr v. Wisconsin*, 582 U.S. 383, 392-94 (2017) (reaffirming that regulations that impair property rights can effect a taking).

190. Government action effects a compensable regulatory taking where, under the standards set forth in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978), it imposes severe economic impacts, interferes with reasonable investment-backed expectations, and alters the character of property rights in a manner functionally equivalent to a direct appropriation. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-39 (2005); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49 (2021) (holding that government appropriation of a property right constitutes a per se taking); *Tyler v. Hennepin County*, 598 U.S. 631, 638-40 (2023) (reaffirming that the Takings Clause protects retained property interests from uncompensated government appropriation).

53

191. The Act prohibits PBMs and their affiliates from owning or controlling pharmacies in Tennessee. As for CVS, it cannot continue providing pharmaceutical services in Tennessee unless it divests either its PBM operations or its health insurance offerings, both of which serve patients or plans in all 50 States. CVS owns substantial property interests in Tennessee, including physical retail pharmacy locations, specialty pharmacy operations, contractual rights, goodwill, and integrated business operations that depend on the lawful collaboration between CVS's pharmacies, PBM (CVS Caremark), and health insurance issuer (Aetna) to serve plans and patients.

192. The Act substantially impairs and devalues those property interests by forcing CVS to dismantle its vertically integrated business model or exit one side of its operations entirely. The law thus imposes a significant economic impact by destroying the value of CVS's integrated operations. See *Penn Cent. Transp. Co.*, 438 U.S. at 124 (identifying economic impact as a central factor).

193. By doing so, the Act interferes with CVS's reasonable, investment-backed expectations. CVS developed, acquired, and operated its integrated PBM–pharmacy model in reliance on longstanding legal frameworks that permitted such ownership structures, and has invested substantial capital in Tennessee on that basis. *See id.* at 124; *see also Kaiser Aetna v. United States*, 444 U.S. 164, 178-80 (1979) (recognizing the importance of reasonable investment-backed expectations).

194. The Act alters the fundamental character of CVS's property rights by prohibiting the company, under its existing and longstanding business, from continuing to operate its retail pharmacy operations in the State. Such a compelled cessation of operations, or a divestiture, bears the hallmarks of a taking where it is functionally equivalent to a forced appropriation or destruction

of a property interest. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015) (holding that a government mandate requiring surrender of property constitutes a per se taking); *see also Cedar Point Nursery,* 594 U.S. at 147-49.

195. The burdens imposed by the Act are not broadly shared. Instead, they fall disproportionately on a small number of entities, including CVS, that operate integrated PBM–pharmacy models. The Act thus forces CVS to bear costs alone. *See Armstrong*, 364 U.S. at 49.

196. The Act does not provide any just compensation for the substantial economic losses it imposes on CVS.

197. Accordingly, the Act effects an unconstitutional taking of CVS's property without just compensation, in violation of the Takings Clause of the Fifth and Fourteenth Amendments.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1) declare that the Act violates the Commerce Clause of the United States Constitution because it discriminates against and/or excessively burdens interstate commerce;

(2) declare that the Act is preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a);

(3) declare that the Act is preempted by the Medicare Modernization Act, 42 U.S.C. § 1395w-26(b)(3);

(4) declare that the Act violates the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution because it effects an unconstitutional taking of CVS's property without just compensation;

(5) grant permanent injunctive relief enjoining Defendants and their agents from taking any action to implement and enforce the Act; and

55

(6) grant Plaintiffs such additional or different relief as the Court deems just and proper.

Dated: May 22, 2026

Respectfully submitted,

/s/ *G. Brian Jackson*

Michael H. McGinley*
Wilfred T. Beaye, Jr.*
David M. Costigan*
Cory J. Kopicki*
DECHERT LLP
2929 Arch Street
Philadelphia, PA
(215) 994-4000

G. Brian Jackson, BPR #015497
Blake M. Morain, BPR #043337
BUTLER SNOW LLP
1320 Adams Street, Suite 1400
Nashville, TN 37208
Phone: (615) 651-6700
Fax: (615) 651-6701
Brian.Jackson@butlersnow.com
Blake.Morain@butlersnow.com


Steven A. Engel*
Rani A. Habash*
DECHERT LLP
1900 K Street NW
Washington, DC
(202) 261-3300

*Attorneys for Plaintiffs*

**pro hac vice* applications forthcoming

56