# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| EXPRESS SCRIPTS, INC., ET AL.,<br><br>    *Plaintiffs,*<br><br>v.<br><br>MARLIN BLANE, ET AL.,<br><br>    *Defendants.* | Civil Case No.: 3:26-cv-00806<br><br>Judge Eli J. Richardson<br><br>Magistrate Judge Jeffery S. Frensley |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A.    Vertically Integrated PBMs Raise the Costs of Prescriptions and
        Decrease the Number of Pharmacies ............................................................ 2

    B.    The General Assembly Responds to this Crisis with the FAIR Rx
        Act ................................................................................................................ 5

    C.    The Big 3 PBMs Immediately Challenge the FAIR Rx Act ......................... 7

ARGUMENT .................................................................................................................. 8

    I.    Plaintiffs Cannot Succeed on the Merits Because Federal Law Does
        Not Preempt the FAIR Rx Act. .................................................................... 9

        A.    Federal law does not expressly preempt the FAIR Rx Act. .............. 9

        B.    Federal law does not impliedly preempt the FAIR Rx Act. ............ 12

    II.    The FAIR Rx Act Will Not Imminently and Irreparably Harm
        Plaintiffs. .................................................................................................... 18

    III.    The Balance of Equities and Public Interest Favor Defendants. ............... 22

CONCLUSION ............................................................................................................. 24

**Cases**

*Baptist Physician Hosp. Org., Inc. v. Humana Mil.
Healthcare Servs., Inc.*, 481 F.3d 337 (6th Cir. 2007) ................................................ 9

*Chamber of Com. of U.S. v. Whiting,*
563 U.S. 582 (2011) ................................................................................ 15

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................................ 20

*D.T. v. Sumner Cnty. Schs.,*
942 F.3d 324 (6th Cir. 2019) .................................................................. 19

*Encino Motorcars, LLC v. Navarro,*
584 U.S. 79 (2018) ........................................................................... 11, 17

*Express Scripts, Inc. v. Richmond,*
No. 4:25-CV-00520-BSM, 2025 WL 2111057 (E.D. Ark. July 28, 2025) ................. 7

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
458 U.S. 141 (1982) .................................................................................. 9

*Hess v. Oakland County,*
174 F.4th 981 (6th Cir. 2026) .................................................................. 8

*Hillsborough Cnty. v. Automated Med. Lab'ys,*
471 U.S. 707 (1985) ................................................................................ 14

*In re Ford Motor Co. Litig.,*
65 F.4th 851 (6th Cir. 2023) .................................................................. 12

*Ingersoll-Rand Co. v. McClendon,*
498 U.S. 133 (1990) ........................................................................... 9, 14

*King v. Burwell,*
576 U.S. 473 (2015) ........................................................................... 17, 18

*Legal Servs. Corp. v. Velazquez,*
531 U.S. 533 (2001) ................................................................................ 17

*LensCrafters, Inc. v. Sundquist,*
33 S.W.3d 772 (Tenn. 2000) ..................................................................... 2

*Leocal v. Ashcroft,*
543 U.S. 1 (2004) ................................................................................... 17

*Maryland v. King,*
567 U.S. 1301 (2012) ................................................................................ 22

*OPAWL-Bldg. AAPI Feminist Leadership v. Yost,*
118 F.4th 770 (6th Cir. 2024) .................................................................... 8

*Rutledge v. Pharm. Care Mgmt. Ass'n,*
592 U.S. 80 (2020) .................................................................................. 2, 3

*Silkwood v. Kerr-McGee Corp.,*
464 U.S. 238 (1984) ................................................................................ 12

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) .................................................................................. 8

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ................................................................................ 19

*Texas v. Biden,*
10 F.4th 538 (5th Cir. 2021) .............................................................. 20, 22

*Thompson v. Dewine,*
959 F.3d 804 (6th Cir. 2020) .................................................................. 22

*TikTok Inc. v. Garland,*
604 U.S. 56 (2025) .................................................................................. 23

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ................................................................................ 22

*Turner Broad. Sys., Inc. v. FCC,*
520 U.S. 180 (1997) ................................................................................ 23

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
484 U.S. 365 (1988) ............................................................................ 17, 18

*United States v. Collins,*
683 F.3d 697 (6th Cir. 2012) .................................................................. 17

*Williamson v. Mazda Motor of Am., Inc.,*
562 U.S. 323 (2011) ................................................................................ 14

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ...................................................................................... 8

*Wyeth v. Levine,*
555 U.S. 555 (2009) .................................................................................. 9

iii

## Statutes

10 U.S.C. § 1103................................................................................................ 10

Act 624, 95th Gen. Assemb., Reg. Sess. (Ark. 2025) ................................................ 11

SB 2040, 114th Gen. Assemb. (Tenn. 2026)
(codified at Tenn. Code Ann. § 63-10-316) ...................................................... *passim*

## Regulations

32 C.F.R. § 199.17.......................................................................................... 10, 11

32 C.F.R. § 199.21.......................................................................................... 10, 12

## Other Authorities

Suzanne G. Bollmeier & Scott Griggs,
*The Role of Pharmacy Benefit Managers and Skyrocketing
Cost of Medications*, 121 Mo. Med. 403 (2024)........................................................ 4

Complaint,
*CVS Pharmacy, Inc. v. Tenn. Bd. of Pharm.*,
No. 3:26-cv-685 (M.D. Tenn., filed May 22, 2026), Doc. 1 ...................................... 7

Complaint,
*Pharm. Care Mgmt. Ass'n v. Blane*, No. 3:26-cv-816
(M.D. Tenn., filed June 15, 2026), Doc. 1 ............................................................... 7

