**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**Nashville Division**

| | |
|---|---|
| CVS PHARMACY, INC., *et al.*,<br>*Plaintiffs*,<br>- v. -<br>TENNESSEE BOARD OF PHARMACY, *et al.*,<br>*Defendants*. | No. 3:26-cv-685 |
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,<br>*Plaintiff*,<br>- v. -<br>MARLIN BLANE, *et al.*,<br>*Defendants*. | No. 3:26-cv-816 |

**JOINT MOTION AND MEMORANDUM OF LAW TO QUASH SUBPOENAS ISSUED TO NON-PARTIES THE TENNESSEE PHARMACISTS ASSOCIATION, ANTHONY PUDLO, GARRETT JOHNSON, C. MORGAN HONEYCUTT, AND JACOB STANDEFER**

Blakeley D. Matthews
Rebecca W. Demaree
CORNELIUS & COLLINS, LLP
211 Athens Way, Suite 200
Nashville, TN 37228
615-244-1440
bdmatthews@cclawtn.com
rwdemaree@cclawtn.com

*Counsel for Non-Party Movants*

## STATEMENT OF COMPLIANCE WITH LOCAL RULES 7.01 AND 37.01

Non-parties Tennessee Pharmacists Association ("TPA"), its CEO, Anthony Pudlo; and its lobbyist, Garrett Johnson; C. Morgan Honeycutt, a member of TPA, a pharmacist, and the owner of Mac's Hometown Pharmacies; and Jacob Standefer, a member of TPA, a pharmacist, and the owner of Access Family Pharmacy (collectively, "Non-Party Movants"), respectfully move the Court, pursuant to Rule 45(d)(3)(A) of the Federal Rules of Civil Procedure, to quash subpoenas duces tecum served upon them by Plaintiffs Pharmaceutical Care Management Association ("PCMA") and various CVS Health entities ("CVS").

Consistent with Local Rules 7.01(a)(1) and 37.01(b), the Non-Party Movants, PCMA, and CVS hereby provide this Joint Statement of Counsel related to their efforts to resolve the dispute among them:

**(1)** **ATTEMPTS TO RESOLVE THE DISPUTE:** Counsel for the Non-Party Movants reached out to counsel for PCMA and CVS shortly after being retained to represent the Non-Party Movants in responding to the subpoenas. PCMA and CVS ultimately agreed to provide the Non-Party Movants until August 14 in which to respond to the subpoenas. Thereafter, counsel for the Non-Party Movants conducted an investigation related to the subpoenas. On August 13, 2026, counsel for the Non-Party Movants, PCMA, and CVS met to discuss the Non-Party Movants concerns about the scope of the information demanded by the subpoenas. Counsel worked in good faith but were unable to reach a resolution because they have diametrically opposed views about the relevancy and appropriateness of the information demanded by the subpoenas.

**(2)** **THE DISCOVERY IN DISPUTE:** The third-party subpoenas served upon the Non-Party Movants are appended to this Combined Motion and Memorandum as Exhibits A through E.

**(3)** **THE PARTIES' RESPECTIVE POSITIONS:**

**A.** **MOVANTS' POSITION:** Through their lawsuits, PCMA and CVS have raised pre-enforcement challenges to the constitutionality of a Tennessee law—challenges that turn on the text of the Tennessee law, its potential effects on interstate commerce, and, in the case of CVS's Takings Clause claim, the law's effects on CVS's reasonable expectations. Nevertheless, PCMA and CVS have served sweeping subpoenas on non-parties, demanding documents and information related largely to their efforts to petition the Tennessee General Assembly and the Governor to enact the challenged law. The discovery that

PCMA and CVS seeks is irrelevant to their claims, and even if it is deemed to have some marginal relevance, it does not survive balancing under either Rule 45(d) or the First Amendment. PCMA and CVS cannot show any compelling need for the information they have demanded, and the lack of relevance raises the specter that the subpoenas were served for impermissible reasons—to retaliate against the Non-Party Movants for advocating for the enactment of the law and to chill others from advocating for the enactment of similar laws across the country. The subpoenas should be quashed.

### B. PCMA's and CVS's Positions:

**CVS' POSITION**: The information sought is relevant to central issues in this case, including whether the Act was adopted with a discriminatory intent or effect. The TPA-affiliated Movants represent the independent Tennessee pharmacies whom the Act protects from out-of-state competition, and TPA's own public statements confirm that it worked hand-in-glove with the bill's sponsors to "ensure the intent of the bill is met" for its local pharmacy members. Movants are therefore uniquely likely to have documents concerning both the discriminatory intent underlying the Act, including communications with and about the legislators who supported it, and its anticipated protectionist effect on TPA's in-state pharmacy members. That evidence matters all the more because several legislators involved in the Act have claimed legislative immunity, leaving Movants as potentially the only source of some of this material.

Movants have not served objections to any of the subpoena requests as the FRCP requires, nor identified any specific cost, volume, or difficulty of production. They rely on generalized burden claims. CVS has offered to work cooperatively to address any specific issues, but Movants have identified none and have refused to produce even a single document. The subpoenas are not "sweeping": they are limited to Movants' documents concerning the Act at issue in this case—materials Movants do not deny they possess and which should not be unduly time-consuming or expensive to retrieve. "Compelling need" is not the governing standard, but even under it, CVS would satisfy the test for the reasons above. Nor is there any basis for the suggestion that this discovery is meant to "chill" or "retaliate": the relevance of the requests, the absence of any particularized burden, and CVS's good-faith engagement all refute that characterization.

**PCMA's POSITION**: PCMA adopts CVS's position, especially as it concerns the lack of burden. PCMA has offered to discuss ways to reduce any potential burden on Mr. Standefer and Mr. Honeycutt, but their counsel took the position that they won't produce on relevance grounds instead of trying to reduce or eliminate the burden (if any).

The sought information is also relevant to PCMA's claims. PCMA and other Plaintiffs have challenged the Act as (among other things) discriminating against out-of-state competition for the benefit of local pharmacists. Mr. Standefer and Mr. Honeycutt are such local pharmacists whom the Act is intended to protect and benefit and who both publicly advocated for the Act, including making public statements suggesting they were coordinating with others in their advocacy. Documents and communications that Mr. Standefer and Mr. Honeycutt have showing that the purpose and intended effect of the Act is to protect and benefit local pharmacists such as themselves at the expense of out-of-state competition and whether there was a coordinated effort by such beneficiaries of the Act is directly relevant to PCMA's claims that the purpose and effect of the Act is discriminatory.