Complaint,
*UnitedHealth Grp., Inc. v. Blane*, No. 3:26-cv-818
(M.D. Tenn., filed June 15, 2026), Doc. 1 ............................................................... 7

Edmer Lazaro et al.,
*Brief No. 2022-3, Update on Rural Independently Owned
Pharmacy Closures in the United States, 2003-2021*,
RUPRI Ctr. for Rural Health Pol'y Analysis, Univ. of Iowa (2022) ........................ 5

Linette Lopez,
*What CVS is Doing to Mom-and-Pop Pharmacies in the US
Will Make Your Blood Boil,* Bus. Insider (Mar. 30, 2018)...................................... 4

Staff of H. Comm. on Oversight & Accountability,
The Role of Pharmacy Benefit Managers in Prescription
Drug Markets (2024)....................................................................................... 3, 5

Staff of Off. Pol'y Planning, U.S. Fed. Trade Comm'n,
  Pharmacy Benefit Managers: The Powerful Middlemen
  Inflating Drug Costs and Squeezing Main Street Pharmacies
  (Interim Rep., July 2024).................................................................................. 4, 5

Staff of U.S. Fed. Trade Comm'n,
  Specialty Generic Drugs: A Growing Profit Center for
  Vertically Integrated Pharmacy Benefit Managers
  (2d Interim Rep., Jan. 2025)................................................................................. 5

Case 3:26-cv-00685    Document 70    Filed 07/24/26    Page 6 of 31 PageID #: 992

# INTRODUCTION

Plaintiffs' preliminary-injunction motion (Doc. 25) is limited to the narrow issue of whether the federal TRICARE program preempts Tennessee's Freedom, Access, and Integrity in Registered Pharmacy (FAIR Rx) Act even though the FAIR Rx Act contains an express carveout for TRICARE administrators. Because Plaintiffs are unlikely to succeed on the merits and there is no threat of irreparable harm should the Court not intervene at this stage of the litigation (two years before the effective date of the FAIR Rx Act), the motion should be denied.

The General Assembly enacted the FAIR Rx Act in response to troubling business practices that have harmed patients and independent pharmacies alike across Tennessee. SB 2040, 114th Gen. Assemb. (Tenn. 2026) (codified at Tenn. Code Ann. § 63-10-316) (Ex. 1). The bill—which does not go into effect until July 1, 2028—prevents these harms by forbidding entities from owning or controlling pharmacies if they also own or control a pharmacy benefit manager (PBM) and a health insurer that set and receive reimbursements issued to pharmacies that distribute medications. This prohibition, by design, eliminates an inherent conflict of interest that has allowed PBMs to strangle independent pharmacies and, in the process, substantially increase the cost that Tennesseans pay for their medications.

While protecting Tennessee citizens and creating a level playing field for in-state and out-of-state pharmacies alike, the General Assembly also recognized that this statutory scheme, while necessary, may conflict with certain aspects of federal law. To avoid any such conflict, the General Assembly included an express carveout for "pharmacy services provided pursuant to a contract with the United States

government," which includes TRICARE. SB 2040, § 2(j). Because that carveout, properly read against the statute's operative provisions, protects the ownership and operational arrangements necessary to fulfill federal contracts such as Plaintiffs' TRICARE contract, that contract does not conflict with—and cannot preempt—the FAIR Rx Act. Accordingly, it is no surprise that Plaintiffs' motion is more about their non-TRICARE operations than the TRICARE contract which serves as the exclusive basis for their preemption argument in the first place.

For this reason, Plaintiffs cannot hope to make the showing necessary to secure a preliminary injunction. They also face no injury at all for at least two years, and even then, they cannot show even a risk of irreparable harm. And, because the FAIR Rx Act—which is designed to facilitate greater "access to affordable and safely dispensed prescription medications," *see* SB 2040—serves compelling interests and aligns with the traditional role that Tennessee has long played in protecting the health and welfare of its citizens, *e.g.*, *LensCrafters, Inc. v. Sundquist*, 33 S.W.3d 772, 775 (Tenn. 2000), the public interest and equities favor Defendants. The motion should thus be denied.

## BACKGROUND

A. **Vertically Integrated PBMs Raise the Costs of Prescriptions and Decrease the Number of Pharmacies**

PBMs "serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83–84 (2020). The process works as follows: First, "a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription." *Id.* at 84. From there, "the

2

pharmacy checks with a PBM to determine that person's coverage and copayment information." *Id.* The PBM then "reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment," and the "prescription-drug plan, in turn, reimburses the PBM." *Id.* PBMs generate profit by ensuring that the reimbursement they get from a prescription-drug plan "exceeds" what they give to pharmacies. *Id.*

With time, the "three largest PBMs"—plaintiff Express Scripts, CVS Caremark, and UnitedHealth Group's Optum Rx[1]— came to control "more than 80 percent of the market" for prescription drugs.[2] Worse, as they consolidated, they also became "vertically integrated with health insurers, pharmacies, and providers."[3] That is the case here. The plaintiff pharmacies "are each affiliated by common ownership" with Plaintiff Express Scripts, a PBM. Am. Compl. ¶ 48 (Doc. 23). And Plaintiff Express Scripts, in turn, "is a subsidiary of Evernorth Health, Inc., which is a subsidiary of The Cigna Group, a holding company that also holds Cigna Healthcare, a health insurance issuer, as a subsidiary." *Id.*

Such triple integration created a perverse incentive for PBMs that manifests in two main ways. First, insurers decide the amount to reimburse to PBMs, and—from those reimbursements—PBMs tend to reimburse *their* pharmacies well above

---

[1] The latter two PBMs also have cases pending before this Court. *CVS Pharmacy, Inc. v. Tenn. Bd. of Pharm.*, No. 3:26-cv-685 (M.D. Tenn.); *UnitedHealth Grp., Inc. v. Blane*, No. 3:26-cv-818 (M.D. Tenn.).