## TABLE OF CONTENTS

Statement of Compliance with Local Rules 7.01 and 37.01 ........ i

Table of Authorities ........ iv

Introduction ........ 1

Background ........ 4

A. PBMs have engaged in abusive practices that required State action ........ 4

B. Pharmacy organizations engaged in protected First Amendment activity in advocating for the passage of the FAIR Rx Act ........ 7

C. PBMs sue to enjoin enforcement of the FAIR Rx Act and serve sweeping subpoenas on their public-policy opponents, seeking protected First Amendment communications ........ 8

Argument ........ 10

I. The subpoenas demand the production of documents that are irrelevant to the Plaintiffs' challenge to the constitutionality of the FAIR Rx Act ........ 11

A. The dormant Commerce Clause claims do not depend on motives ........ 12

B. The federal preemption claims turn on pure issues of law ........ 14

C. The Takings Claim does not implicate third-party documents ........ 15

II. Even if the documents and information sought are marginally relevant, Plaintiffs have not shown their entitlement to obtain them ........ 16

A. Any marginal relevance of or hypothetical need for the subpoenaed material does not justify the impermissible burden of the discovery sought ........ 16

B. The subpoenas intrude upon the Non-Party Movants' First Amendment rights to associate and petition, would chill lawful associational conduct, and cannot be justified by a compelling need ........ 18

1. *Prima facie* chilling effect ........ 19

2. No compelling need ........ 21

III. In the alternative, the Court should substantially modify the subpoenas and ensure other protections through the entry of an appropriate protective order ........ 23

Conclusion ........ 23

Certificate of Service ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Abundes v. Athens Food Servs., LLC*,
No. 3:14-cv-1278, 2015 WL 13664280 (M.D. Tenn. Sept. 18, 2015) ....................10, 11

*AFL-CIO v. FEC*,
333 F.3d 168 (D.C. Cir. 2003) ....................18

*All. of Auto. Mfrs., Inc. v. Jones*,
No. 4:08-cv-555, 2013 WL 4838764 (N.D. Fla. Sept. 11, 2013) ....................3

*Ass'n of Equip. Mfrs. v. Burgum*,
427 F. Supp. 3d 1082 (D.N.D. 2019) ....................3

*Bailey v. Callaghan*,
715 F.3d 956 (6th Cir. 2013) ....................2

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*,
496 U.S. 226 (1990) ....................2

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998) ....................2

*Buckley v. Valeo*,
424 U.S. 1 (1976) ....................18

*Burgess v. Doji, Inc.*,
No. 3:25-cv-495, 2026 WL 1599393 (M.D. Tenn. June 4, 2026) ....................11

*Chavez v. Carranza*,
559 F.3d 486 (6th Cir. 2009) ....................15

*Comptroller of the Treasury of Maryland v. Wynne*,
575 U.S. 542 (2015) ....................12

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ....................12

*Energy Mich. v. Mich. Pub. Serv. Comm'n*,
126 F.4th 476 (6th Cir. 2025) ....................2

*Foresight Coal Sales, LLC. v. Chandler*,
60 F.4th 288 (6th Cir. 2023) ....................12, 13

*Fusion Elite All Stars v. Varsity Brands, LLC*,
340 F.R.D. 255 (W.D. Tenn. 2022) ....................13

*Godfrey v. Fed. Bureau of Investigation, CJIS, NICS Section*,
No. 5:26-cv-13, 2026 WL 906668 (E.D. Ky. Apr. 2, 2026)....................15

*In re Motor Fuel Temperature Sales Practices Litig.*,
641 F.3d 470 (10th Cir. 2011) ....................18

*Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*,
No. 3:07-cv-979, 2009 WL 1952780 (M.D. Tenn. July 2, 2009)....................22

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)....................15

*Marshall v. Bramer*,
828 F.2d 355 (6th Cir. 1987) ....................18

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)....................18

*Nickels v. Grand Trunk W. R.R.*,
560 F.3d 426 (6th Cir. 2009) ....................15

*PCMA v. Rowe*,
429 F.3d 294 (1st Cir. 2005), *cert. denied*, 547 U.S. 1179 (2006) ....................7

*PCMA v. Wehbi*,
18 F.4th 956 (8th Cir. 2021) ....................5

*Pernell v. Fla. Bd. of Governors of State Univ.*,
84 F.4th 1339 (11th Cir. 2023) ....................22

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ....................21

*Rutledge v. PCMA*,
592 U.S. 80 (2020)....................4, 5

*Sagebrush Solutions, LLC v. Health Mgmt. Sys.*,
289 F.R.D. 251 (S.D. Ohio 2013)....................11

*Thompson v. Merrill*,
No. 2:16-CV-783-ECM, 2020 WL 2545317 (M.D. Ala. May 19, 2020)....................22

*Tree of Life Christian Sch. v. City of Upper Arlington*,
No. 2:11-cv-09, 2012 WL 831918 (S.D. Ohio Mar. 12, 2012) ....................18, 19, 21

*Truesdell v. Friedlander*,
80 F.4th 762 (6th Cir. 2023) ....................................................................................12

*United States v. O'Brien*,
391 U.S. 367 (1968)...................................................................................................2

*Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*,
No. 3:19-cv-508, 2022 WL 19403696 (E.D. Tenn. July 1, 2022)..........................................11

*Virginia Dep't of Corr. v. Jordan*,
921 F.3d 180 (4th Cir. 2019) ....................................................................................16

*Whole Woman's Health v. Smith*,
896 F.3d 362 (5th Cir. 2018) ...............................................................................16, 17

**Statutes**

29 U.S.C. § 1144(a) ..................................................................................................14

ERISA ....................................................................................................................8, 14

FAIR Rx Act ..........................................................................1, 2, 3. 7, 8, 11, 12, 15, 21

**Articles (attached in order as Collective Exhibit G)**

*Gov. Sanders, Arkansas Insurance Department Enforce Arkansas Law Against PBM*, Aug. 6, 2024

Abiodun Salkeo, et al, *Update Independently Owned Pharmacy Closures in Rural America*

Reed Abelson & Rebecca Robbins, *The Powerful Companies Driving Local Drugstores Out of Business*, N.Y. Times, June 21, 2024

Marty Schladen & Cathy Candisky, *CVS paid itself far more than some major competitors*, Columbus Dispatch, Jan. 20, 2019

Nathan Layne, *Walmart has a drug problem*, Business Insider, Aug. 18, 2015

Linette Lopez, *What CVS is doing to mom-and-pop pharmacies in the US will make your blood boil*, Business Insider, Mar. 30, 2018

*Specialty Generic Drugs A Growing profit Center for Vertically Integrated Pharmacy Benefit Managers* (Jan. 2025)

Marty Schladen, *Report "Specialty" drugs are by far the most expensive, but classification seems arbitrary*, Ohio Capital Journal, May 15, 2023

Joseph Walker, *Generic Drugs Should Be Cheap, but Insurers Are Charging Thousands of Dollars for Them*, Wall Street, Journal, Sept. 11, 2023.

## INTRODUCTION

Non-parties Tennessee Pharmacists Association ("TPA"), its CEO, Anthony Pudlo; and its lobbyist, Garrett Johnson; C. Morgan Honeycutt, a member of TPA, a pharmacist, and the owner of Mac's Hometown Pharmacies; and Jacob Standefer, a member of TPA, a pharmacist, and the owner of Access Family Pharmacy (collectively, "Non-Party Movants"), respectfully move the Court, pursuant to Rule 45(d)(3)(A) of the Federal Rules of Civil Procedure, to quash subpoenas duces tecum served upon them by Plaintiffs Pharmaceutical Care Management Association ("PCMA") and various CVS Health entities ("CVS").