[2] Staff of H. Comm. on Oversight & Accountability, The Role of Pharmacy Benefit Managers in Prescription Drug Markets 3 (2024) [hereinafter "House Oversight Rep."] (citation omitted), https://tinyurl.com/5bdbvhu7 (Ex. 2).

[3] *Id.* (citation omitted).

the cost of any prescriptions rendered while reimbursing non-integrated pharmacies "at untenably low levels" for the same prescriptions.[4] The difference between what PBMs gave to their own pharmacies and what they gave back to independent pharmacies was stark. A 2018 article, for example, reported that, while one PBM (CVS Caremark) reimbursed a pharmacy it owned $400.65 for a fentanyl patch and $5.86 for Ibuprofen, it reimbursed non-CVS pharmacies far less—only $75.74 for the patch and $1.39 for the Ibuprofen.[5]

Second, PBMs steer as many beneficiaries as possible away from independent pharmacies and toward their own pharmacies.[6] They do this by "requiring patients to use these PBM-owned or affiliated pharmacies," by charging higher co-pays to those who visit independent pharmacies, or by offering patients at independent pharmacies "a reduced day supply" on any filled prescriptions.[7]

The consequences of this system were foreseeable. Independent pharmacies, unable to survive in a climate where they both get sent fewer beneficiaries and get reimbursed below cost for those prescriptions they *can* fill, are shutting down across

---

[4] Staff of Off. Pol'y Planning, U.S. Fed. Trade Comm'n, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies 53 (Interim Rep., July 2024) [hereinafter "FTC 2024 Rep."], https://tinyurl.com/5n8z3yr6 (Ex. 3).

[5] Linette Lopez, *What CVS is Doing to Mom-and-Pop Pharmacies in the US Will Make Your Blood Boil,* Bus. Insider (Mar. 30, 2018), https://tinyurl.com/vqph452 (Ex. 4).

[6] FTC 2024 Rep., *supra* note 4, at 31–32.

[7] Suzanne G. Bollmeier & Scott Griggs, *The Role of Pharmacy Benefit Managers and Skyrocketing Cost of Medications*, 121 Mo. Med. 403, 407 (2024) (Ex. 5).

4

the country.[8] By some estimates, in recent decades, "the number of independently owned retail pharmacies declined in noncore areas by 16.1 percent, and in micropolitan areas by 9.1 percent."[9] As the House Committee on Oversight and Accountability found, this has led to patients' "seeing significantly higher costs with fewer choices and worse care" as "PBMs inflate prescription drug costs and interfere with patient care for their own financial benefit."[10] Indeed, the Federal Trade Commission found that, with less competition, "the Big 3 PBMs"—a group that, again, includes Plaintiff Express Scripts—"marked up numerous specialty generic drugs by hundreds and thousands of percent, with the majority of the most highly marked-up drugs dispensed by the PBMs' own affiliated pharmacies."[11]

## B.    The General Assembly Responds to this Crisis with the FAIR Rx Act

The General Assembly enacted Senate Bill 2040 in response to this crisis of Plaintiffs' making. It found that there was an inherent conflict of interest "when a pharmacy benefits manager both sets and receives reimbursement." SB 2040 (Ex. 1 at 1). And the legislature found that this conflict of interest "can restrict patient choice, increase costs, and jeopardize continuity of care." *Id.*

---

[8] FTC 2024 Rep., *supra* note 4, at 16.

[9] Edmer Lazaro et al., *Brief No. 2022-3, Update on Rural Independently Owned Pharmacy Closures in the United States, 2003-2021*, at 1, RUPRI Ctr. for Rural Health Pol'y Analysis, Univ. of Iowa (2022), https://tinyurl.com/7aczt9a6 (Ex. 6).

[10] House Oversight Rep., *supra* note 2, at 3.

[11] Staff of U.S. Fed. Trade Comm'n, Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers 29 (2d Interim Rep., Jan. 2025) (internal citations omitted), https://tinyurl.com/4t438jdx (Ex. 7).

To combat these harms, the General Assembly made it unlawful to "own, operate, control, or direct the operation of" any part "of a pharmacy" while simultaneously "own[ing], operat[ing], control[ling], or direct[ing] the operation of" the "whole or any part of" a health insurance issuer and a PBM. *Id.* § 2(b). That ownership prohibition "applies when the percentage of ownership interest held by a person, entity, or affiliate is greater than five percent." *Id.* § 2(c). The focus of the statute is thus preventing one entity from owning or controlling all three links in the chain—pharmacies, PMBs, and health insurers—since it is that integration that facilitates the abuses targeted by the statute.

But the General Assembly reasonably recognized that divestiture or other alternate arrangements would take time. Accordingly, it made the FAIR Rx Act's operative date July 1, 2028. *Id.* § 2(b). And even then, it gave additional protections to any vertically integrated pharmacy that, as of July 1, 2028, is "actively pursuing a bona fide sale to an unaffiliated entity." *Id.* § 2(e). Such pharmacies have until December 31, 2028, to complete the sale. *Id.* It also granted discretion to Defendants to give such pharmacies "a single extension, not to exceed six (6) months, upon proof of substantial progress toward completion of such sale." *Id.* It is thus foreseeable that, for some, divestiture (if necessary to comply with the law) will not be required until 2029. Divestiture does not, however, require the sale or closure of *pharmacies*. Rather, an entity's divestiture of any one of the three links will suffice. Thus, Cigna could sell its interest in Express Scripts. Or it could sell its affiliated pharmacies. Either option would satisfy the FAIR Rx Act's requirements. And, once sold, Cigna

6

could contract with the entities that it previously owned to preserve the business model or mode of operations that existed before the FAIR Rx Act—absent the conflict of interests that drove up prices.