Through these consolidated cases, Plaintiffs—the three largest pharmacy benefit managers ("PBMs") and their trade association—have brought pre-enforcement actions seeking to enjoin the eventual enforcement of Tennessee's Freedom, Access, and Integrity in Registered Pharmacy ("FAIR Rx") Act. That law would eliminate an inherent conflict of interest: Vertically integrated PBMs and insurers control pharmacy reimbursements, and they have used that control to steer patients to their own affiliated pharmacies while reimbursing those pharmacies at supra-competitive prices. That conflict has increased costs for health plans and patients and strangled the ability of independent pharmacies to compete on a level playing field, resulting in massive pharmacy closures and inhibited access to a critical component of the health system. For example, the Federal Trade Commission found that PBMs have paid their own affiliated pharmacies 1,000 percent above their acquisition costs on certain drugs while reimbursing independent pharmacies at (or even below) their acquisition costs. No wonder the Tennessee legislature enacted FAIR Rx Act to eradicate this conflict.

Not confining their dispute to the State officials ultimately charged with enforcing the FAIR Rx Act, PCMA and CVS served sweeping subpoenas on the Non-Party Movants, directing them to produce more than a dozen categories of documents reflecting their efforts to advocate

for, organize around, and petition the Tennessee General Assembly to enact the FAIR Rx Act, including all communications with members of the Tennessee General Assembly, political contributions, presentations, polling, public-action alerts, internal assessments, and other associational activities. Every one of these categories is protected by the First Amendment's guarantees of freedom of association and to petition the government to redress grievances.

The Court should quash the subpoenas for at least two independent reasons:

*First*, the subpoenas demand the production of irrelevant information: A law is measured by its text, not what might reside in the hearts and minds of the individual legislators who voted for its passage. For that reason, the Sixth Circuit recently reaffirmed that, even under the dormant "Commerce Clause's antidiscrimination principle," an assessment of the *motivations* of individual legislators "is irrelevant" to whether a statute is, in fact, discriminatory. *Energy Mich. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 491 (6th Cir. 2025). That makes sense. In adjudicating constitutional questions, "what is relevant is the legislative purpose of *the statute*," not the "*motives* of the legislators who enacted the law." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 249 (1990) (plurality op.) (emphasis added); *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) ("[I]t is simply not consonant with our scheme of government for a court to inquire into the motives of legislators." (cleaned up)); *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). And yet, PCMA and CVS seek to probe the motivations of individual legislators based on communications they might have had with independent pharmacists and their trade association advocating for the passage of the FAIR Rx

Act, along with the pharmacists' purely internal assessments and strategic playbook related to petitioning for the passage of that legislation. That type of information is irrelevant twice over.

*Second*, even if some of the information sought could be said to have some marginal relevance, PCMA and CVS are not entitled to the extraordinary breadth of documents and communications these subpoenas demand. The requests are wildly disproportionate to the claims they are pursuing, and it would set a dangerous precedent to sanction sweeping non-party discovery in furtherance of PCMA's and CVS's quintessential *legal* challenges to the constitutionality of the FAIR Rx Act. That concern is particularly acute because compelled production here impinges on the Non-Party Movants' core associational and First Amendment rights, and neither PCMA nor CVS can demonstrate the "compelling need" required to override the Non-Party Movants' constitutional privilege. Courts time and again have quashed similar subpoenas for fear of "chill[ing] a willingness [on the part of citizens from] participat[ing] in the political process, caus[ing] a fear of retaliation, and chill[ing] the free flowing of information." *All. of Auto. Mfrs., Inc. v. Jones*, No. 4:08-cv-555, 2013 WL 4838764, at *4 (N.D. Fla. Sept. 11, 2013); *accord Ass'n of Equip. Mfrs. v. Burgum*, 427 F. Supp. 3d 1082 (D.N.D. 2019) (quashing third-party subpoena directed at a trade association that had drafted and lobbied for a challenged law, finding the materials "lie at the core of" the First Amendment and were irrelevant to the constitutional merits). And to the extent that the motivations of individual legislators are relevant, there is already a publicly available source for that information—the legislative file maintained by the Tennessee General Assembly.

Indeed, because the information sought here is of such dubious value, it gives rise to a strong inference that the subpoenas were issued instead for improper purposes: to retaliate against independent pharmacies advocating for the passage of Tennessee's law and to intimidate others

from advocating for the passage of similar laws across the country. The message sent here is clear: If you advocate for the passage of this type of legislation, then you better be prepared to spend tens of thousands of dollars responding to baseless subpoenas.

The subpoenas must be quashed. They seek irrelevant documents, are disproportionate and burdensome, and Plaintiffs cannot show a substantial need sufficient to compel the Non-Party Movants to disclose—and thereby potentially chill and retaliate against—core First Amendment activities.

## BACKGROUND

### A. PBMs have engaged in abusive practices that required State action.

Through unchecked vertical integration, three Fortune 13 companies (CVS Health, UnitedHealth, and Cigna) have positioned themselves to straddle both sides of the lucrative prescription drug market: Through their vertically integrated PBMs and affiliated pharmacies, these conglomerates have the power to force patients to use their own pharmacies, and they get to decide how much they pay those pharmacies for filling prescriptions. It doesn't take an economist to predict what happened next: higher consumer costs and even less competition in the marketplace. All the while, these same PBMs have reimbursed independent pharmacies at less than their costs to acquire those same drugs, *see Rutledge v. PCMA*, 592 U.S. 80, 84 (2020), forcing the closure of thousands of locally operated pharmacies across the country and threatening patient access to a critical component of the healthcare system, Jenny S. Guadamuz, *et al.*, *More US Pharmacies Close Than Opened in 2019–21; Independent Pharmacies, Those in Black, Latinx Communities Most at Risk*, 43 Health Aff. 1703, 1709-10 (2024), (manuscript available at https://pmc.ncbi.nlm.nih.gov/articles/PMC12988438/pdf/nihms-2050829.pdf).

The harm from the conflicted practices of PBMs has been difficult to eradicate. When States have sought to regulate PBM-pharmacy networks directly, they have been met with steep

resistance. PBMs have sued to enjoin the enforcement of these laws on the grounds that they are preempted as applied to PBMs serving plans subject to regulation by ERISA and Medicare Part D, tying those laws up in years of litigation. *See, e.g.*, *PCMA v. Wehbi*, 18 F.4th 956 (8th Cir. 2021) (rejecting a challenge to North Dakota's PBM law after four years of litigation). And PBMs have outright refused to comply with such laws even after courts have rejected their challenges. For example, even after the Supreme Court of the United States blessed an Arkansas law that allowed that State to prevent PBMs from reimbursing independent pharmacies below their costs to acquire drugs, *see Rutledge*, 592 U.S. at 88-92, some PBMs have allegedly refused to comply, prompting Arkansas to bring an enforcement action against many of the same plaintiffs here. Gov. Sanders, *Arkansas Insurance Department Enforce Arkansas Law Against PBMs*, Aug. 6, 2024.[1]

The harm PBMs have wrought has had a particularly deleterious effect on independent pharmacies. In the last few decades, the business practices of PBMs have shuttered countless pharmacies—including many in rural, underserved, and medically vulnerable communities. Abiodun Salako, *et al.*, *Update: Independently Owned Pharmacy Closures in Rural America*[2]; *see also* Reed Abelson & Rebecca Robbins, *The Powerful Companies Driving Local Drugstores Out of Business*, N.Y. Times, October 19, 2024.[3]

Independent pharmacies, including large chains like Walmart and Sam's Club, have struggled to compete when conglomerates like CVS reimburse their PBM-affiliated pharmacies forty-six percent more for generic drugs. Marty Schladen & Cathy Candisky, *CVS paid itself far more than some major competitors*, Columbus Dispatch, Jan. 20, 2019 (citing a report by the State

---

[1] https://governor.arkansas.gov/news_post/governor-sanders-arkansas-insurance-department-enforce-arkansas-law-against-pbms/.