The General Assembly also recognized that a similar Arkansas law was recently enjoined as likely being preempted by the federal TRICARE program. *See Express Scripts, Inc. v. Richmond,* No. 4:25-CV-00520-BSM, 2025 WL 2111057 (E.D. Ark. July 28, 2025), *appeal docketed,* No. 25-2529 (8th Cir. Aug. 4, 2025). To avoid similar concerns, the General Assembly expressly carved from the FAIR Rx Act's reach those "pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program." SB 2040, § 2(j).

## C.    The Big 3 PBMs Immediately Challenge the FAIR Rx Act

The big 3 PBMs immediately challenged the FAIR Rx Act. CVS challenged the bill on the day Governor Lee signed it, May 22, 2026. *See* Compl., *CVS Pharmacy, Inc. v. Tenn. Bd. of Pharm.*, No. 3:26-cv-685 (M.D. Tenn.), Doc. 1 ["*CVS* Compl."]. Express Scripts filed suit on June 12, 2026, and amended its complaint as of right a week later. *See* Docs. 1, 23. The UnitedHealth Group brought its action on June 15, 2026. *See* Compl., *UnitedHealth Grp., Inc. v. Blane*, No. 3:26-cv-818 (M.D. Tenn.), Doc. 1 ["*UnitedHealth* Compl."]. A fourth group representing other PBMs sued that day as well. *See* Compl., *Pharm. Care Mgmt. Ass'n v. Blane*, No. 3:26-cv-816 (M.D. Tenn.), Doc. 1. Each Complaint contains many of the same allegations and causes of action. But the only issue before the Court here is whether Plaintiffs' TRICARE

contract preempts the statute even though the statute, by its terms, does not apply to Plaintiffs' TRICARE contract at all.

## ARGUMENT

To secure a preliminary injunction, Plaintiffs must make a "clear showing" that they are (1) "likely to succeed on the merits" and (2) "likely to suffer irreparable harm" without preliminary relief. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20, 22 (2008)). They must also establish (3) "that the balance of equities tips in [their] favor" and (4) "that an injunction is in the public interest." *Id.* (quoting *Winter,* 555 U.S. at 20). These latter two factors "merge" when, as here, the government is a party. *OPAWL-Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 785 (6th Cir. 2024). But a preliminary injunction is "an extraordinary remedy *never* awarded as of right." *Hess v. Oakland County*, 174 F.4th 981, 990–91 (6th Cir. 2026) (emphasis added) (quoting *Winter*, 555 U.S. at 24), *reh'g en banc denied,* No. 25-1784, 2026 WL 1642928 (6th Cir. May 27, 2026), *stay denied mem.,* No. 25A1410, 2026 WL 1764500 (U.S. June 18, 2026) (Kavanaugh, J., in chambers). Rather, the issuance of a preliminary injunction is placed in the district court's sound discretion. *Id.* at 991.

Here, Plaintiffs have not established any of the required preliminary injunction factors. Their motion should thus be denied.

## I. Plaintiffs Cannot Succeed on the Merits Because Federal Law Does Not Preempt the FAIR Rx Act.

The clearest reason to deny to plaintiffs their requested relief is that the FAIR Rx Act is not preempted by the federal TRICARE program since the FAIR Rx Act *expressly* exempts pharmacy services performed pursuant to TRICARE contracts.

### A. Federal law does not expressly preempt the FAIR Rx Act.

Plaintiffs' arguments for express preemption based on the TRICARE program cannot withstand even cursory scrutiny. To be sure, federal regulations, like all other sources of federal law, can preempt state law. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–53 (1982). But preemption is never presumed. Rather, courts apply a presumption against preemption under which they assume that federal law does not supersede the historic police powers of the states "unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). This inquiry requires courts to "examine the explicit statutory language and the structure and purpose of the statute" because Congress' purpose "is the ultimate touchstone." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990) (citation omitted from second quotation).

TRICARE, a program designed "to improve the quality, cost, and accessibility of healthcare to the nation's military," *Baptist Physician Hosp. Org., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 481 F.3d 337, 340 (6th Cir. 2007), includes an express preemption clause. Under the clause, any "law or regulation of a State or local government relating to health insurance, prepaid health plans, or other health care delivery or financing methods" that the Secretary of Defense concludes is

"inconsistent with" or "necessary to implement or administer" a TRICARE contract "shall not apply" to that contract. 10 U.S.C. § 1103(a). As Plaintiffs suggest (at 12), the Secretary of Defense has found it necessary to preempt all "State and local laws relating to health insurance … or other health care delivery." 32 C.F.R. §§ 199.17(a)(7)(i), 199.21(o)(1). But the Secretary does not have the authority—and does not purport—to preempt such laws outright. Rather, since the statute that he is implementing deals exclusively with the applicability of state laws to TRICARE *contracts*, 10 U.S.C. § 1103(a), the Secretary has done the same and determined that—"[b]ased on the determination set forth in paragraph (a)(7)(i) of this section"— such laws are "preempted and [do] not apply in connection with TRICARE regional" and "pharmacy contracts." 32 C.F.R. § 199.17(a)(7)(ii); *see also id.* § 199.21(o)(2). Although these subsections come immediately after the subsections on which Plaintiffs principally rely and say what the Secretary's findings mean in practice, Plaintiffs never acknowledge that they are limited to contracts. They thus begin— and end—their analysis assuming, incorrectly, that the Secretary (without authority) preempted *any* laws that deal with health insurance or delivery. *See* Mot. at 12.