[2] https://rupri.org/wp-content/uploads/2018-Pharmacy-Closures.pdf.

[3] https://www.nytimes.com/2024/10/19/business/drugstores-closing-pbm-pharmacy.html.

of Ohio)[4]; *see also* Nathan Layne, W*almart has a drug problem*, Business Insider, Aug. 18, 2015 (attributing business losses to negative PBM reimbursements).[5] And in some situations, CVS has paid itself over five times as much as it reimbursed independent pharmacies for some medications—or $324.91 more on a single transaction. Linette Lopez, *What CVS is doing to mom-and-pop pharmacies in the US will make your blood boil, Business Insider*, Mar. 30, 2018.[6] Adding insult to injury, CVS sent letters to independent pharmacists asserting that selling their businesses to CVS was an "attractive and practical option" in the face of "declining reimbursements." *Id.* (linking to CVS letter).

The problem is particularly acute when it comes to specialty drugs—typically higher-cost (and higher-margin) drugs that require special handling. *See* Fed. Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers*, at 2 (Jan. 2025).[7] PBMs have prohibited unaffiliated pharmacies from distributing specialty drugs and simultaneously expanded the designation of those drugs to include non-specialty medications. *See, e.g.*, Marty Schladen, *Report: "Specialty" drugs are by far the most expensive, but classification seems arbitrary*, Ohio Capital Journal, May 15, 2023.[8] Some PBMs have then required patients to obtain these drugs through mail-order pharmacies owned by the PBMs. *See, e.g.*, Joseph Walker, *Generic Drugs Should Be Cheap, but Insurers Are Charging Thousands of*

---

[4] https://www.dispatch.com/story/news/politics/2019/01/20/cvs-paid-itself-far-more/6241130007/.

[5] https://www.businessinsider.com/r-wal-marts-drug-problem-pharmacy-business-drags-on-profit-2015-8.

[6] https://www.businessinsider.com/cvs-squeezing-us-momand-pop-pharmacies-out-of-business-2018-3.

[7] https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

[8] https://www.ohiocapitaljournal.com/2023/05/15/report-specialty-drugs-are-by-the-most-expensive-but-classification-seems-arbitrary/.

*Dollars for Them*, Wall Street Journal, Sept. 11, 2023[9]; *Medicare Program; Contract Year 2019 Policy and Technical Changes*, 82 Fed. Reg. 56,336, 56,410 (Nov. 28, 2017) (expressing concern that PBMs are using pharmacy contracts "in a way that inappropriately limits dispensing of specialty drugs to certain pharmacies"). And with these captive patients, PBMs have then exploited their control over both sides of prescription-drug reimbursements. According to the Federal Trade Commission, the three largest PBMs reimbursed their affiliated pharmacies more than 100 percent over their estimated acquisition cost on 63 percent of the specialty medications they dispensed, and 22 percent of the time those PBMs reimbursed their affiliated pharmacies at a markup of more than 1,000 percent. FTC, *Specialty Drugs*, *supra* note 7, at 2; *see* Walker, *supra* note 9. As the First Circuit recognized, "'[w]hether and how a PBM actually saves an individual benefits [plan] money with respect to the purchase of a particular prescription drug is largely a mystery to the benefits [plan].'" *PCMA v. Rowe*, 429 F.3d 294, 298 (1st Cir. 2005) (citation omitted), *cert. denied*, 547 U.S. 1179 (2006).

### B. Pharmacy organizations engaged in protected First Amendment activity in advocating for the passage of the FAIR Rx Act.

In the face of this, interested citizens, patient organizations, and independent pharmacies—both mom-and-pop pharmacies and independent chain drugstores like Walgreens and Walmart—have advocated for legislative change at the State and federal levels. Tennessee was no exception. The Non-Party Movants spoke out prominently in favor of the passage of legislation to prevent PBMs from self-dealing.

Ultimately, the Tennessee General Assembly enacted the FAIR Rx Act, which seeks to eradicate the conflict of interest inherent when PBMs and their vertically integrated insurers have

[9] https://www.wsj.com/health/healthcare/generic-drugs-should-be-cheap-but-insurers-are-charging-thousands-of-dollars-for-them-ef13d055.

the power and financial incentive to steer patients to affiliated pharmacies. It does so by denying a pharmacy license to any entity that is affiliated with an insurer and PBM—though, it includes exceptions and a far-off effective date to allow market participants time to adapt to the new law.

The FAIR Rx Act is facially neutral in its treatment of PBMs and their affiliated pharmacies; it applies equally to companies that are headquartered in Tennessee and those that are headquartered outside the State. It focuses exclusively on pharmacies that are affiliated with a PBM and an insurer. As a result, the law has no effect on unaffiliated pharmacies—whether they are owned locally or in distant States. That means a chain drugstore like Walgreens, which is headquartered in Illinois, can continue to maintain a license in the State of Tennessee, so long as it remains unaffiliated with a PBM and insurer. And it also means that, even if CVS relocated to the State of Tennessee, it will not be able to obtain a pharmacy license as long as it remains affiliated with a PBM and an insurer.

### C. PBMs sue to enjoin enforcement of the FAIR Rx Act and serve sweeping subpoenas on their public-policy opponents, seeking protected First Amendment communications.

Shortly after the enactment of the FAIR Rx Act, the three largest PBMs and their trade association sued to enjoin enforcement of the law. In overlapping lawsuits, they claim that the law violates the dormant Commerce Clause, is preempted by ERISA, Medicare Part D, and TRICARE, and constitutes an unconstitutional taking of private property in violation of the Fifth and Fourteenth Amendments.

As noted, two of the plaintiff groups, PCMA and CVS, also served subpoenas on independent pharmacists who advocated for the passage of the FAIR Rx Act. Those subpoenas are sweeping in their demands. Two other plaintiff groups, Express Scripts and United Health, did not serve such subpoenas, apparently (and correctly) concluding that third-party discovery is neither

necessary nor appropriate in these cases about how the Constitution and federal statutes interact with a State law.

The CVS subpoenas were served upon TPA, its CEO, and its lobbyist; they demand the production of sixteen categories of documents, including any communications with State officials about the Act, documents relating to the preparation of witnesses at legislative hearing, public-action alerts, polling, focus groups, and other efforts to promote the Act; all communications concerning the Act; all documents and communications concerning similar legislation in Arkansas; all documents and communications concerning strategy, coordination, messaging, talking points, and position papers related to the Act; documents showing any political contributions to members of the Tennessee General Assembly; documents analyzing existing Tennessee laws that regulate PBMs; documents that might show the anticipated effect that the Act will have on pharmacies operating in the State; documents identifying any person who may have had any communications with members of the Tennessee General Assembly or the Governor about the Act; documents concerning TPA's fundraising activities; and any other document or communication not captured in the other requests relating to the Act. *See* Exhs. A, B & C.