But Plaintiffs' ignoring that the Secretary properly limited his rules to laws that apply to TRICARE *contracts* does not make the limiting principles he established go away. And that distinction, properly applied, is fatal to Plaintiffs' claim that TRICARE expressly preempts the FAIR Rx Act. After all, the FAIR Rx Act expressly carves out "pharmacy services provided pursuant to a contract with the United States," a group that would include TRICARE contracts. SB 2040, § 2(j). That

10

exemption is "as much a part of the [FAIR Rx Act's] purpose" as every other part of the bill. *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018). And the exemption reflects the General Assembly's clear intent to respond to the predatory practices of vertically-integrated PBMs as much as it could without running headlong into the Supremacy Clause or TRICARE.

In short, no federal contracts can preempt the FAIR Rx Act because the General Assembly determined that the FAIR Rx Act does not apply to services provided pursuant to any federal contracts.

In arguing otherwise, Plaintiffs fight the ghost of a different statute. They argue (at 12) that "Arkansas Act 624," a statute enjoined last year, is "very similar" to the FAIR Rx Act. And to be sure, the bills have many similarities. Both Arkansas and Tennessee have recognized the harms that vertical integration between PBMs and pharmacies impose on patients and independent pharmacies alike and moved to eliminate vertical integration. *Compare* Act 624, § 1, 95th Gen. Assemb., Reg. Sess. (Ark. 2025), *with* SB 2040. But Tennessee, learning from Arkansas' experience, acted to avoid any potential conflict with TRICARE through the federal carveout, thus making Tennessee's statute fundamentally different in this legally dispositive way.

Perhaps recognizing this, Plaintiffs argue (at 13) that the federal carveout still "does not save" the FAIR Rx Act because the bill "expressly relates to health insurance and healthcare delivery." But this again relies on the Secretary's finding at the expense of what the Secretary did "[b]ased on" that finding—preempt any state laws that would otherwise apply to TRICARE contracts. 32 C.F.R. §§ 199.17(a)(7)(ii),

11

199.21(o)(2). Since the General Assembly provided that the FAIR Rx Act does not apply to TRICARE contracts, neither TRICARE nor its implementing regulations expressly preempt the FAIR Rx Act.

**B.      Federal law does not impliedly preempt the FAIR Rx Act.**

Nor is there any merit to Plaintiffs' implied preemption claim. Yes, federal laws can preempt state laws when it is "impossible" to comply with both or where the state law is "an obstacle to the accomplishment" of Congress' "full purposes and objectives." *In re Ford Motor Co. Litig.*, 65 F.4th 851, 859–60 (6th Cir. 2023) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)). But Plaintiffs do not claim that the FAIR Rx Act makes compliance with TRICARE *impossible*. Instead, they claim (at 14) that the FAIR Rx Act "interferes with [their] performance" obligations under TRICARE because the law applies to their non-TRICARE operations. Their preemption claim has no merit.

1. As discussed, the FAIR Rx Act does not apply to pharmacy services offered pursuant to a TRICARE contract. SB 2040, § 2(j). In arguing implied preemption, Plaintiffs claim (at 13–14) a broad right under TRICARE for their pharmacies to provide services to both TRICARE beneficiaries and to "patients who are not TRICARE beneficiaries." But several arguments in support of this claim reflect little more than an effort to constitutionalize Plaintiffs' business decisions having nothing to do with TRICARE.

For example, Plaintiffs argue (at 15) that they must serve non-TRICARE patients to be able to serve TRICARE patients because their "business models" depend on economies of scale. And they argue (at 15–16) that the TRICARE contract

has designated Accredo and Freedom Fertility (at Plaintiffs' request) as entities approved to send pharmaceuticals by mail to TRICARE beneficiaries nationwide but that, under the Tennessee law, those pharmacies would lose the "advantage of the efficiencies and savings created by" vertical integration. But because of the federal carveout, Plaintiffs can easily continue operating with the same vertical integration they now enjoy in serving TRICARE beneficiaries. They will just be unable to provide mail-order pharmaceuticals to patients who are not TRICARE beneficiaries using their existing business model given their current ownership structure. And, because TRICARE does not *require* Plaintiffs to continue serving non-TRICARE beneficiaries, if Plaintiffs opt to move their facilities outside of Tennessee to continue serving both, that is not, as Plaintiffs characterize it (at 16), a decision by Tennessee "to dictate changes to … federally designated and approved parties." Rather, it is a business decision by Plaintiffs to effectuate economies of scale that TRICARE does not require.

Even the Declaration of Thomas Jenkins (Doc. 25-1), the only declaration addressing Plaintiffs' TRICARE operations, fails to explain how the FAIR Rx Act affects their TRICARE operations at all. Plaintiff Evernorth Federal Services, Inc. (EFS) was only established in 2025, and at Plaintiffs' request, DOD transferred the TRICARE contract to EFS. Am. Compl. ¶ 64; Jenkins Decl. ¶¶ 3, 5, 7. There is nothing in his declaration that says EFS must be affiliated with any pharmacy or that it must be owned or controlled by Cigna or any health insurer. And Jenkins fails to explain how a change in ownership and control of EFS for non-TRICARE beneficiaries would affect any of the efficiencies of which it complains.