The PCMA subpoenas were served upon Mr. Honeycutt and Mr. Standefer; they seek similar information from these independent pharmacists and proponents of the FAIR Rx Act, including all documents and communications related to the potential or actual adoption of the Act; documents concerning whether the Act may be preempted by ERISA and Medicare; documents and communications with members of the Tennessee General Assembly and their staff about the Act; documents related to the closure of independent pharmacies related to PBM practices; documents related to the drafting, development, or promotion of the Act; documents and communications with specific members of the General Assembly and their staff—without any

relation to the FAIR Rx Act; documents and communications with various trade associations that advocate for pharmacists related to the Act, PBM regulation, or pharmacy-ownership restrictions in Tennessee; documents and communications to any candidate for the General Assembly; documents bearing on any actual or potential conflict of interest that any Tennessee legislator might have relating to the Act; any documents bearing on coordination among independent pharmacies concerning advocacy for, or support of, the Act; documents and communications concerning a similar law in Arkansas; and any documents related to the Act's potential impact on pharmacies, including potential closures, layoffs, or increased business. *See* Exhs. D & E.

PCMA and CVS subsequently agreed to allow the subpoenas' recipients until August 14, 2026, in which to respond to the subpoenas, and after conducting a reasonable investigation, counsel met and conferred as required by Local Rules 7.01 and 37.01. Ultimately, counsel were unable to reach a resolution on the recipients' objections to the subpoenas, and as result, the recipients have filed a motion to quash.

## ARGUMENT

Rule 45 of the Federal Rules of Civil Procedure governs the issuance of subpoenas to non-parties to civil litigation. Among other things, it admonishes parties to remain mindful of the burden that subpoenas can impose on non-parties: "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). "Under Rule 45, the court must quash or modify a subpoena that 'requires disclosure of privileged or other protected matter, if no exception or waiver applies[,] or ... subjects a person to undue burden.'" *Abundes v. Athens Food Servs., LLC*, No. 3:14-cv-1278, 2015 WL 13664280, at *2 (M.D. Tenn. Sept. 18, 2015) (quoting Fed. R. Civ. P. 45(d)(3)(A)).

"While Rule 45 does not list irrelevance or overbreadth as reasons for quashing a subpoena, courts have held that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26." *Burgess v. Doji, Inc.*, No. 3:25-cv-495, 2026 WL 1599393, at *1 (M.D. Tenn. June 4, 2026) (quoting *Abundes*, 2015 WL 13664280, at *2). "Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs against disclosure." *Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*, No. 3:19-cv-508, 2022 WL 19403696, at *3 (E.D. Tenn. July 1, 2022) (quoting *Sagebrush Solutions, LLC v. Health Mgmt. Sys.*, 289 F.R.D. 251, 253 (S.D. Ohio 2013)).

The third-party subpoenas at issue here must be quashed for two main reasons. First, the information sought is essentially *irrelevant* to the claims PCMA and CVS bring, which are constitutional challenges to the substance of the FAIR RX Act based on the dormant Commerce Clause, express federal preemption, and the Takings Clause. Second, even assuming some of the categories of documents requested have marginal relevance to some asserted claims, PCMA and CVS's requests do not survive a balancing inquiry under either Rule 45 or the First Amendment. The requests are wildly disproportionate to the objective needs of the case and, as such, inherently burdensome, and they impinge upon the First Amendment rights of the TPA and individual Tennessee pharmacy owners, threatening to chill lawful associational activities, and PCMA and CVS can demonstrate no compelling need to obtain them.

## I. The subpoenas demand the production of documents that are irrelevant to the Plaintiffs' challenge to the constitutionality of the FAIR Rx Act.

The subpoenas should be quashed for the simple reason that they seek documents that are irrelevant to PCMA's and CVS's claims. A claim-by-claim assessment proves as much.

### A. The dormant Commerce Clause claims do not depend on motives.

PCMA's and CVS's principal challenge to the FAIR Rx Act is that it violates the "core antidiscrimination principle" of the dormant Commerce Clause in "purpose" and "effect." *See* PCMA Compl. ¶¶ 73-83; CVS Compl. ¶¶ 157-167. Their Complaints both liberally cite documents from and statements in the legislative history, including (in CVS's case) a "confidential memorandum to members of the General Assembly." CVS Compl. ¶ 107. Now, from the Non-Party Movants, PCMA and CVS seek a host of documents that can only plausibly bear on the subjective motivations of Tennessee legislators in enacting the FAIR Rx Act—*e.g.*, TPA's and pharmacists' internal communications about why the FAIR Rx Act was proposed, what legislators intended, what the advocacy goals were, and how lobbying was planned and coordinated. None of this has any relevancy to PCMA's and CVS's dormant Commerce Clause challenges.

As the Sixth Circuit emphasized, the Supreme Court has made clear that "the Commerce Clause concerns itself with protectionist 'effects, not motives,' and thus does not require courts to investigate the subjective mindsets of the legislators who passed the law." *Truesdell v. Friedlander,* 80 F.4th 762, 772-73 (6th Cir. 2023) (quoting *Foresight Coal Sales, LLC. v. Chandler*, 60 F.4th 288, 296 (6th Cir. 2023), in turn quoting *Comptroller of the Treasury of Maryland v. Wynne*, 575 U.S. 542, 561 n.4 (2015)). "This disclaimer follows from the [Supreme] Court's longstanding caution against trying to deduce a single 'intent' behind legislation enacted by a body of individuals." *Id.*; *Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215, 253-54 (2022) ("Even when an argument about legislative motive is backed by statements made by legislators who voted for a law, we have been reluctant to attribute those motives to the legislative body as a whole."). Thus, the Sixth Circuit "generally find[s] a law's text conclusive as to its objectives." *Friedlander*, 80 F.4th at 773; *see Foresight*, 60 F.4th at 300 ("Usually, the text is sufficient to determine purpose."). It reiterated the point in *Energy Michigan*: "Divining a law's

purpose . . . is tricky business. Indeed, it is the rare law from which one can deduce a single underlying purpose." 126 F.4th at 491. As the Sixth Circuit has observed, moreover, it is unlikely that any law *could* violate the Commerce Clause based on discriminatory legislative "purpose" alone, absent actual discrimination in the text of the statute or in practical effect. *Foresight*, 60 F.4th at 296 n.1. Those inquiries do not turn on what's in the hearts and minds of the various individual legislators who introduced, supported, or voted for a law—let alone those of the third parties who advocated for its passage.