13

Indeed, Plaintiffs point to *nothing* in TRICARE's enabling statute, regulations, or the resulting contracts that requires them to commingle their commercial and TRICARE activities, to use the same pharmacies and inventory for both, or to deliver TRICARE benefits through PBM-affiliated outlets at all. And since any supposed conflict with TRICARE performance is thus entirely of Plaintiffs' own making, Plaintiffs' intentional decision to commingle their TRICARE operations with non-TRICARE operations cannot create a preemption problem. To hold otherwise would allow businesses to intentionally commingle preempted activity with non-preempted activity to evade state regulation entirely—an invitation to anarchy. This is likely why Plaintiffs do not challenge any of the other PBM regulations referenced in their motion.

To be sure, Congress could have made Plaintiffs' business decisions relevant to the TRICARE inquiry. *See Williamson v. Mazda Motor of Am., Inc.,* 562 U.S. 323, 330 (2011) (recognizing that "a significant federal regulatory objective" can be "the maintenance of manufacturer choice"). But there is nothing to suggest that it did so here. And since the FAIR Rx Act is a "regulation of health and safety matters" that has been "primarily, and historically, a matter of local concern," *Hillsborough County v. Automated Med. Lab'ys, Inc.,* 471 U.S. 707, 719 (1985), there is no reason to assume such an intent either. Thankfully, preemption looks to Congress' purposes, *Ingersoll-Rand*, 498 U.S. at 137–38, not to Express Scripts' business model and certainly not to their ownership structure.

2.  At still other times, Plaintiffs argue (at 13–14) that applying the FAIR Rx Act would interfere with their TRICARE contract's requirement to use a "replenishment" model under which they "dispense prescriptions to TRICARE beneficiaries" from their own "commercially-acquired inventory" and then request "replenishment" of those same medications from the government's wholesale distributor. The FAIR Rx Act, they argue (at 14), makes it so "the replenishment model cannot properly function" because it deprives them of "access to the commercial market." But they make no effort to show any such deprivation or how the FAIR Rx Act affects this at all. To the contrary, the sole evidence they cite, Jenkins Decl. ¶16 (Doc. 25-1), simply assumes that they will be cut off from the commercial market without showing that the ownership prohibition would cut off their ability to maintain commercially acquired inventory or fulfill replenishment obligations. Plaintiffs cannot carry the "high threshold" that "must be met if a state law is to be preempted for conflicting with the purposes of a federal Act" with such assumptions generally. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality op.) (citation omitted). And that is especially true here.

As shown, the FAIR Rx Act allows Plaintiffs to continue operating pursuant to the TRICARE contract. *See* SB 2040, § 2(j). And if, as Plaintiffs claim, the TRICARE contract requires them to use commercial inventory, it follows that the FAIR Rx Act will pose no obstacle to Plaintiffs' obtaining commercial inventory as necessary to further their federal replenishment obligations. The federal carveout—as designed—facially eliminates any obstacle.

3. Finally, Plaintiffs argue (at 17) that the Court should consider the effects that the FAIR Rx Act would have if laws like it were broadly adopted by every other state. But in so arguing, they repeat many of the same faulty assumptions. For example, they claim (at 17) that "if every state" adopted the FAIR Rx Act, "there would be no out-of-state commercial inventory." But this assumes the FAIR Rx Act lacks the federal carveout. And Plaintiffs, again, never say why vertically integrated pharmacies are necessary for commercial inventory in the first place. So they cannot claim they will lose access to such commercial inventory to serve their TRICARE patients if bills like the FAIR Rx Act proliferate, no matter how many states adopt them.

Because TRICARE does not require integrated pharmacies, Plaintiffs cannot show that, if every state—like Tennessee—forbade integrated pharmacies from serving anyone but TRICARE patients, the integrated pharmacies would be unable to fulfill their TRICARE obligations. Rather, Plaintiffs with integrated pharmacies would adapt to the new regulatory regime by continuing to perform their obligations as the TRICARE contract requires—less the ability to provide services to non-TRICARE beneficiaries if they operate using an integrated ownership business model.

In short, since Plaintiffs can continue to serve TRICARE beneficiaries under the FAIR Rx Act with the only possible burden stemming not to the TRICARE obligations but to their personal business ownership preferences related to non-TRICARE services, they have necessarily failed to show any implied preemption.

16

4. But if—and only if—this Court agrees with Plaintiffs that the FAIR Rx Act would interfere with their federal obligations, it is susceptible to a saving construction that should be adopted.

As the Supreme Court has explained, "when there are two reasonable constructions for a statute, yet one raises a constitutional question, the Court should prefer the interpretation which avoids the constitutional issue." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). The statute's federal carveout, like all statutory exemptions, is entitled to a "fair reading." *Encino Motorcars*, 584 U.S. at 89. A fair reading "give[s] effect to every word." *United States v. Collins*, 683 F.3d 697, 706 (6th Cir. 2012) (quoting *Leocal v. Ashcroft,* 543 U.S. 1, 12 (2004)). And where a term contains some ambiguity in isolation, "the remainder of the statutory scheme" can provide needed clarity, especially if "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *King v. Burwell*, 576 U.S. 473, 492 (2015) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)).