The upshot is obvious: While the role of "purpose" evidence drawn from regulatory context and legislative history may be open to debate, the Sixth Circuit's dormant Commerce Clause jurisprudence does not contemplate PCMA's and CVS's extraordinary, intrusive, and burdensome attempts to launch an inquisition into "true" legislative motives by rifling through the files of *third parties* who advocated for and communicated regarding a purportedly protectionist statute. *See Burgum*, 427 F. Supp. 3d at 1093 (holding that discovery sought from third-party association analogous to discovery sought here was "too tenuous to be relevant regardless of the claim being pursued"); *Jones*, 2013 WL 4838764, at *4 ("A decision on the merits of these claims does not hinge on the opinions or activities of [the subpoenaed association] or even the motives or opinions of the legislators passing the [law].").[10]

The core problem here is that PCMA and CVS seem to be under the impression they are prosecuting a claim for conspiracy to enact "protectionist" legislation. They are not, because no

[10] Notably, in both *Burgum* and *Jones*, the requests deemed to seek information irrelevant to constitutional claims were served on *parties* to the case. Here, PCMA and CVS's blunderbuss subpoenas target *non-parties*, as to which litigants are expressly obliged to avoid imposing an "undue burden" and courts generally offer the issuing party less latitude. *See, e.g.*, *Fusion Elite All Stars v. Varsity Brands, LLC*, 340 F.R.D. 255, 261 (W.D. Tenn. 2022) ("[T]he status of a person as a non-party is a factor that weighs against disclosure." (quotation marks omitted))

such cause of action exists. Rather, they assert claims that the *statute itself*—the law on the books—violates the dormant Commerce Clause. The text of the statute, the effects of the statute, and (potentially) the contents of the legislative and public record will resolve that question. PCMA's and CVS's third-party subpoenas, however, demand things fundamentally irrelevant to their constitutional claims.[11]

**B. The federal preemption claims turn on pure issues of law.**

PCMA and CVS both assert claims that Medicare's and ERISA's express preemption clauses preempt the FAIR Rx Act, either as a whole or as applied to certain plans. *See* PCMA Compl. ¶¶ 84-107; CVS Compl. ¶¶ 169-186; 42 U.S.C. §§ 1395w26(b)(3), 1395w-112(g) (Medicare); 29 U.S.C. § 1144(a) (ERISA). In addition to the raft of communications and documents PCMA seeks from two individual pharmacists related to their advocacy and associational affiliations, PCMA also seeks from them all communications and documents concerning "whether the Act is or may be preempted by Medicare," "whether the Act is or may be preempted under ERISA," and "the actual or potential applicability of the Act to a licensed PBM's services provided to self-insured or self-funded ERISA plans." Exhs. D, E. These documents have no relevance to PCMA's preemption claims.

[11] To the extent any of PCMA's or CVS's requests (*e.g.*, CVS's Request #1) could be considered relevant to the "effects" test under the dormant Commerce Clause—so-called *Pike* balancing between in-state and out-of-state effects—a demand that a non-party produce its internal economic and market analyses and communications about same remains irrelevant. For a law that has yet to go into effect, the Non-Party Movants could only guess at the law's predicted effects, which likely will need to be established through expert testimony. In any event, requesting such information is inherently disproportionate to the needs of the case and there is no compelling need for such documents. Plus, enforcing these subpoenas would open a Pandora's box: Countless organizations and individuals take an interest in legislation; it cannot be that parties to litigation may fire off subpoenas to local law school professors, businesses, and even average citizens demanding their assessments of a law's effects. Neither Rule 45 nor the First Amendment support such a result.

"Whether federal law preempts state law is a question of law." *Godfrey v. Fed. Bureau of Investigation, CJIS, NICS Section*, No. 5:26-cv-13, 2026 WL 906668, at *3 (E.D. Ky. Apr. 2, 2026) (citing *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir. 2009)). PCMA is seeking inherently intrusive third-party discovery into the opinions of private citizens about *legal questions* as to which their documents and communications are, as a matter of law, necessarily irrelevant. Much like the Court would not accept expert opinion on a pure issue of federal law, it does not need discovery to decide whether federal law preempts the FAIR Rx Act. These requests would be equally irrelevant if they demanded the same categories of communications and documents from attorneys, law professors, or state legislators. *See, e.g.*, *Chavez v. Carranza*, 559 F.3d 486, 498 (6th Cir. 2009) ("An expert opinion on a question of law is inadmissible."). That PCMA is seeking them from two non-lawyer independent Tennessee pharmacists here only underscores that these requests are *per se* improper and must be quashed. Whatever the relevance of the other requests—and Non-Party Movants submit that there is none—including these *facially* irrelevant requests in a subpoena compelling production of personal papers related to private citizens' participation in the democratic process is indefensible.

### C. The Takings Clause claim does not implicate third-party documents.

CVS alone asserts a claim that the FAIR Rx Act amounts to an unconstitutional regulatory taking in violation of the Takings Clause. *See* CVS Compl. ¶¶ 187-197. None of the document requests CVS has propounded to TPA and its agents bear on the merits of this claim, which depends upon the economic impact *on CVS* of the FAIR Rx Act, whether *CVS* had reasonable investment-backed expectations of indefinitely remaining a vertically integrated owner and operator of Tennessee pharmacies, and the costs *CVS* contends that it will bear by virtue of complying with the law. *See id.* ¶ 190 (citing, among other cases, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-39 (2005)).

## II. Even if the documents and information sought are marginally relevant, Plaintiffs have not shown their entitlement to obtain them.

Even if the subpoenas could be said to request documents of marginal relevance, the Court should still quash them on either of two grounds: They do not survive a balancing inquiry under either Rule 45 or the First Amendment.

### A. Any marginal relevance of or hypothetical need for the subpoenaed material does not justify the impermissible burden of the discovery sought.

Rule 45 requires that this Court quash or modify a subpoena if necessary to avoid "subject[ing] a person to an undue burden." Fed. R. Civ. P. 45(d)(3)(A). This provision embodies the same principles of proportionality that govern the discovery process more generally—though with particular solicitude, given the subpoenas impose unilateral obligations on third parties. *See, e.g.*, *Fusion Elite*, 340 F.R.D. at 261 ("[T]he status of a person as a non-party is a factor that weighs against disclosure." (quotation marks omitted)); *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) ("[C]ourts must give the recipient's nonparty status special weight, leading to an even more demanding and sensitive inquiry than the one governing discovery generally." (quotation marks omitted)). Here, the minimal relevance of the requested communications and documents to PCMA's and CVS's constitutional claims and the correspondingly negligible need for them suffices to resolve this motion based on those principles alone.

*Whole Woman's Health v. Smith*, 896 F.3d 362, 375 (5th Cir. 2018), is illustrative. As in this case, the subpoena in *Smith* was issued to a non-party entity whose associational rights under the First Amendment went without saying. Reversing an order that denied the non-party's motion to quash and compelled it to produce the requested information, the Fifth Circuit observed that the district court's "rejection of the free speech, association, and petition claims [by the association] too narrowly construe[d] the nature of chilling effects on those rights while overbroadly interpreting the importance to the plaintiffs of the discovery sought." *Id.* at 370. It did not, however,

ultimately predicate its reversal on those rights directly—though it almost certainly could have. Rather, invoking the "rule of constitutional avoidance," it grounded its holding in Rule 45 itself: "The small or non-existent incremental 'need' for and 'relevance' of this discovery alone impose[d] a burden on [the association], if it must produce documents unnecessary to the litigation." *Id.* at 374-76.

There are at least two good reasons to follow that logic here:

First, both PCMA and CVS have access to ample publicly available information that they contend already establishes the *actual* motivations of individual legislators involved in enacting the FAIR Rx Act; their Complaints are fairly laced with it. Imposing a burden on third-party associations and individual pharmacists to obtain from non-legislators what, under PCMA's and CVS's theory of their cases, would ultimately be cumulative further underscores the disproportionality of PCMA's and CVS's subpoenas under Rule 45 and therefore the undue nature of the burden. And all of this assumes the relevancy of individual-motivation evidence, despite Sixth Circuit and Supreme Court precedent to the contrary.