Applying these well-settled principles here, if applying the FAIR Rx Act to Plaintiffs' pharmacies that serve both TRICARE and non-TRICARE patients would create a conflict even though the business decision to so commingle operations was not required by TRICARE, the statutory scheme allows § 2(j)'s federal carveout for "pharmacy services" to apply to the entities that are a party to a TRICARE contract themselves, not just to the services those entities provide. Such an interpretation, after all, would comply with the rest of the FAIR Rx Act because it would tie the

federal carveout to the operative part of the statute. By its terms, the FAIR Rx Act does not target "pharmacy services." Instead, it targets an entity's ownership and control by making it unlawful for a person to own or control greater than 5% of a pharmacy, a health insurance issuer, and a pharmacy benefits manager. By reading the exemption to reach the conduct that is otherwise proscribed to avoid preemption, the federal carveout can reflect the "remainder of the statutory scheme." *King*, 576 U.S. at 492 (quoting *United Sav. Ass'n*, 484 U.S. at 371).

To be sure, a better reading of the statute's exemption is that it exempts only those "pharmacy services" conducted pursuant to a TRICARE contract. But, if that reading results in constitutional heartburn, it would be permissible to read the federal carveout to apply to any *entity* that contracts "with the United States government for the administration of a federal healthcare program," including TRICARE. SB 2040, § 2(j). Such a construction would be preferable to an injunction. And the possibility of such a reading further reduces Plaintiffs' already low probability of success on the merits.

## II.    The FAIR Rx Act Will Not Imminently and Irreparably Harm Plaintiffs.

Plaintiffs next claim (at 17–21) that they face irreparable harm from enforcement of the FAIR Rx Act. But they cannot show—even if they face irreparable harm—that such harm is imminent. And although the Court can deny their motion for that reason alone, Plaintiffs also fail to show *any* irreparable harm.

1. For irreparable-injury purposes, it is significant that Plaintiffs are seeking pre-enforcement relief from the Act. The Supreme Court has allowed Article III

18

standing to claim such pre-enforcement relief only when "threatened enforcement" of a law is "sufficiently imminent" or "certainly impending." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014) (citation omitted from third quotation). But the standard for Article III *jurisdiction* is different from the standard for a preliminary injunction. When seeking a preliminary injunction, a plaintiff must show that they are "facing imminent *and* irreparable injury." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). If they don't make that showing of imminence and irreparability, even if they have standing, "there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.*

Here, Plaintiffs cannot show any risk of imminent *or* irreparable harm. As shown above, the FAIR Rx Act does not conflict with federal law by design, so Plaintiffs cannot claim (at 18) that its enactment threatens any federal right to be free from the reach of preempted state statutes.

And they cannot show imminence either. Whatever this Court concludes on Plaintiffs' likelihood of success on the merits, the FAIR Rx Act does not go into effect for another two years. This gives Plaintiffs plenty of time to seek a final judgment. If Plaintiffs lose on the merits, as they should, they are not entitled to an injunction at all. Once the FAIR Rx Act goes into effect, they can pursue divestiture on favorable terms or otherwise adjust their operations to comply with the FAIR Rx Act then. On the other hand, if this Court concludes at final judgement that the FAIR Rx Act is unlawful, it can enter a permanent injunction that will protect Plaintiffs from its reach while Defendants appeal.

19

Whatever this Court's ultimate conclusion on the merits, Plaintiffs cannot show that they will be harmed if they do not get an injunction now. For the next two years, each of Plaintiffs' pharmacies may lawfully continue dispensing prescriptions to Tennessee patients—including TRICARE beneficiaries—exactly as they do today. And the Act's transition provisions provide still more breathing room by allowing until December 2028 for any sale pending when the FAIR Rx Act goes into effect. Thus, any concrete operational disruption is not *imminent*.

2. In arguing otherwise, Plaintiffs claim (at 18–19) that they need immediate relief because Defendants have sovereign immunity and it will be expensive and take "close to three years, if not longer," to close or relocate Accredo's Memphis pharmacy. Peppers Decl. ¶ 36 (Doc. 25-2). But the FAIR Rx Act does not require Plaintiffs to close or move that pharmacy (or any other). Plaintiffs will only need to alter their ownership structure to eliminate the inherent conflict of interest resulting from the tri-form vertical integration after they lose on the merits. And even then, they will have options: They can close, move, or sell any pharmacy they own.

Any harms arising from Plaintiffs' decision to close or relocate a pharmacy *now* are thus self-inflicted harms that cannot satisfy the irreparable injury requirement. *See Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) (collecting sources). Just as Plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013), they cannot manufacture imminence sufficient to warrant a preliminary injunction by suggesting that they must act to

avoid a law that Defendants cannot even enforce until 2028. And Plaintiffs certainly cannot manufacture imminence by saying that they have to do something now that the FAIR Rx Act wouldn't require even if it were operative.

3. The Court should reject Plaintiffs' other attempt to show imminence for much the same reasons. *See* Mot. at 19–21. They claim they will imminently lose patient, provider, and employee relationships because certain patients may decide to stop using their pharmacies in anticipation of the 2028 enforcement date. *Id.* But this argument makes no sense. If, as Plaintiffs claim, patients can seamlessly "transfer their prescription needs to other pharmacies preemptively" without any loss of care now to avoid the FAIR Rx Act's future enforcement (Mot. at 21; *see also id.* at 5), then there is no reason to credit any suggestion that they will be unable to seamlessly transfer their prescription needs to independent pharmacies without loss of care in 2028 after a final judgment. And, of course, non-TRICARE patients would not need to transfer their prescription needs at all if Plaintiffs were to simply divest from Cigna or otherwise alter its ownership structure to comply with the FAIR Rx Act once it goes into effect.