Second, permitting these subpoenas to stand in a constitutional challenge like this has repercussions. Non-profits and trade associations regularly engage in political advocacy; in most cases, pursuing a shared cause or advancing a collective interest is one of their primary purposes. Legislatures are always debating policy questions, considering legislation, and listening to their constituents. Associations frequently hire lobbyists to refine and elevate their advocacy. They mobilize their members. They craft strategy and messaging. And they make political contributions. This is politics. Compelling production from groups and individuals engaged in the everyday business of political participation in *this* case leaves no meaningful limiting principle for *future* cases. The scope and breadth of the subpoenas speak for themselves, as does their at-best tenuous

connection to the claims asserted. Enforcing them would reward PCMA's and CVS's shock-and-awe approach to straightforward constitutional claims while adding nothing material to the record. This, too, establishes that the burden on Movants is inherently undue.

### B. The subpoenas intrude upon the Non-Party Movants' First Amendment rights to associate and petition, would chill lawful associational conduct, and cannot be justified by a compelling need.

Rule 45 also requires the Court to quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii). Non-Party Movants have a strong First Amendment privilege in their associational documents and communications; PCMA's and CVS's desire to obtain them cannot outweigh it.

The First Amendment protects the right to associate for the advancement of beliefs and ideas. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). This right extends to compelled disclosure in civil discovery. *See In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 479-80 (10th Cir. 2011); *Marshall v. Bramer*, 828 F.2d 355, 358 (6th Cir. 1987) (recognizing First Amendment privilege in Sixth Circuit); *cf. AFL-CIO v. FEC*, 333 F.3d 168, 177-78 (D.C. Cir. 2003) (recognizing "public disclosure of an association's confidential internal materials . . . intrudes on the 'privacy of association and belief guaranteed by the First Amendment,' as well as seriously interferes with internal group operations and effectiveness" (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)). Moreover, it extends just as much to "economic" and "professional" associations as it does to groups whose beliefs are "political" or "religious." *In re Motor Fuel*, 641 F.3d at 480.

Courts thus recognize "a First Amendment privilege when discovery requests infringe on a party's associational rights." *Tree of Life Christian Sch. v. City of Upper Arlington*, No. 2:11-cv-09, 2012 WL 831918, at *2 (S.D. Ohio Mar. 12, 2012). In assessing assertions of such privilege,

courts typically apply a two-step balancing-test framework. *See id.* at *2-3; *id.* at 2 (Sixth Circuit "has suggested that a balancing test is appropriate when free association rights are at stake" (citing *Bramer*, 828 F.2d at 359); *Jones*, 2013 WL 4838764, at *4; *Burgum*, 427 F. Supp. 3d at 1097-99.

**1. *Prima facie* chilling effect.**

First, a party must demonstrate an "arguable first amendment infringement"—that is, "an objectively reasonable probability that disclosure will chill associational rights." *Id.* at *2 (cleaned up). "[T]he Court may look to whether disclosure will result in membership withdrawal, discouragement of new members, or other consequences which objectively suggest an impact on the members' associational rights." *Id.* (cleaned up). "The burden in making [the] prima facie case is light." *Jones*, 2013 WL 4838764, at *4 (quotation marks and citation omitted); *see, e.g.*, *Burgum*, 427 F. Supp. 3d at 1097-98 (finding "threshold showing" "need not be great").

The attached Declarations of Anthony Pudlo, Morgan Honeycutt and Jacob Standefer establish in detail the chilling effects TPA, its members, and its affiliates will experience if PCMA's and CVS's wide-ranging discovery demands are enforced. (*See* Exhs. F, G, and H).

*First*, the prospect that TPA's core strategic materials, and internal and external communications may be publicly disclosed at the behest of their economic and political competitors will hang over every document produced and message sent, inevitably discouraging members and management from forthcoming and candid communications in their open dialogue about present and future public policy priorities and advocacy. For example, TPA's CEO attests that he will communicate less often, and certainly less in writing, about sensitive political priorities of TPA's members. He will exercise greater care in drafting remarks, knowing that his uncommunicated drafts could end up in the hands of competitors. And ultimately, TPA's members would suffer from less robust advocacy and communication on their behalf. (*See* Ex. F).

*Second*, disclosure of TPA's donor and financial-support records, lobbying strategies, and coalition communications will inevitably deter or dampen future dialogue among members, allied organizations, and potential supporters, impairing TPA's ability to engage in collective advocacy on matters of public concern. As Mr. Pudlo notes, the dynamics of TPA's meetings would change if he would have to treat PCMA and CVS as having seats at the table for sensitive discussions. *Id.*

*Third*, PCMA and CVS appear to have targeted these specific subpoena recipients based on their public statements in support of the FAIR Rx Act—indeed, the subpoenas directed to Mr. Honeycutt (of Mac's Hometown Pharmacies) and Mr. Standefer (of Access Family Pharmacy) cannot be explained *apart* from their decision to speak out in public in favor of the Act. Enforcing broad and intrusive subpoenas that were issued based on open contribution to political discourse would deter them (and others like them) from further such activities. And as Mr. Honeycutt explains, he would think twice before speaking out if it means having to hire a lawyer to respond to onerous subpoena requests. (*See* Ex. G, ¶10).

*Fourth*, TPA's members include independent pharmacists who compete directly with PBM-affiliated pharmacy chains, including CVS. Compelled disclosure of members' identities, internal communications, and strategic deliberations could expose them to reprisal by way of exclusion from pharmacy networks, increased audits, and other exercises of PBMs' disproportionate power to control pharmacy markets. Mr. Pudlo details some of the forms of retaliation that TPA's members could face. And Mr. Standefer speaks to his legitimate concerns about economic retaliation based on his outspoken support for the FAIR Rx Act. (*See* Ex. H, ¶9).

These affidavits provide specific, detailed accounts of the actual and anticipated real-world effects of PCMA's and CVS's no-holds-barred litigation strategy. This is more than enough to establish the Non-Party Movants' threshold burden. *See Jones*, 2013 WL 4838764, at *4 (affidavits

attesting that subpoenas would chill "willingness to participate in the political process" and "the free flow of information," "cause a fear of retaliation," and "discourage members of [the association] from participation" met *prima facie* burden).

**2. No Compelling Need.**

Because Non-Party Movants have satisfied their initial burden to show a *prima facie* impairment of their First Amendment rights, PCMA and CVS must "demonstrate an interest in obtaining the disclosures [they] seek[] . . . sufficient to justify the deterrent effect . . . on the free exercise . . . of the constitutionally protected right of association." *Tree of Life*, 2012 WL 831918, at *3 (quoting *Perry v. Schwarzenegger*, 591 F.3d 1147, 1161 (9th Cir. 2010)) (cleaned up). In this analysis, the court should "balance the burdens imposed on individuals and associations against the significance of the interest in disclosure." *Id.* at *3 (cleaned up). The Court may consider several factors when balancing such burdens against disclosure, including "(1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information." *Id.* (cleaned up) All of these factors weigh against PCMA and CVS.