The Court should also reject Plaintiffs' efforts to invoke the speculative actions of their patients and employees to create imminent irreparable harm for other reasons too. Plaintiffs, sophisticated nationwide entities who purport to offer their patients real value, can reassure those patients and any employees (1) that operations will continue uninterrupted for years and (2) that final judgment will precede any material change. If patients and employees decide to seek independent

pharmacies anyway, it cannot possibly be attributable to the FAIR Rx Act. And, of course, to the extent that patients or employees are leaving Plaintiffs now because Plaintiffs have told them that the sky might fall later, that too would be self-inflicted injury that cannot be the basis for a finding of irreparable harm. *See Texas v. Biden*, 10 F.4th at 558.

### III. The Balance of Equities and Public Interest Favor Defendants.

Plaintiffs have not carried their burden of proving that the equitable factors support them either.

1. As shown above, TRICARE does not preempt the FAIR Rx Act. This means that it is squarely in the public interest to give "effect to the will of the people by enforcing" it. *Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020) (per curiam). Indeed, to enjoin the FAIR Rx Act would impose on Tennessee "a form of irreparable injury" by forbidding it from "effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025) (quoting *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The equities and the public interest thus favor Defendants.

But they favor Defendants even when viewed against Plaintiffs' asserted "public interest in maintaining patient access to health services." Mot. at 22. Far from threatening access to health services in Tennessee, the FAIR Rx Act promises to reverse the significant burdens—including higher costs—that vertical integration places on patients in the State. Indeed, the General Assembly found that the FAIR Rx Act was necessary because vertical integration leads to "conflicts of interest that can restrict patient choice, increase costs, and jeopardize continuity of care." SB 2040

(Ex. 1 at 1). And it found that only through eliminating the conflict of interest—by requiring integrated pharmacies to unaffiliate from PBMs or health insurance providers—could the General Assembly "ensure transparent pricing, maintain trust in the pharmacy system, and promote better health outcomes for Tennessee patients." *Id.* These legislative findings—which are consistent both with Congressional findings and findings from the Federal Trade Commission—are entitled to deference both "as to the harm to be avoided and to the remedial measures adopted for that end." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997).

2. In arguing otherwise, Plaintiffs assert (at 1, 10) that the FAIR Rx Act threatens to "banish" the pharmacies that they own. For example, they claim (at 22) that patients will lose access to their relationships with their chosen healthcare providers and the "personalized" care they provide. But this claim rests on the untenable assumption that Plaintiffs will simply leave Tennessee altogether rather than disaffiliate with the pharmacies they own. Of course, against much stronger constitutional claims, the Supreme Court has rejected challenges claiming that a mere regulation requiring divestiture is a ban. *See TikTok Inc. v. Garland*, 604 U.S. 56, 66, 80 (2025) (per curiam). This Court should follow the Supreme Court's lead.

In any event, the FAIR Rx Act does not ban Plaintiffs at all. It merely eliminates the conflict of interest inherent in allowing entities to own greater than 5% of pharmacies, PBMs, and health insurance companies at the same time while also deciding the costs of prescriptions and reimbursements made to these pharmacies. As discussed throughout this response, Plaintiffs can sell their interests

23

in any Tennessee pharmacy to any entity that lacks that forbidden integration, or they can disaffiliate from the insurance company or the PBM. Any of these options available to Plaintiffs would preserve the access to health services that Plaintiffs claim to be championing while also ensuring that costs go down and pharmacy options available to patients increase. PBMs and insurance companies could even enter into arms-length contracts with any pharmacy it sold to serve the same patients—so long as the contract would not allow them to "own, operate, control, or direct the operation of" more than 5% of those pharmacies. *See* SB 2040, § 2(b), (c). Such contracts would protect competition and benefit patients—the exact goal of the General Assembly in enacting the FAIR Rx Act.

As the General Assembly found, the kind of "clinical and operational expertise Plaintiffs provide," Doc. 25 at 22, will continue—and likely increase—once PBMs and health insurers are not controlling pharmacies to maximize profit at the expense of patient care. That too is a powerful equitable consideration counseling *against* a preliminary injunction.

## CONCLUSION

The General Assembly passed the FAIR Rx Act to respond to a real problem that was leading independent pharmacies not owned or controlled by PBMs and health insurers to close and prescription prices to skyrocket. And it did so cognizant of its obligation to follow federal law. Plaintiffs have not shown any conflict, have identified no harm, and cannot show that the public interests favor the ruinously

24

expensive *status quo* that the FAIR Rx Act is designed to displace. The Court should

deny their motion for a preliminary injunction

July 24, 2026                    Respectfully submitted,

                                 */s/ Edward H. Trent*
                                 Gene C. Schaerr*
                                 Edward H. Trent (BPR# 30045)
                                 Joshua J. Prince*
                                 SCHAERR | JAFFE LLP
                                 1717 K Street NW, Suite 900
                                 Washington, DC 20006
                                 Telephone: (202) 787-1060
                                 Fax: (202) 776-0136
                                 gschaerr@schaerr-jaffe.com
                                 etrent@schaerr-jaffe.com
                                 jprince@schaerr-jaffe.com

                                 *Admitted *pro hac vice*

                                 JONATHAN SKRMETTI
                                 Attorney General and Reporter

                                 /s/ *Michael Wennerlund*
                                 Michael Wennerlund (BPR# 31332)
                                 Assistant Attorney General
                                 OFFICE OF THE TENNESSEE ATTORNEY GENERAL
                                 FINANCIAL DIVISION
                                 P.O. Box 20207
                                 Nashville, Tennessee 37202-0207
                                 Telephone: (615) 741-8950
                                 Michael.Wennerlund@ag.tn.gov

                                 *Counsel for Defendants*

25