*No Relevance.* As discussed in Section I, the relevance of the information PCMA and CVS seek is nugatory. Legislators' *individual motives* are not relevant to an assessment of the "purpose" of a challenged statute enacted by the General Assembly with the support of 24 State Senators and 86 State House Members; that analysis is informed by the text of the statute, its legislative history, and public records documenting the deliberative process. Advocates' associational efforts to spread information about and generate support for passage of the FAIR Rx Act are even less relevant. They will not make the statute any *more* or *less* constitutional.

*No Necessity and Other Sources.* There is no need for PCMA and CVS to obtain this information at all, let alone from non-parties. In addition to its irrelevance, PCMA and CVS have already cited countless documents of public record to support their theory that certain individual legislators were improperly motivated. And to the extent the document requests seek TPA's economic and market analyses to prove discriminatory effect, that information is available from sources that do not implicate First Amendment concerns: the parties' own business records, public pharmacy-licensing data, and market-share analyses from industry experts that plaintiffs presumably intend to retain to prove their case. The inadmissible beliefs about and assessments of the economic and market effects of legislation *by third parties* are simply not needed here, and they would set a dangerous precedent. There is no limit to the number of assessments that businesses, think tanks, academics, and lay citizens perform of pending legislation.

*The Sensitive Nature of the Information Sought*. PCMA and CVS are demanding that associational advocates on the other side of a fierce public debate about PBMs' disproportionate power and influence produce essentially everything that informs and is connected to their part in that ongoing dialogue. Courts are "especially wary of orders forcing a non-party to turn over internal communications to a public-policy opponent." *Smith*, 896 F.3d at 370-71. This case should be no exception.[12]

---

[12] The materials that PCMA and CVS are seeking are also likely subject to a legislative privilege that would shield the State from being forced to produce the same materials. *See, e.g.*, *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:07-cv-979, 2009 WL 1952780, at *3 (M.D. Tenn. July 2, 2009) ("[L]egislative immunity protects not only against civil liability, but . . . also functions as an evidentiary and testimonial privilege." (quotation marks omitted)); *see also Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1344 (11th Cir. 2023) (reversing denial of motion to quash based on legislative privilege where "the subpoenas' purpose was to uncover the legislators' motives in passing the law"); *Thompson v. Merrill*, No. 2:16-CV-783-ECM, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020) (noting many courts have concluded "legislative privilege is not waived simply because a legislator has communicated with third parties, if the communication was part of the formulation of legislation").

### III. In the alternative, the Court should substantially modify the subpoenas and ensure other protections through the entry of an appropriate protective order.

Even if this Court were to conclude that some subset of the requested materials is relevant to PCMA's and CVS's claims and decline to quash the subpoenas in full, meaningful relief is still required.

First, the subpoenas as drafted must be substantially modified to eliminate Non-Party Movants' obligations to respond to requests seeking fundamentally irrelevant information, as discussed above. *See* Fed. R. Civ. P. 45(d)(3)(A). Second, discovery should be carefully managed by way of a protective order, which Non-Party Movants submit should be principally negotiated between the parties within a reasonable time. *See* Fed. R. Civ. P. 26(c)(1) ("[A]ny person from whom discovery is sought may move for a protective order . . . ."). However, any protective order, Non-Party Movants note, should defer any third-party production pending resolution of any Motion to Dismiss, *see* Dkt. No. 68 at 5 (deadline of August 21, 2026 for "responsive pleading"); Fed. R. Civ. P. 26(c)(1)(B) (Court may "specify[] . . . time and place . . . for the disclosure or discovery"), and require that any production of internal communications, deliberations, or strategic and analytical documents made to PCMA and CVS be made on an attorney's eyes only basis, *see* Fed. R. Civ. P. 26(c)(1)(G).

## CONCLUSION

The Court should grant Non-Party Movants' motion and quash the subpoenas. In the alternative, the Court should substantially modify the subpoenas by eliminating irrelevant requests and categories of materials; substantially narrowing them to requests for which PCMA and CVS can demonstrate "need" sufficient to overcome the inherent undue burden and First Amendment privilege that the requests would impose on Non-Party Movants; and enter a protective order

deferring compliance until resolution of any motion to dismiss and requiring that any production be subject to attorneys' eyes only protection.

Dated: August 14, 2026

Respectfully submitted,

/s/ Rebecca W. Demaree

Blakeley D. Matthews
Rebecca W. Demaree
CORNELIUS & COLLINS, LLP
211 Athens Way, Suite 200
Nashville, TN 37228
615-244-1440
bdmatthews@cclawtn.com
rwdemaree@cclawtn.com

*Counsel for Non-Party Movants*

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing document and exhibits has been filed via the Court's CM/ECF system, electronic transmission and/or US Mail, postage prepaid, this 14th day of August, to the following:

Edward H. Trent (#30045)
Gene C. Schaerr
Joshua J. Prince
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC 20006
etrent@schaerr-jaffe.com
gschaerr@schaerr-jaffe.com
jprince@schaerr-jaffe.com

Jing Geng
Michael Wennerlund (31332)
Tyler S. Sanders
Office of the Tennessee Attorney General
Financial Division
P.O. Box 20207
Nashville, TN 37202-0207
Michael.wennerlund@ag.tn.gov
Tyler.sanders@ag.tn.gov

Blake M. Morain
G. Brian Jackson
Butler Snow LLP (Nashville Office)
Neuhoff Building
1320 Adams Street
Suite 1400
Nashville, TN 37208
615-651-6631
Blake.Morain@butlersnow.com
brian.jackson@butlersnow.com

Cory J. Kopicki
David Costigan
Michael McGinley
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2082
David.costigan@dechert.com
cory.kopicki@dechert.com
michael.mcginley@dechert.com

Rani A. Habash
Steven A. Engel
Wilfred Beaye, Jr.
Dechert LLP (DC Office)
1900 K Street, NW
Washington, DC 20006-1110
Rani.Habash@dechert.com
steven.engel@dechert.com
wilfred.beaye@dechert.com

Daniel S. Volchok
Jane E. Kessner
Jennifer Milici
Kevin Matthew Lamb
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
volchok@wilmerhale.com
jane.kessner@wilmerhale.com
Jennifer.Milici@wilmerhale.com
kevin.lamb@wilmerhale.com

L. Webb Campbell, II
William J. Harbison, II
William L. Harbison
Sherrard Roe Voigt & Harbison, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
wcampbell@srvhlaw.com
jharbison@srvhlaw.com
bharbison@srvhlaw.com

E. Todd Presnell
Tim Rodriquez
Bradley Arant Boult Cummings LLP
(Nashville, TN Office)
1221 Broadway, Suite 2400
Nashville, TN 37203
tpresnell@bradley.com
trodriquez@bradley.com

Linda M. Blair
Michael B. Kimberly
Winston Taylor
1901 L Street, NW
Washington, DC 20036
linda.blair@winstontaylor.com
michael.kimberly@winstontaylor.com

Nathan Lee
Winston Taylor
2121 N. Pearl Street
Dallas, TX 75201
nathan.lee@winstontaylor.com

s/ Rebecca W. Demaree
Rebecca Wells Demaree