**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| IN RE: TENNESSEE SENATE BILL 2040 | Master Case No.:<br>3:26-cv-00685<br><br>Consolidated with Case Nos.:<br>3:26-cv-00806<br>3:26-cv-00816<br>3:26-cv-00818<br><br>JUDGE RICHARDSON<br><br>MAGISTRATE JUDGE FRENSLEY |

**DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. PBMs Raise the Costs of Prescriptions and Decrease the Number of Pharmacies ........ 2

B. The General Assembly Responds to This Crisis with Various Statutes, Including the FAIR Rx Act ........ 5

C. The Big 3 PBMs Immediately Challenge the FAIR Rx Act ........ 7

LEGAL STANDARD ........ 7

ARGUMENT ........ 8

I. Plaintiffs Fail to Allege That the FAIR Rx Act Violates the Dormant Commerce Clause. ........ 8

A. The Act does not discriminate against interstate commerce. ........ 10

1. The Act is not purposefully discriminatory. ........ 10

2. The Act is not discriminatory in effect. ........ 14

B. The Act does not substantially harm interstate commerce. ........ 18

II. ERISA Does Not Preempt the FAIR Rx Act Because the FAIR Rx Act Does Not Regulate or Reference Employee Benefit Plans. ........ 22

III. Medicare Part D Does Not Preempt the FAIR Rx Act Because the Act Is a Licensing Law, Does Not Regulate Part D Plans, and Furthers Part D's Goal. ........ 27

A. Medicare Part D did not preempt the field. ........ 28

B. The Act is an authorized licensing law. ........ 29

C. The Act does not regulate Part D plans or conflict with Part D regulations. ........ 31

1. The Act does not regulate Part D plans. ........ 31

2. The Act does not conflict with Part D regulations. ........ 33

D. The Act does not frustrate Part D's purpose; it furthers it. ........ 36

IV. The FAIR Rx Act Expressly Exempts Federal Health Benefit Programs and Is Not Preempted by TRICARE. .......... 36

A. TRICARE does not expressly preempt the Act. .......... 37

B. TRICARE does not impliedly preempt the Act. .......... 40

1. Express Scripts' non-TRICARE business cannot create an impossibility to comply with the terms of its TRICARE contract to preempt the Act. .......... 40

2. The Act does not interfere with Express Scripts' ability to fulfill its TRICARE contract. .......... 42

3. TRICARE does not preempt the Act even if the Act limits Express Scripts' non-TRICARE business opportunities .......... 43

4. Even if every state adopted the Act, TRICARE would not preempt those laws. .......... 44

V. The FAIR Rx Act Does Not Constitute a Taking in Violation of the Fifth Amendment. .......... 45

A. The Act does not physically take any property. .......... 46

B. The Act does not deprive CVS or UnitedHealth of all economic or productive use of their pharmacies. .......... 47

C. The Act does not constitute a taking under *Penn Central*. .......... 49

1. The Act's economic impact does not support a taking. .......... 49

2. The Act does not interfere with reasonable investment expectations. .......... 50

3. Neither the Act's character nor its purpose suggests a taking. .......... 52

D. Whatever the merits of the Takings claim, UnitedHealth is not entitled to injunctive relief. .......... 54

CONCLUSION .......... 56

## TABLE OF AUTHORITIES

**Cases** **Page(s)**


*AbbVie Inc. v. Skrmetti*,
No. 3:25-CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) ..................... 29

*Aetna Life Ins. Co. v. Borges*,
869 F.2d 142 (2d Cir. 1989) ..................... 25

*Am. Beverage Ass'n v. Snyder*,
735 F.3d 362 (6th Cir. 2013) ..................... 10, 11

*Andrus v. Allard*,
444 U.S. 51 (1979) ..................... 49

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................... 7, 8

*Baptist Physician Hosp. Org., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
481 F.3d 337 (6th Cir. 2007) ..................... 37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................... 7

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
486 U.S. 888 (1988) ..................... 19

*Blanchette v. Conn. Gen. Ins. Corps.* (*Reg'l Rail Reorg. Act Cases*),
419 U.S. 102 (1974) ..................... 47

*C & A Carbone, Inc. v. Town of Clarkstown*,
511 U.S. 383 (1994) ..................... 9

*Cal. Div. Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*,
519 U.S. 316 (1997) ..................... 23, 25

*California ex rel. Harrison v. Express Scripts, Inc.*,
154 F.4th 1069 (9th Cir. 2025) ..................... 44

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ..................... 46, 47

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) ..................... 43

*Comptroller of Treasury v. Wynne*,
575 U.S. 542 (2015) ..................... 9

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*,
508 U.S. 602 (1993) .................... 50, 51

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987) .................... 19

*E. Ky. Res. v. Fiscal Ct. of Magoffin Cnty.*,
127 F.3d 532 (6th Cir. 1997) .................... 9, 10

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018) .................... 39

*Express Scripts, Inc. v. Richmond*,
No. 4:25-CV-00520-BSM, 2025 WL 2111057
(E.D. Ark. July 28, 2025) .................... 7, 30, 31

*Exxon Corp. v. Governor of Md.*,
437 U.S. 117 (1978) .................... 14, 15, 16, 18

*Fabian v. Fulmer Helmets, Inc.*,
628 F.3d 278 (6th Cir. 2010) .................... 8

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .................... 21

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S.Ct. 1114 (2026) .................... 54, 55

*First Med. Health Plan, Inc. v. Vega-Ramos*,
479 F.3d 46 (1st Cir. 2007) .................... 31, 32

*Foresight Coal Sales, LLC v. Chandler*,
60 F.4th 288 (6th Cir. 2023) .................... 9, 12, 13

*Garber v. Menendez*,
888 F.3d 839 (6th Cir. 2018) .................... 19

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) .................... 15

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) .................... 25

*Hadacheck v. Sebastian*,
239 U.S. 394 (1915) .................... 50

*Heckler v. Ringer*,
466 U.S. 602 (1984) .................... 27

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985) ........ 42

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ........ 46, 47

*In re Ford Motor Co. Litig.*,
65 F.4th 851 (6th Cir. 2023) ........ 37

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) ........ 37, 42

*Isle Royale Boaters Ass'n v. Norton*,
330 F.3d 777 (6th Cir. 2003) ........ 10, 11

*Kelo v. City of New London*,
545 U.S. 469 (2005) ........ 53, 54

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987) ........ 52

*Knick v. Township of Scott*,
588 U.S. 180 (2019) ........ 45, 54, 55

*Laborers' Int'l Union of N. Am. v. Neff*,
29 F.4th 325 (6th Cir. 2022) ........ 55

*LensCrafters, Inc. v. Robinson*,
403 F.3d 798 (6th Cir. 2005) ........ *passim*

*Lifestyle Cmtys., Ltd. v. City of Worthington*,
165 F.4th 1013 (6th Cir. 2026) ........ 50, 52

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ........ 52

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ........ 45, 46

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........ 46, 47, 52

*Maine v. Taylor*,
477 U.S. 131 (1986) ........ 21

*McKee Foods Corp. v. BFP Inc.*,
173 F.4th 242 (6th Cir. 2026) ........ 23, 24, 25, 26

*Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*, 58 F.4th 5 (1st Cir. 2023) .......... 32

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .......... 29

*Meek-Horton v. Trover Sols., Inc.*, 915 F. Supp. 2d 486 (S.D.N.Y. 2013) .......... 32, 33

*Mehaffy v. United States*, 102 Fed. Cl. 755 (2012) .......... 49, 52

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) .......... 11, 20, 21

*N. Mich. Hosps., Inc. v. Health Net Fed. Servs., LLC*, No. 07-CV-039-GMS, 2008 WL 2233964 (D. Del. May 30, 2008) .......... 38

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) .......... 23, 25, 27, 39

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) .......... 9

*New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003) .......... 2

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922) .......... 46

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) .......... 45, 46

*Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978) .......... *passim*

*Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183 (10th Cir. 2023) .......... 28, 32, 33

*Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956 (8th Cir. 2021) .......... 28

*Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024) .......... 29

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .......... 9

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 29

*Roschen v. Ward*,
279 U.S. 337 (1929) .......... 22

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) .......... 50, 54, 55

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
592 U.S. 80 (2020) .......... *passim*

*Self-Ins. Inst. of Am., Inc. v. Snyder*,
827 F.3d 549 (6th Cir. 2016) .......... 25

*Semler v. Or. State Bd. of Dental Exam'rs*,
294 U.S. 608 (1935) .......... 21

*Silkwood v. Kerr-McGee Corp.*,
464 U.S. 238 (1984) .......... 37

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) .......... 52

*Tenn. Scrap Recyclers Ass'n v. Bredesen*,
556 F.3d 442 (6th Cir. 2009) .......... 49, 50, 51, 52

*Thiokol Corp. v. Roberts*,
76 F.3d 751 (6th Cir. 1996) .......... 24

*TikTok Inc. v. Garland*,
122 F.4th 930 (D.C. Cir. 2024) .......... 47, 48, 49, 50

*Truesdell v. Friedlander*,
80 F.4th 762 (6th Cir. 2023) .......... *passim*

*United States ex rel. Rahimi v. Rite Aid Corp.*,
3 F.4th 813 (6th Cir. 2021) .......... 27

*Village of Euclid v. Ambler Realty Co.*,
272 U.S. 365 (1926) .......... 50

*Wade v. Burns*,
361 F. Supp. 3d 306 (D. Conn. 2019) .......... 30

*Williamson v. Lee Optical of Okla., Inc.*,
348 U.S. 483 (1955) .......... 22

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011) ..... 42

*Wyeth v. Levine*,
555 U.S. 555 (2009) ..... 37

**Constitutional Provision**

U.S. Const. amend. V ..... 45

**Statutes**

10 U.S.C. § 1103 ..... 38

29 U.S.C. § 1144 ..... 23

42 U.S.C. § 1395w-26 ..... 28, 29, 31, 33

42 U.S.C. § 1395w-104 ..... 33, 34, 36

42 U.S.C. § 1395w-112 ..... 28, 29, 31, 33

Tenn. Code Ann. § 12-1-202 ..... 55

Tenn. Code Ann. § 56-7-3118 ..... 5, 51

Tenn. Code Ann. § 56-7-3120 ..... 5, 51

Tenn. Code Ann. § 56-7-3206 ..... 5, 51

Tenn. Code Ann. § 63-10-203 ..... 17

Tenn. Code Ann. § 9-8-307 ..... 55

**Regulations**

32 C.F.R. § 199.17 ..... 37, 38, 40

32 C.F.R. § 199.21 ..... 38, 40

42 C.F.R. § 422.400 ..... 29

42 C.F.R. § 423.100 ..... 27

42 C.F.R. § 423.120 ..... 33, 34, 35, 36

42 C.F.R. § 423.124 ..... 33, 34

42 C.F.R. pt. 423 ..... 33, 34

**Rule**


Fed. R. Civ. P. 12 .......... 7


**Other Authorities**


Act 624, 95th Gen. Assemb., Reg. Sess. (Ark. 2025) .......... 39

Suzanne G. Bollmeier & Scott Griggs,
*The Role of Pharmacy Benefit Managers and Skyrocketing Cost of Medications*, 121 Mo. Med. 403 (2024) .......... 4

Ctrs. for Medicare & Medicaid Servs., U.S. Dep't of Health & Hum. Servs.,
Medicare Managed Care Manual (2011) .......... 30

Freedom, Access, and Integrity in Registered Pharmacy Act,
SB 2040, Gen. Assemb. (Tenn. 2024) .......... *passim*

Edmer Lazaro et al.,
*Brief No. 2022-3, Update on Rural Independently Owned Pharmacy Closures in the United States, 2003-2021*, RUPRI Ctr. for Rural Health Pol'y Analysis, Univ. of Iowa (2022) .......... 4

Linette Lopez,
*What CVS is Doing to Mom-and-Pop Pharmacies in the US Will Make Your Blood Boil,* Bus. Insider (Mar. 30, 2018) .......... 3

Staff of H. Comm. on Oversight & Accountability,
The Role of Pharmacy Benefit Managers in Prescription Drug Markets (2024) .......... 2, 4, 13

Staff of Off. Pol'y Planning, U.S. Fed. Trade Comm'n,
Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies (Interim Rep., July 2024) .......... 3, 4, 13

Staff of U.S. Fed. Trade Comm'n,
Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers (2d Interim Rep., Jan. 2025) .......... 5

## INTRODUCTION

These consolidated actions—brought by the three largest pharmacy benefit managers (PBMs) in the country, their parent insurance companies, and a PBM trade association—ask this Court to enjoin Tennessee's Freedom, Access, and Integrity in Registered Pharmacy (FAIR Rx) Act (SB 2040 or the Act) before it takes effect. The Act prohibits any single entity from simultaneously owning a pharmacy, a PBM, *and* a health insurance issuer. SB 2040, § 2(b) (Ex. 1 at 2). It does nothing else. It does not dictate how any retirement or healthcare plan designs benefits, how pharmacies operate, or how drugs are priced or dispensed. Plaintiffs nonetheless advance five theories to invalidate it, claiming violations of the Dormant Commerce Clause, ERISA, Medicare Part D, TRICARE, and the Takings Clause. None states a claim.

Each theory rests on the same flawed threshold. The Act regulates corporate structure, not the conduct these federal doctrines protect. Rather than discriminate against interstate commerce, the Act disfavors a particular corporate form that *no* company, in-state or out-of-state, may adopt. Rather than "relate to" ERISA plans, the Act leaves every plan free to choose for itself how to design its pharmacy network and benefits. Rather than regulate Medicare Part D plans, the Act defines who may be a pharmacy in the first place. Rather than interfere with TRICARE contracts, the Act expressly exempts any pharmacy services performed pursuant to a TRICARE contract. SB 2040, § 2(j) (Ex. 1 at 3). And rather than take property, the Act permits Plaintiffs to sell their assets and keep the proceeds. Accepting every well-pleaded allegation as true, Plaintiffs fail to state a claim under any theory, and their complaints should be dismissed with prejudice.

## BACKGROUND[1]

### A. PBMs Raise the Costs of Prescriptions and Decrease the Number of Pharmacies

PBMs "serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83–84 (2020). The process works as follows: First, "a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription." *Id.* at 84. From there, "the pharmacy checks with a PBM to determine that person's coverage and copayment information." *Id.* The PBM then "reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment," and the "prescription-drug plan, in turn, reimburses the PBM." *Id.* PBMs generate profit by ensuring that the reimbursement they get from a prescription-drug plan "exceeds" what they give to pharmacies. *Id.*

With time, the "three largest PBMs"—Plaintiffs Express Scripts, CVS Caremark, and UnitedHealth Group's Optum Rx—came to control "more than 80 percent of the market" for prescription drugs.[2] Worse, as they consolidated, they also became "vertically integrated with health insurers, pharmacies, and providers."[3] That is the case here. The plaintiff pharmacies are each affiliated with a PBM and a

---

[1] This background section references several documents that were created by congressional committees, the Federal Trade Commission, and even media organizations. Each is in the public record, and the Court can take judicial notice of them even if the Complaints did not cite them. *See New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

[2] Staff of H. Comm. on Oversight & Accountability, The Role of Pharmacy Benefit Managers in Prescription Drug Markets 3 (2024) [hereinafter "House Oversight Rep."] (citation omitted), https://tinyurl.com/5bdbvhu7 (Ex. 2).

[3] *Id.* (citation omitted).

health insurance company. *See* Compl. ¶¶ 17–19, *Pharm. Care Mgmt. Ass'n* ("PCMA") *v. Blane,* No. 3:26-cv-00816, Doc. 1 [hereinafter "PCMA Compl."]; Am. Compl. ¶ 48, *Express Scripts, Inc. v. Blane,* No. 3:26-cv-00806, Doc. 23 [hereinafter "Express Scripts Am. Compl."]; Compl. ¶¶ 21–37, *UnitedHealth Grp., Inc. v. Blane*, No. 3:26-cv-00818, Doc. 1 [hereinafter "UnitedHealth Compl."]; Compl. ¶¶ 29–57, *CVS Pharm., Inc. v. Blane*, No. 3:26-cv-00685, Doc. 1 [hereinafter "CVS Compl."].

As the FTC found in a July 2024 report, such triple integration created a perverse incentive for PBMs that manifests in two main ways. First, insurers decide the amount to reimburse to PBMs, and—from those reimbursements—PBMs tend to reimburse *their* pharmacies well above the cost of any prescriptions rendered while reimbursing non-integrated pharmacies "at untenably low levels" for the same prescriptions.[4] The difference between what PBMs gave to their own pharmacies and what they gave back to independent pharmacies was stark. A 2018 article, for example, reported that, while one PBM (Plaintiff CVS Caremark) reimbursed a pharmacy it owned $400.65 for a fentanyl patch and $5.86 for Ibuprofen, it reimbursed non-CVS pharmacies far less—only $75.74 for the patch and $1.39 for the Ibuprofen.[5]

---

[4] Staff of Off. Pol'y Planning, U.S. Fed. Trade Comm'n, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies 53 (Interim Rep., July 2024) [hereinafter "FTC 2024 Rep."], https://tinyurl.com/5n8z3yr6 (Ex. 3).

[5] Linette Lopez, *What CVS is Doing to Mom-and-Pop Pharmacies in the US Will Make Your Blood Boil,* Bus. Insider (Mar. 30, 2018), https://tinyurl.com/vqph452 (Ex. 4).

Second, PBMs steer as many beneficiaries as possible away from independent pharmacies and toward their own pharmacies.[6] They do this by "requiring patients to use these PBM-owned or affiliated pharmacies," by charging higher co-pays to those who visit independent pharmacies, or by offering patients at independent pharmacies "a reduced day supply" on any filled prescriptions.[7]

The consequences of this system were foreseeable. Independent pharmacies, unable to survive in a climate where they both get sent fewer beneficiaries and get reimbursed below cost for those prescriptions they can fill, are shutting down across the country.[8] By some estimates, in recent decades, "the number of independently owned retail pharmacies declined in noncore areas by 16.1 percent, and in micropolitan areas by 9.1 percent."[9] As the House Committee on Oversight and Accountability found, this has led to patients' "seeing significantly higher costs with fewer choices and worse care" as "PBMs inflate prescription drug costs and interfere with patient care for their own financial benefit."[10] Indeed, the Federal Trade Commission found that, with less competition, "the Big 3 PBMs"—all Plaintiffs here—"marked up numerous specialty generic drugs by hundreds and thousands of

---

[6] FTC 2024 Rep., *supra* note 4, at 31–32.

[7] Suzanne G. Bollmeier & Scott Griggs, *The Role of Pharmacy Benefit Managers and Skyrocketing Cost of Medications*, 121 Mo. Med. 403, 407 (2024) (Ex. 5).

[8] FTC 2024 Rep., *supra* note 4, at 16.

[9] Edmer Lazaro et al., *Brief No. 2022-3, Update on Rural Independently Owned Pharmacy Closures in the United States, 2003-2021*, at 1, RUPRI Ctr. for Rural Health Pol'y Analysis, Univ. of Iowa (2022), https://tinyurl.com/7aczt9a6 (Ex. 6).

[10] House Oversight Rep., *supra* note 2, at 3.

percent, with the majority of the most highly marked-up drugs dispensed by the PBMs' own affiliated pharmacies."[11]

### B. The General Assembly Responds to This Crisis with Various Statutes, Including the FAIR Rx Act

In response to this crisis of Plaintiffs' making, the General Assembly has spent several years trying to prevent the harms from integration. Tennessee law now requires, for example, that PBMs not reimburse independent pharmacies less than affiliated pharmacies. Tenn. Code Ann. § 56-7-3118(d). It also forbids PBMs from requiring or incentivizing patients to use affiliated pharmacies. *Id.* § 56-7-3120(b). And it requires PBMs to reimburse at least the actual cost of the drug and to pay a minimum professional dispensing fee to low-volume pharmacies. *Id.* § 56-7-3206(c)(1), (f).

When these necessary protections proved insufficient, the General Assembly also enacted Senate Bill 2040. It found that there was an inherent conflict of interest "when a pharmacy benefits manager both sets and receives reimbursement." SB 2040 (Ex. 1 at 1). And the legislature found that this conflict of interest "can restrict patient choice, increase costs, and jeopardize continuity of care." *Id.*

To combat these harms, the General Assembly made it unlawful to "own, operate, control, or direct the operation of" any part "of a pharmacy" while simultaneously "own[ing], operat[ing], control[ling], or direct[ing] the operation of"

---

[11] Staff of U.S. Fed. Trade Comm'n, Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers 29 (2d Interim Rep., Jan. 2025) (internal citations omitted), https://tinyurl.com/4t438jdx (Ex. 7).

any part of a health insurance issuer and a PBM. *Id.* § 2(b) (Ex. 1 at 2). That ownership prohibition "applies when the percentage of ownership interest held by a person, entity, or affiliate is greater than five percent." *Id.* § 2(c). The focus of the statute is thus preventing one entity from owning or controlling all three links in the chain—pharmacies, PBMs, and health insurers—since it is that integration that facilitates the abuses targeted by the statute.

But the General Assembly reasonably recognized that divestiture or other alternate arrangements would take time. Accordingly, it made the Act's operative date July 1, 2028. *Id.* § 2(b). And even then, it gave additional protections to any vertically integrated pharmacy that, as of July 1, 2028, is "actively pursuing a bona fide sale to an unaffiliated entity." *Id.* § 2(e). Such pharmacies have until December 31, 2028, to complete the sale. *Id.* It also granted discretion to Defendants to give such pharmacies "a single extension, not to exceed six (6) months, upon proof of substantial progress toward completion of such sale." *Id.* It is thus foreseeable that, for some, divestiture (if necessary to comply with the law) will not be required until 2029. Divestiture does not, however, require the sale or closure of *pharmacies*. Rather, an entity's divestiture of any one of the three links will suffice. As an example, Cigna could sell its interest in Express Scripts. Or UnitedHealthcare could sell its interest in Optum Rx. Either option would satisfy the Act's requirements. And, once sold, a health insurer or a PBM could contract with the entities that it previously owned to preserve the mode of operations that existed before the Act—absent any conflict of interest.

The General Assembly also recognized that a similar Arkansas law was recently enjoined as likely being preempted by the federal TRICARE program. *See Express Scripts, Inc. v. Richmond,* No. 4:25-CV-00520-BSM, 2025 WL 2111057 (E.D. Ark. July 28, 2025), *appeal docketed*, No. 25-2529 (8th Cir. Aug. 4, 2025). To avoid similar concerns, the General Assembly expressly carved out from the Act's reach those "pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program." SB 2040, § 2(j) (Ex. 1 at 3).

### C. The Big 3 PBMs Immediately Challenge the FAIR Rx Act

The Big 3 PBMs immediately challenged the FAIR Rx Act. *See* CVS Compl., Express Scripts Am. Compl., UnitedHealth Compl. So too did a group representing other PBMs. *See* PCMA Compl. Each Complaint contains many of the same allegations and causes of action. All four complaints make claims under (1) the Dormant Commerce Clause, (2) ERISA preemption, and (3) Medicare Part D preemption. Express Scripts alone asserts a claim of TRICARE preemption. And CVS and UnitedHealth assert Takings Clause claims. All such claims fail as a matter of law and should be dismissed.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain "enough facts" that, accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts a complaint's well-pleaded factual allegations as true and draws reasonable inferences

in Plaintiffs' favor, but it need not credit "[t]hreadbare recitals of the elements of a cause of action" or "bare assertions" that amount to "nothing more than a 'formulaic recitation of the elements'" of a claim. *Iqbal*, 556 U.S. at 678, 681 (citations omitted). Plausibility "requires showing more than the sheer possibility" of relief. *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010) (cleaned up).

## ARGUMENT

Whether the Act discriminates against interstate commerce, is preempted by federal law, or effects a taking are predominantly questions of law that turn on the text of the Act and Plaintiffs' own well-pleaded allegations. This Court should dismiss each claim because Plaintiffs' allegations and the Act's text establish that Plaintiffs cannot prevail on any of their claims.

### I. Plaintiffs Fail to Allege That the FAIR Rx Act Violates the Dormant Commerce Clause.

Each set of Plaintiffs claims that the Act violates the Dormant Commerce Clause. *See* CVS Compl. ¶¶ 154–68 (Count I); PCMA Compl. ¶¶ 72–83 (Count 1); UnitedHealth Compl. ¶¶ 88–107 (Count I); Express Scripts Am. Compl. ¶¶ 129–34 (Count One). Because the clear text of the Act does not discriminate against interstate commerce or substantially harm interstate commerce, Plaintiffs' claims should be dismissed.

In this Circuit, a Dormant Commerce Clause analysis proceeds in two steps. First, the court asks "if a challenged state law 'discriminates' against out-of-state economic interests to benefit local economic interests." *Truesdell v. Friedlander*, 80 F.4th 762, 768 (6th Cir. 2023) (quoting *C & A Carbone, Inc. v. Town of Clarkstown*,

511 U.S. 383, 390 (1994)). Discrimination may be "(a) facial[], (b) purposeful[], or (c) in practical effect." *E. Ky. Res. v. Fiscal Ct. of Magoffin Cnty.*, 127 F.3d 532, 540 (6th Cir. 1997).[12]

"If a law does not discriminate," then "a court must ask at step two whether it nevertheless inflicts a 'substantial harm' on interstate commerce." *Truesdell*, 80 F.4th at 768 (quoting *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 385–86 (2023) (plurality op.)). A law that inflicts a substantial harm on interstate commerce "may still violate the Commerce Clause" if its interstate "burdens clearly exceed its local benefits under a benefits-burdens balancing test." *Id.* (cleaned up).[13]

Even taking the complaints as true, Plaintiffs have not plausibly alleged that the Act violates the Dormant Commerce Clause at either step.[14]

---

[12] The Supreme Court has since cast doubt on purpose-based invalidation, observing that "the Commerce Clause regulates effects, not motives." *Comptroller of Treasury v. Wynne*, 575 U.S. 542, 561 n.4 (2015). The Sixth Circuit has had "no occasion to consider whether discriminatory purpose alone could ever suffice" after *Wynne* but is "skeptical." *Foresight Coal Sales, LLC v. Chandler*, 60 F.4th 288, 296 & n.1 (6th Cir. 2023). Defendants recognize that, until the Sixth Circuit expressly revisits its pre-*Wynne* cases, they continue to bind this Court. Although the Act is *not* motivated by a discriminatory purpose, Defendants reserve the right to challenge the possibility that a law that is merely discriminatory in purpose can violate the Dormant Commerce Clause before the Sixth Circuit or the Supreme Court if it becomes necessary.

[13] This test, established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), is known as *Pike* balancing.

[14] To the extent Plaintiffs recast the Act as an extraterritorial regulation of out-of-state ownership, *National Pork* forecloses any such freestanding theory. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 371–76 (2023).

### A. The Act does not discriminate against interstate commerce.

At step one, Plaintiffs have not plausibly alleged that the Act discriminates against interstate commerce. No Plaintiff group claims facial discrimination, and all thus concede the Act's facial neutrality. *See generally* CVS Compl.; PCMA Compl.; Express Scripts Am. Compl.; UnitedHealth Compl. But Plaintiffs also fail to show discrimination in purpose or effect.

#### 1. The Act is not purposefully discriminatory.

Plaintiffs first fail to show that the Act purposefully discriminates against interstate commerce.

1. "To determine whether a state regulation purposefully discriminates within interstate commerce," the Sixth Circuit "turn[s] to the actual language in the statute." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 371 (6th Cir. 2013). Statutory text is "the most 'persuasive evidence of . . . purpose'" and can be "sufficient in and of [itself] to determine the purpose of the legislation." *Id.* (quoting *E. Ky. Res.*, 127 F.3d at 542). When that text is clear, courts "follow[] [its] plain meaning." *Id.* (quoting *E. Ky. Res.*, 127 F.3d at 542). That approach guards against reconstructing purpose from a "patchwork record of statements inserted by individual legislators and proposals that may never have been adopted by a committee, much less an entire legislative body." *Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 784 (6th Cir. 2003) (citation omitted). Thus, where the text shows a bill is "intended to address a significant problem . . . by regulating the conduct of both in-state and out-of-state actors," purposeful-discrimination claims "cannot prevail." *Am. Beverage Ass'n*, 735

F.3d at 372; *accord Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 & n.15 (1981).

Here, the General Assembly's purpose is clear from the Act's text. It found that consolidating health insurers, PBMs, and pharmacies can "restrict patient choice, increase costs, and jeopardize continuity of care," and thus enacted the Act "to strengthen the integrity of Tennessee's healthcare delivery system by separating financial control from patient care decisions, improving affordability, and protecting rural and community pharmacy access." SB 2040 (Ex. 1 at 1). That text is "conclusive as to [the Act's] objectives." *Truesdell*, 80 F.4th at 773. The Assembly sought better healthcare for Tennesseans—not to favor in-state businesses over out-of-state ones.

2. Plaintiffs try to prove otherwise by quoting individual legislators and even pointing to some legislators' financial interests in independent pharmacies. *E.g.*, Express Scripts Am. Compl. ¶¶ 111–12; UnitedHealth Compl. ¶¶ 3, 96; CVS Compl. ¶ 13; PCMA Compl. ¶¶ 65–67. The Sixth Circuit has rejected comparable efforts. Because "legislators' statements are almost always cacophonous," *Isle Royale Boaters*, 330 F.3d at 785, stray remarks—or even stray motives—cannot establish purposeful discrimination. In *LensCrafters, Inc. v. Robinson*, for example, the court reviewed a Tennessee law that "essentially prohibit[ed] optical companies from leasing space to optometrists to perform eye exams in their retail eyewear stores." 403 F.3d 798, 800 (6th Cir. 2005). Challenging that ban on vertical integration, LensCrafters "cite[d] several legislators' statements suggesting that the bill lacked a public purpose." *Id.* at 803.

The Sixth Circuit rejected that claim outright. "[N]o rational factfinder," it explained, would treat those stray statements as proof "that the purpose of the legislation was to discriminate against out-of-state interests" when the bulk of the evidence—including the statutory text—showed that "the purpose of the legislation was to apply the prohibition evenhandedly." *Id.* The bill was "concerned with optometrists who practiced in or in conjunction with any retail establishments, regardless of whether those establishments were owned by in-state or out-of-state interests." *Id.* So too here. Even if some legislators made protectionist remarks about the Act, "none of that matters, at least not when the purpose is plain from the text." *Foresight Coal Sales, LLC v. Chandler*, 60 F.4th 288, 300 (6th Cir. 2023). The text targets higher costs and reduced pharmacy access from integrating pharmacies, PBMs, and health insurers, "regardless of whether those" integrated "establishments were owned by in-state or out-of-state interests." *LensCrafters*, 403 F.3d at 803.

3. Plaintiffs' other efforts to show purposeful discrimination fare no better. Each group claims that Tennessee carved the sole in-state PBM, RxPreferred Benefits, out of the Act by limiting its reach to pharmacies owned by both PBMs and insurers, citing interest-group statements about its role in the Act's amendment history. *See* CVS Compl. ¶ 8; Express Scripts Am. Compl. ¶¶ 107–109; UnitedHealth Compl. ¶ 97; PCMA Compl. ¶¶ 10–11. But if legislators' own statements cannot override purpose as reflected in the text, neither can statements from groups like the Tennessee Pharmacists Association. Interest groups routinely overstate their role and offer self-serving characterizations of purpose, and such claims carry no weight

when they conflict with the statute's purpose as established by the statute's text. *See Foresight Coal Sales*, 60 F.4th at 300.

Even with such statements, the Act's design supplies non-discriminatory reasons for limiting its reach to pharmacies owned by both PBMs and insurers. Tennessee's triple-integration requirement targets the multi-level vertical structures federal authorities have identified as the source of the anticompetitive harms the General Assembly sought to curb. The House Oversight Committee's 2024 staff report, for example, found that "[t]he three largest PBMs have used their position as middlemen and integration with health insurers, pharmacies, providers, and recently manufacturers, to enact anticompetitive policies and protect their bottom line," including by "shar[ing] patient information and data across their many integrated companies for the specific and anticompetitive purpose of steering patients to pharmacies a PBM owns" and "artificially reduc[ing] reimbursement rates for competing pharmacies."[15]

The FTC's July 2024 interim staff report similarly documented significant harm to patients and independent pharmacies resulting from integration between PBMs, "the nation's largest health insurers and specialty and retail pharmacies."[16] The sole Tennessee-based PBM has no health-insurance-issuer affiliation, so it falls outside the integrated structures those reports flagged as enabling the worst self-dealing and competitive distortions. Targeting those pharmacies first, then, does not

---

[15] House Oversight Rep., *supra* note 2, at 4.

[16] FTC 2024 Rep., *supra* note 4, at 2–4.

suggest a discriminatory purpose. Rather, as in *LensCrafters*, "the purpose of the legislation was to apply the prohibition evenhandedly." 403 F.3d at 803. And it does: no pharmacy—in or out of Tennessee—may be owned by both a PBM and an insurer. Current market realities do not change that. Even if only out-of-state companies are hit today, the Act looks not to a company's location, but to its corporate form. The Act would ban an in-state triple-integrated firm the same way. Conversely, out-of-state single- or dual-integrated pharmacies can freely operate in Tennessee—even if they compete with RxPreferred Benefits. The fact that such out-of-state companies stand to benefit from the Act in precisely the same way as in-state companies only confirms that the Act is not motivated by discriminatory purpose.

**2. The Act is not discriminatory in effect.**

Plaintiffs cannot show that the Act is discriminatory in effect either.

1. A law that is facially neutral nevertheless has a discriminatory effect if it gives "in-state entities a 'competitive advantage' that will lead consumers to shift market share to those entities." *Truesdell*, 80 F.4th at 771 (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978)). But the Sixth Circuit has cautioned that "a court must not confuse a law that has only a disparate impact on out-of-state businesses for one that has discriminatory effects on interstate commerce." *Id.* "[D]isparate impact alone does not suffice." *Id.*

*Exxon* is instructive. There, the Supreme Court found no discriminatory effect from a law that "did not permit gasoline producers to vertically integrate and operate ordinary retail gas stations" even though it "had a 100% disparate impact on out-of-state companies because Maryland imported all of its gas." *Truesdell*, 80 F.4th at 771

(discussing *Exxon*, 437 U.S. at 119–21, 125). Because the law had no effect on out-of-state competitors who did not fall within the reach of the statute, those that did not "refine or produce gasoline," and the law otherwise did not "prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market," the law did not harm interstate commerce. *Exxon*, 437 U.S. at 126. Further, because the law did not "incentiviz[e] consumers to shift market share to in-state gas from out-of-state gas," and instead only "shifted market share from producer-owned retailers to independent retailers," it had no cognizable discriminatory effect. *Truesdell*, 80 F.4th at 771. In practice, this means that it is not enough that the law merely offers "incumbency favoritism" or that it favors one type of entity over another. *Id.* at 772. States can favor "certain corporate forms" over others. *Id.* at 771. The Commerce Clause "does not bar laws incentivizing certain market 'structure[s]' where, as here, this favoritism does not effectively place a competitive disadvantage on out-of-state businesses." *Id.* (citation omitted). Nor does it protect "particular . . . firms" or "particular . . . methods of operation." *Exxon*, 437 U.S. at 127–28.

Further, when considering whether a bill has a discriminatory effect, courts are required to "assume[] a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1997). Entities with different corporate forms are not "substantially similar" by definition. In *LensCrafters*, for example, the Sixth Circuit held that the relevant comparators were "in-state optometrists, considered healthcare providers under state law, and out-of-state optical companies, which are

not considered healthcare providers." 403 F.3d at 804. And the Court looked to the reason for the ban, explaining that the challenged law discriminated "against LensCrafters because it is a retail optical store, not because it is an interstate company." *Id.* Because "licensed optometrists and optometric stores . . . provide different services to the market," they were "not similarly situated." *Id.*

2. "This definition of 'discriminatory effects' dooms" Plaintiffs' claims. *Truesdell*, 80 F.4th at 771. No Plaintiff alleges that the Act advantages in-state pharmacies as such by steering consumers to them. They claim instead that it shifts "volume, customers, and market share away from out-of-state competitors and toward the in-state pharmacies" not because they are out of state, but because only out-of-state companies are triply integrated. UnitedHealth Compl. ¶ 98; *accord* Express Scripts Am. Compl. ¶ 132; CVS Compl. ¶ 163; PCMA Compl. ¶¶ 79–81.

That argument runs headlong into *Exxon* and the Sixth Circuit's application of it in *Truesdell*. It may be true that no in-state companies are triply integrated and that only out-of-state companies will feel the effect of the Act. But that was also the case in *Exxon*. It too involved "a 100% disparate impact on out-of-state companies." *Truesdell*, 80 F.4th at 771 (citing *Exxon*, 437 U.S. at 125). But "disparate impact alone does not suffice." *Id.* Tennessee may "disfavor[]" one "corporate form[]"—pharmacies owned by both PBMs and health insurers—without disfavoring independents or pharmacies owned only by a PBM (or, conceivably, only by an insurer). *Id.* It may even "shift market share" between those forms. *Id.* To do so may show "disparate

impact," but it does not show "discriminatory effect." *Id.* This Court should decline Plaintiffs' invitation to "confuse" the two. *Id.*

*LensCrafters* only confirms this conclusion. Just as "in-state optometrists" were different from "out-of-state optical companies" in *LensCrafters*, 403 F.3d at 804, in-state independent pharmacies or pharmacies owned by only one of a PBM or a health insurer are not "similarly situated" to out-of-state pharmacies owned by both.[17] If Tennessee discriminates against triply integrated pharmacies at all, it is precisely *because* they are triply integrated, "not because" they are "interstate compan[ies]." *Id.*[18]

Several Plaintiffs seem to concede as much. CVS, for example, acknowledges that "the Act permits some out-of-state pharmacies to continue operating in Tennessee." CVS Compl. ¶ 164; *accord* PCMA Compl. ¶ 80. This concession gives the game away. If out-of-state pharmacies can both operate in Tennessee and comply with the Act, then the discrimination that Plaintiffs allege cannot be attributed to

---

[17] They also serve different purposes. Pharmacies, and the pharmacists that staff them, are "necessary health care providers" tasked "with a provision of care intended to enhance patients' wellness, prevent illness and optimize outcomes." Tenn. Code Ann. § 63-10-203(b). Triply integrated companies, by contrast, exist to help with drug costs, not to provide healthcare. *E.g.*, PCMA Compl. ¶ 1; Express Scripts Am. Compl. ¶ 35; CVS Compl. ¶ 65; UnitedHealth Compl. ¶ 7. They are thus not similarly situated for purposes of the dormant commerce clause.

[18] RxPreferred Benefits, an entity that is only doubly integrated, is not similarly situated to any company whose structure matches the integrated pharmacy-PBM-insurer structure that the FAIR Rx Act regulates.

their status as out-of-state entities. *See Exxon*, 437 U.S. at 125–26. As shown, there is another explanation for the line that the Act draws—Plaintiffs' "corporate form."

In short, Plaintiffs have not adequately alleged a cognizable discriminatory effect. The Act "does not discriminate among in-state and out-of-state" pharmacies owned by PBMs and insurance companies; "both are prohibited." *LensCrafters*, 403 F.3d at 804.

### B. The Act does not substantially harm interstate commerce.

At step two, Plaintiffs fare no better. They have not plausibly alleged that the Act inflicts a "substantial harm" on interstate commerce—still less that any interstate burdens "clearly exceed" its local benefits. *Truesdell*, 80 F.4th at 768 (cleaned up).

1. Before a court can "attempt to quantify" a law's benefits "or compare those benefits to the law's costs," the Sixth Circuit has explained that a challenger must show "substantial burdens" on interstate commerce. *Id.* at 774 (cleaned up). But "only *interstate-commerce* burdens" count—"the *Pike* balance does not consider *all* burdens that a state law might impose." *Id.* "[T]he costs incurred by specific interstate *businesses*—in contrast to interstate *commerce* generally—do not matter." *Id.* (citation omitted). Any effect that a challenged law imposes on "some businesses" or even a "price increase" on "in-state consumers" "fall[s] outside *Pike*'s calculus." *Id.* (citations omitted).

Thus, if Plaintiffs get to balancing, they face a "tall order in proving the invalidity of a seemingly neutral law." *Id.* at 773. The Sixth Circuit has explained

that the burden is "similar[]" to the State's burden in "proving the validity of a discriminatory law": "nearly impossible." *Id.* Indeed, the Supreme Court has not invalidated a law at step two "in more than 30 years." *Id.*

The Sixth Circuit justifies making the burden of balancing at step two "nearly impossible" because such balancing asks judges to make "'subjective' policy 'judgments' far outside their area of expertise in neutrally interpreting legal texts." *Id.* (quoting *Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018)). "[E]ven if experts can calculate the benefits and costs" of a particular law, "those calculations will be in the eye of the beholder." *Id.* at 773–74. That is why courts traditionally leave to the legislative branches "judgments . . . concerning the utility of legislation." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987) (citation omitted). As Justice Scalia explained, *Pike* balancing is like judging "whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in the judgment).[19]

2. Given the "important constraints" on the *Pike* inquiry that the Sixth Circuit has recognized, *Truesdell*, 80 F.4th at 774, Plaintiffs have not adequately alleged that the Act will substantially harm interstate commerce and therefore do not even get to balancing.

[19] This Court is bound to apply the balancing test. But because of the difficulty in measuring incomparable interests, Justice Scalia called for it to be abandoned altogether, thereby "leav[ing] essentially legislative judgments to the Congress." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in the judgment). Defendants reserve the right to seek exactly that relief in the appropriate forum if it becomes necessary.

To the contrary, each of their allegations turns on "costs incurred by" particular businesses and in-state patients—the very harms the Sixth Circuit says "do not matter." *Id.* Plaintiffs plead forced divestment, disrupted care, and fewer mail-order prescriptions into Tennessee, PCMA Compl. ¶ 82; CVS Compl. ¶ 166; Express Scripts Am. Compl. ¶ 133, or even "hundreds of millions if not billions of dollars" in losses by PBMs and their affiliated pharmacies, UnitedHealth Compl. ¶ 106. But even accepting these allegations as true, Plaintiffs do not claim a burden on interstate commerce. *Truesdell*, 80 F.4th at 774. Nor could they. Tennesseans will still need the same medications, and—because the Act is nondiscriminatory—they will obtain them from other pharmacies in the interstate market, including non-integrated out-of-state pharmacies. That "effect on some businesses"—Plaintiffs'—"did not plausibly allege a substantial harm to interstate commerce." *Id.*

3. If this Court gets to balancing, Plaintiffs have also failed to adequately carry their "nearly impossible" burden of showing that the putative local benefits are outweighed by the harm. *Truesdell*, 80 F.4th at 773–74. They claim that the Act's benefits are "speculative" and "illusory," and that the harms the law aims to end are "already addressed by existing Tennessee law" or could be addressed by more-targeted legislation. Express Scripts Am. Compl. ¶ 134; UnitedHealth Compl. ¶¶ 104, 107; CVS Compl. ¶ 167; PCMA Compl. ¶ 82.

But *Pike* considers only "putative" local benefits; it does not require legislatures to prove that those benefits will come to fruition. *Clover Leaf Creamery*, 449 U.S. at 471. A "legislative choice is not subject to courtroom fact-finding and may

be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). What matters is whether the General Assembly "could rationally have decided that" the FAIR Rx Act could further its stated goals even with other laws on the books. *Clover Leaf Creamery*, 449 U.S. at 466, 463 n.7, 471 & n.15. Here, it could, and Plaintiffs do not allege otherwise.

That other statutes address related conduct changes nothing. The General Assembly could rationally conclude that vertical integration itself poses dangers that conduct rules alone cannot eliminate. After all, the "abstract possibility" that existing laws will solve the problem, with "no assurance as to their effectiveness, does not make" a structural rule an unavailable alternative. *Maine v. Taylor*, 477 U.S. 131, 147 (1986) (cleaned up). States need not "strike at all evils at the same time or in the same way." *Clover Leaf Creamery*, 449 U.S. at 466 (quoting *Semler v. Or. State Bd. of Dental Exam'rs*, 294 U.S. 608, 610 (1935)).

Parity rules illustrate the point. Even though PBMs must treat integrated and independent pharmacies the same, a triple-integrated enterprise can still raise reimbursement rates across the board—for affiliates and independents alike.[20] It can thereby widen the spread it captures while staying in formal compliance with Tennessee law, leaving Tennessee patients to bear the higher costs. Structural

[20] Plaintiffs may respond that Tennessee could just ban across-the-board rate increases. But that just illustrates the problem. A State should not be barred from adopting a structural solution that removes underlying perverse incentives just because Plaintiffs can constantly think of new, regulable ways to respond to maximize profit. The Dormant Commerce Clause does not consign states to a perpetual game of regulatory whack-a-mole.

separation removes that incentive in a way pure conduct rules cannot. Of course, legislatures may act prophylactically against such workarounds. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 490–91 (1955). But they are not required to. A measure that "tend[s] to diminish an evil" is still valid, even if it does not eliminate every risk. *Roschen v. Ward*, 279 U.S. 337, 339 (1929).

In short, Plaintiffs never clear step two's threshold. Their complaints plead firm-specific costs and preferred methods of operation—not a substantial burden on interstate commerce—and they come nowhere near showing that any such burden "clearly exceed[s]" the General Assembly's putative interests in lower costs, patient choice, and rural pharmacy access. *Truesdell*, 80 F.4th at 768, 774. Having failed to plausibly allege either discrimination or a substantial harm to interstate commerce that is not outweighed by local benefits, Plaintiffs have collectively failed to show that the Act violates the Dormant Commerce Clause. The Court should dismiss each claim to the contrary.

## II. ERISA Does Not Preempt the FAIR Rx Act Because the FAIR Rx Act Does Not Regulate or Reference Employee Benefit Plans.

Each set of Plaintiffs claims the Act is preempted by ERISA. See CVS Compl. ¶¶ 169–76 (Count II); PCMA Compl. ¶¶ 84–97 (Count 2); UnitedHealth Compl. ¶¶ 158–60 (Count II); Express Scripts Am. Compl. ¶¶ 159–66 (Count Four). They are wrong.

1. The Supreme Court has explained that ERISA preempts only state laws that regulate how employee benefit plans are administered, such as what benefits are offered. *See Rutledge*, 592 U.S. at 86–87. By its terms, it preempts state laws that

"may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "A state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Rutledge*, 592 U.S. at 86 (cleaned up). That language is quite broad, but the Court has rejected an "uncritical[ly] literalis[t]" reading of the statute. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995). Indeed, "not every state law that affects an ERISA plan or" even that "causes some disuniformity in plan administration has an impermissible connection with an ERISA plan." *Rutledge*, 592 U.S. at 87.

The Court has thus given some guidance for whether a state law has the "forbidden connection." *Cal. Div. Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997). Courts consider "'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." *Id.* (quoting *Travelers*, 514 U.S. at 656, 658–59). Congress enacted ERISA to ensure a "uniform body of benefits law" so that "plans [did] not have to tailor substantive benefits to the particularities of multiple jurisdictions." *Rutledge*, 592 U.S. at 86 (citation omitted). Thus, ERISA is primarily concerned with preempting laws that affect substantive benefits.

The Sixth Circuit has recognized "four bases" for finding an impermissible connection to ERISA. *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 263 (6th Cir. 2026). ERISA preempts laws that (1) "require[] providers to structure benefit plans" or "prohibit[] employers from structuring their employee benefit plans" in certain

ways, (2) "bind[] plan administrators to [a] particular choice," (3) "govern[] a central matter of plan administration," or (4) "interfere[] with nationally uniform plan administration." *Id.* (internal quotations and citations omitted). But it does not apply to state laws that fall short of forcing "plans to adopt any particular scheme of substantive coverage." *Rutledge*, 592 U.S. at 88.

2. Applying these principles, the Act and ERISA do not conflict. First, the Act does not even purport to regulate the administration of plans. Rather, it prohibits an entity from owning a pharmacy, PBM, and health insurer at the same time. *See* SB 2040, § 2(b).

Second, the Act does not reference an ERISA plan. *See generally* SB 2040. True, it mentions an employee benefit plan. *Id.* § 2(i). But that mention only clarifies that "an employer" may continue "owning or operating a pharmacy or administering pharmacy benefits solely for its own employees, retirees, and dependents under an employee benefit plan." *Id.*

This fleeting reference is not enough to trigger ERISA preemption. A mere mention of an employee benefit plan triggers preemption only if the law also *affects* the administration of a covered plan. *Thiokol Corp. v. Roberts*, 76 F.3d 751, 760 (6th Cir. 1996). To hold otherwise would lead to "patently absurd results"—preemption by "mere reference alone, without any impermissible effect on a covered plan." *Id.*[21]

[21] To illustrate the point, the Sixth Circuit explained that, if mere reference to ERISA were enough, even "a state law providing that 'No employer, including an ERISA plan, shall discriminate on the basis of race or gender' would be pre-empted." *Thiokol Corp. v. Roberts*, 76 F.3d 751, 760 (6th Cir. 1996).

Third, the Act does not affect the administration of an ERISA plan. It does not regulate substantive benefits or how providers administer their plans. Where, as here, a state law does not require a plan administrator to change how it administers a plan at all, it does not interfere with ERISA. *See Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 556 (6th Cir. 2016) ("What triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans." (quoting *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir. 1989))). Nor is there interference from a law that does not "regulate" how administrators report, disclose, or keep records. *Id.* (citing *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 323–26 (2016)). The Act does not concern itself with those activities.

At most, the Act has only an "indirect economic influence" on the plan providers, which is insufficient to establish preemption. *Travelers*, 514 U.S. at 659–60. Without directly regulating an ERISA plan, such as by "bind[ing] plan administrators to any particular choice," the Act does not affect substantive benefits. *Id*. Therefore, the Act has no "forbidden connection" with an employee benefit plan. *Dillingham Constr.*, 519 U.S. at 325.

3. Plaintiffs' contrary position rests principally on *McKee Foods*. But that decision confirms the distinction that defeats their claim. There, the Sixth Circuit held that ERISA preempted Tennessee's any-willing-provider provision, a law that required PBMs to admit all pharmacies to a preferred network. 173 F.4th at 263. The court held that the provision dictated how a plan composes its pharmacy network and

thus "attempt[ed] to govern a central matter of plan administration: the scope and extent of a plan's pharmacy network." *Id.* at 264. The FAIR Rx Act does not do that. It does not refer to any pharmacy network or dictate which pharmacies a plan may include. *See generally* SB 2040. It regulates only whether a pharmacy may operate in the State based on corporate ownership structure. *See* SB 2040, § 2.

The Sixth Circuit in *McKee* also held that ERISA preempted Tennessee's incentive provision, which impeded certain cost-sharing arrangements. 173 F.4th at 268. That provision covered ERISA plans directly, steered participants toward or away from certain pharmacies, and required a plan to "structure [its] benefit plans in [a] particular way." *Id.* (citation omitted). The Act does none of those things. By its terms, it *allows* "employer[s]" to continue "owning or operating a pharmacy or administering pharmacy benefits solely for its own employees, retirees, and dependents under an employee benefit plan." SB 2040, § 2(i). But this subsection is the closest that it gets to saying anything about a plan, and even it says nothing about what the Act requires of ERISA plans, but instead what the section "does not prohibit." *Id.* Given this silence about ERISA plans, a plan remains free to design any network and adopt any cost-sharing arrangement it wishes. True, if a plan's PBM is owned by an insurer that also owns a pharmacy, the Act may force a sale. But that does not "dictate plan choices." *McKee*, 173 F.4th at 267–68 (citation omitted). It merely requires a change in the available market. The Act thus falls on the *Rutledge* side of the line *McKee* drew by imposing—at most—an indirect effect on the market

in which plans shop, not a mandate dictating plan design. *Rutledge*, 592 U.S. at 88; *Travelers*, 514 U.S. at 659–60.

In short, ERISA does not preempt the Act because it has neither an impermissible "connection with [n]or reference to" an ERISA-covered plan. *Rutledge*, 592 U.S. at 86 (citation omitted).

## III. Medicare Part D Does Not Preempt the FAIR Rx Act Because the Act Is a Licensing Law, Does Not Regulate Part D Plans, and Furthers Part D's Goal.

Each set of Plaintiffs also claims that Medicare Part D preempts the Act. *See* CVS Compl. ¶¶ 177–86 (Count III); PCMA Compl. ¶¶ 98–107 (Count 3); UnitedHealth Compl. ¶¶ 161–63 (Count III); Express Scripts Am. Compl. ¶¶ 149–58 (Count Three). Again, Plaintiffs are incorrect.

Medicare is a federal health insurance program for the elderly and disabled. *Heckler v. Ringer*, 466 U.S. 602, 605 (1984). Part D is "overseen by the Centers for Medicare and Medicaid Services (CMS), which contracts with private companies (called Part D Sponsors) to handle claim submissions and payment processes for Medicare Part D beneficiaries." *United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 821 n.1 (6th Cir. 2021). Part D Sponsors "work directly with retail pharmacies to provide covered prescriptions at negotiated rates," then "tender[] payment to the pharmacy and seek[] reimbursement from CMS." *Id.* Networks may include both "preferred" and "non-preferred" pharmacies. 42 C.F.R. § 423.100.

The statute, moreover, specifies that Part D "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Part D] plans which are offered by [Part D] organizations under [Part

D]." 42 U.S.C. § 1395w-26(b)(3) (as incorporated by 42 U.S.C. § 1395w-112(g)). The Eighth Circuit has explained that this provision articulates "a sufficient rather than necessary condition for preemption." *See Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021). Accordingly, Medicare Part D preempts state laws "only if they either (1) regulate the same subject matter as a federal Medicare Part D standard (in which case they are expressly preempted), *or* (2) otherwise frustrate the purpose of a federal Medicare Part D standard (in which case they are impliedly preempted)." *Id.* (emphasis added).

Plaintiffs have not carried their burden of showing Medicare Part D preemption. Medicare Part D did not preempt the field. And the FAIR Rx Act (1) is a licensing law, (2) does not regulate the same subject matter as Part D, and (3) does not frustrate Part D's purpose.

### A. Medicare Part D did not preempt the field.

Plaintiffs begin by claiming that Medicare Part D "effectively operates as a form of 'field preemption.'" UnitedHealth Compl. ¶ 122 (quoting *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1206 (10th Cir. 2023), *cert. denied mem.,* 145 S.Ct. 2843 (2025)); PCMA Compl. ¶ 101; CVS Compl. ¶¶ 182, 186; Express Scripts Am. Compl. ¶¶ 154–55. They are wrong.

As shown, the plain language of Part D's preemption clause alone contradicts any claim to field preemption. Congress expressly carved out state licensing and solvency laws from preemption and limited preemption to when: (1) the federal law "supersede[s]" the state law, (2) "with respect to" Part D plans. 42 U.S.C. § 1395w-

26(b)(3) (as incorporated by 42 U.S.C. § 1395w-112(g)). And, of course, the Act says nothing about Part D plans.

Any doubt about Congress's intent to preempt the field of healthcare and pharmacies should be resolved in favor of retaining the State's power to regulate pharmacies. The Supreme Court has explained that, where Congress has "legislated . . . in a field which the States have traditionally occupied," courts assume that "the historic police powers of the States [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Here, "the practice of pharmacy is an area traditionally left to state regulation." *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025) (quoting *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), *cert. denied mem.,* 145 S.Ct. 768 (2024)). And, of course, the "clear and manifest purpose" of Congress actually cuts against field preemption.

For these reasons, the Court should reject Plaintiffs' claim that Medicare Part D preempts the field.

### B. The Act is an authorized licensing law.

Also pertinent to preemption, the Act is best understood as a licensing law because it regulates which pharmacies can operate in Tennessee. And because it is a licensing law, Part D does not preempt it.

To the contrary, federal law leaves licensing to the States. Organizations must be "licensed under State law, or otherwise authorized to operate under State law" before they can participate in a Medicare program. 42 C.F.R. § 422.400(a). And CMS

treats as licensing laws those that "determine[] whether an entity is capable of offering health insurance in the State at the time of application" and "differentiate[s] between requirements that govern the fitness of an organization to serve as a health insurer or risk bearing entity and the requirements that govern the ongoing operation of how, where, and to whom it provides benefits."[22] States thus retain the power to decide who may operate under Part D and that authority extends to pharmacies.

Accordingly, courts have found that Part D does not preempt a state law that merely concerns who may operate in the State in the first place. In *Wade v. Burns*, for example, the court remanded a case after finding that Medicare likely did not preempt the state's revocation of the plaintiff's license as an insurance producer precisely because "federal statutes and regulations have so clearly delegated licensing responsibility to the states." 361 F. Supp. 3d 306, 312 (D. Conn. 2019), *aff'd,* 803 F. App'x 433 (2d Cir. 2020). The district court in *Express Scripts v. Richmond* reached the same conclusion for a state law that prohibited PBMs from holding a state retail pharmacy license. 2025 WL 2111057, at *5. While the court did not describe that law as a licensing law, it found that the law was not preempted because the law regulated "who may be a pharmacy in the first place," not "Medicare Part D's pharmacy network composition." *Id.*

The Act here is a licensing law for the same reason. It provides that a pharmacy owned or controlled by a PBM and a health insurer cannot operate in Tennessee. *See*

---

[22] Ctrs. for Medicare & Medicaid Servs., U.S. Dep't of Health & Hum. Servs., Medicare Managed Care Manual ch. 10, § 30.2 (2011) (Ex. 8), https://tinyurl.com/3uh3fsd3.

SB 2040, § 2(b). Like the license revocation in *Wade*, *see* 361 F. Supp. 3d at 312, the Act withholds from an insurer the right to operate a pharmacy in the state if it is also affiliated with a PBM (the triple-integration prohibition), SB 2040, § 2(b). Thus, like the Arkansas law in *Express Scripts v. Richmond*, the Act simply regulates "who may be a pharmacy [or PBM or health insurer] in the first place," regardless of whether the entity participates in a Medicare plan. 2025 WL 2111057, at *5.

### C. The Act does not regulate Part D plans or conflict with Part D regulations.

Even if the Act were not a licensing law, Part D does not preempt the Act because it falls outside of the scope of Part D's express preemption.

#### 1. The Act does not regulate Part D plans.

Medicare Part D expressly preempts a non-licensing law only "with respect to [Part D] plans." 42 U.S.C. § 1395w-26(b)(3) (as incorporated by 42 U.S.C. § 1395w-112(g)). This means that Medicare Part D does not preempt state laws that regulate something other than a Part D plan's pharmacy network or a sponsor's Part D operations.

*Express Scripts v. Richmond* is again instructive. The Arkansas law survived there because it did not purport to regulate "Medicare Part D's pharmacy network composition." 2025 WL 2111057, at *5. The First Circuit's decision in *First Medical Health Plan, Inc. v. Vega-Ramos* illustrates this. 479 F.3d 46 (1st Cir. 2007). There, the First Circuit held that Medicare Part C's identical preemption provision did not preempt a Puerto Rico rule that barred an "entity wishing to participate in a Puerto

Rico Medicaid Program" because that rule did not set a standard "for the operation of a Medicare Advantage plan operating under Medicare Part C." *Id.* at 51–52.

By contrast, state laws that regulate a Part D plan's prices or payments, a sponsor's Part D pharmacy networks, or a sponsor's subrogation and lien rights are preempted. *See Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*, 58 F.4th 5, 10, 14 (1st Cir. 2023); *Mulready*, 78 F.4th at 1206; *Meek-Horton v. Trover Sols., Inc.*, 915 F. Supp. 2d 486, 492 & n.3 (S.D.N.Y. 2013). In *Emanuelli Hernández*, for example, the First Circuit held that Part C preempted a Puerto Rico law setting how much Medicare Advantage Organizations must pay Part C providers. 58 F.4th at 10, 14. Similarly, in *Mulready*, the Tenth Circuit held that Part D preempted an Oklahoma law requiring PBMs to allow any willing pharmacies into their "preferred" networks because it "govern[ed] PBM pharmacy networks for Part D plans." *Mulready*, 78 F.4th at 1208 (citation omitted). Finally, the district court in *Meek-Horton* held that Medicare Part C preempted state anti-subrogation statutes as applied to Part C insurers. *Meek-Horton*, 915 F. Supp. 2d at 492.

But here, the FAIR Rx Act only prohibits an entity from simultaneously owning, controlling, or operating a pharmacy, a PBM, and a health insurer. SB 2040, § 2(b). This prohibition applies regardless of whether the pharmacy, PBM, or health insurer is part of a Part D plan. *See* SB 2040, § 2. It is silent about Medicare Part D, unlike the laws in *Emanuelli Hernández*, *Mulready*, and *Meek-Horton*. For example, unlike the law in *Emanuelli Hernández*, the Act does not regulate what Part D sponsors pay pharmacies or PBMs. 58 F.4th at 10, 14. Unlike the law in *Mulready*,

the Act leaves preferred-network design to the plans. 78 F.4th at 1208. And unlike the law in *Meek-Horton*, the Act places no limit on subrogation or liens. 915 F. Supp. 2d at 492.

Instead, the Act does only what it says it does. It regulates who may operate as a pharmacy in Tennessee. Part D thus cannot "supersede" that rule "with respect to [Part D] plans." 42 U.S.C. § 1395w-26(b)(3) (as incorporated by 42 U.S.C. § 1395w-112(g)).

### 2. The Act does not conflict with Part D regulations.

Plaintiffs recast the same point as a conflict with particular Part D standards. See CVS Compl. ¶¶ 23, 184 (citing 42 U.S.C. § 1395w-104(b) and 42 C.F.R. pt. 423); PCMA Compl. ¶ 106 (citing 42 U.S.C. § 1395w-104(b) and 42 C.F.R. § 423.120(a)); UnitedHealth Compl. ¶¶ 123–27 (citing 42 C.F.R. § 423.120(a)); Express Scripts Am. Compl. ¶¶ 151–52 (citing 42 U.S.C. § 1395w-104; 42 C.F.R. §§ 423.120, 423.124). But this claim is old wine in new skins. Each claim continues to be that the Act regulates or bars pharmacies affiliated with both a PBM and an insurer and thereby keeps those pharmacies out of Part D networks in Tennessee. The argument fails here for the same reasons as before; it is nothing more than a regulation on who can operate in the state in the first place.

1. CVS, PCMA, and Express Scripts each claim that the Act "will impair or alter access to drugs currently covered by Medicare Part D plans" and thereby "conflict[] with the Medicare requirement that plans must provide convenient access to covered Part D drugs as well as Medicare's extensive regulation of drug coverage and formulary development requirements." CVS Compl. ¶¶ 23 (citing 42 U.S.C.

§ 1395w-104(b)), 184; *accord* PCMA Compl. ¶ 106 (citing 42 U.S.C. § 1395w-104(b)); Express Scripts Am. Compl. ¶¶ 151–52 (citing 42 U.S.C. § 1395w-104). But a pharmacy does not need to be owned by both a PBM and a health insurer to satisfy this requirement of Medicare Part D.

This is obvious, as 42 U.S.C. § 1395w-104(b)(1) and (3) require a Part D sponsor to "permit any pharmacy that meets the standard contract terms and conditions under such plan to participate as a network pharmacy of such plan." This necessarily includes unaffiliated pharmacies that comply with the Act. This broad provision for Part D is to provide convenient access to network pharmacies, and to meet certain requirements when developing a sponsor's formulary. But this statute says nothing about a pharmacy's ownership structure—which is the subject of the Act. And, of course, it assumes that the pharmacy is eligible to operate in the state in the first place.

2. Each group also claims that the Act conflicts with sundry provisions of 42 C.F.R. pt. 423. *See* CVS Compl. ¶¶ 23, 184 (citing 42 C.F.R. pt. 423); PCMA Compl. ¶ 106 (citing 42 C.F.R. § 423.120(a)); UnitedHealth Compl. ¶¶ 123–27 (citing 42 C.F.R. § 423.120(a)); Express Scripts Am. Compl. ¶¶ 151–52 (citing 42 C.F.R. §§ 423.120, 423.124). But 42 C.F.R. pt. 423 describes eligibility, benefits, and subsidies for Part D plans. Each referenced provision follows in kind.

For example, 42 C.F.R. § 423.120(a)(3) allows Part D sponsors to include non-retail pharmacies in their network. 42 C.F.R. § 423.120(a)(4) requires Part D sponsors to provide "adequate access" to home-infusion pharmacies. 42 C.F.R.

§ 423.120(a)(7)(i) is the provision through which CMS "waives [certain network] requirements" for Medicare Advantage organizations "that provide[] [their] enrollees with access to covered Part D drugs through pharmacies owned and operated by the [Medicare Advantage] organization[s]." And 42 C.F.R. § 423.120(a)(8)(i) requires Part D sponsors to contract with any pharmacy that meets Part D sponsors' terms. In all of this, the regulations necessarily assume that the pharmacy is licensed under state law.

None of these provisions suggests that the Plaintiff groups have a right under Medicare Part D to be triple integrated or to operate pharmacies in Tennessee. Section 423.120(a)(3) permits, but does not require, non-retail pharmacies to participate in pharmacy networks. Section 423.120(a)(4) requires "adequate access" to home-infusion pharmacies, but it says nothing about who must own those pharmacies. Section 423.120(a)(7)(i) similarly fails to establish pharmacy ownership requirements when it waives certain network rules for organizations using their own pharmacies. A PBM can still own a pharmacy if it is not also owned or controlled by an insurer. And when § 423.120(a)(8)(i) requires a sponsor to contract with any willing pharmacy, which is presumably not owned by that sponsor, it necessarily assumes that the pharmacy may duly operate under state law.

In short, Plaintiffs' efforts to show a conflict with Medicare Part D and its regulations ultimately fail to state a claim because, even if the Act were not a licensing law, it does not regulate anything to do with Medicare Part D.

### D. The Act does not frustrate Part D's purpose; it furthers it.

Finally, rather than frustrate Medicare Part D, the Act furthers its purpose—to increase patients' access to the prescription drugs they need. *See* SB 2040 (Ex. 1 at 1).

As shown, each regulation Plaintiffs cite is designed to increase Medicare beneficiaries' access to Part D drugs. The statute governing Part D benefits, for example, is titled, "Beneficiary protections for qualified prescription drug coverage" and focuses on providing "[a]ccess to covered part D drugs" and "[a]ssuring pharmacy access." *See* 42 U.S.C. § 1395w-104(b). 42 C.F.R. § 423.120 too aims to increase "[a]ccess to covered Part D drugs," including—for some drugs—"out-of-network" access. The Act furthers that goal by keeping independent pharmacies from being squeezed out of the market. As a result, patients will have more pharmacies to choose from, and Part D sponsors will have more pharmacies to put in network.

* * *

The Act regulates corporate ownership structures of pharmacies, PBMs, and health insurers, not Part D plans. *See* SB 2040, § 2. The Act also furthers Part D's purpose, rather than frustrating it. Therefore, Medicare Part D neither expressly nor impliedly preempts the Act.

## IV. The FAIR Rx Act Expressly Exempts Federal Health Benefit Programs and Is Not Preempted by TRICARE.

The Express Scripts Plaintiffs alone claim TRICARE preempts the Act. Express Scripts Am. Compl. ¶¶ 135–48 (Count Two). It does not. Rather, the Act

expressly exempts "pharmacy services provided pursuant to a contract with the United States government," including TRICARE contracts. SB 2040, § 2(j).

Just as with Plaintiffs' ERISA and Medicare preemption arguments, preemption is never presumed. Rather, courts assume federal law does not supersede the States' historic police powers "unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). Congress's purpose is "the ultimate touchstone." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990) (citation omitted).

Preemption can be express on the face of a statute or regulation, or implied when compliance with both laws is "impossible" or the state law is "an obstacle to the accomplishment" of Congress's "full purposes and objectives." *In re Ford Motor Co. Litig.*, 65 F.4th 851, 859–60 (6th Cir. 2023) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)). While the Express Scripts Plaintiffs claim both express and obstacle preemption, they have not plausibly alleged either.

### A. TRICARE does not expressly preempt the Act.

Express preemption must come from the text of TRICARE or its regulations. *Ingersoll-Rand*, 498 U.S. at 138. Neither says anything about the subject of the Act, which expressly states it does not apply to TRICARE contracts in the first place. *See* SB 2040, § 2(j).

1. TRICARE exists "to improve the quality, cost, and accessibility of healthcare to the nation's military." *Baptist Physician Hosp. Org., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 481 F.3d 337, 340 (6th Cir. 2007); *accord* 32 C.F.R. § 199.17(a)(1). Its preemption clause provides that any state "law or regulation . . .

relating to health insurance, prepaid health plans, or other health care delivery or financing methods shall not apply to any contract entered into pursuant to this chapter" if the Secretary of Defense finds it "inconsistent with a specific provision of the contract." 10 U.S.C. § 1103(a)(1). The Secretary has determined that "State and local laws relating to health insurance . . . or other health care delivery" are inconsistent with TRICARE contracts. 32 C.F.R. §§ 199.17(a)(7)(i), 199.21(o)(1). However, he has not purported to wipe those laws off the books. The statute reaches only the application of state law to TRICARE contracts, 10 U.S.C. § 1103(a), so the Secretary has done the same: such laws are "preempted and [do] not apply in connection with TRICARE regional" and "pharmacy contracts." 32 C.F.R. §§ 199.17(a)(7)(ii), 199.21(o)(2).

2. For this reason, Express Scripts is wrong to suggest that the Secretary (without authority) fully preempted *any* state laws that deal with health insurance or delivery. Express Scripts Am. Compl. ¶¶ 137–40. Such state laws are permissible if they have no connection with TRICARE contracts. And courts have rightly rejected Express Scripts' apparent contrary reading. In *Northern Michigan Hospitals, Inc. v. Health Net Federal Services, LLC*, the court held that § 1103 preemption is textually confined to contracts "entered into . . . by the Secretary of Defense"—the federal TRICARE contracts themselves—and does not reach a contractor's dealings with private parties, cautioning against an overbroad reading of the statute's "relating to" language. No. 07-CV-039-GMS, 2008 WL 2233964, at *3–4 (D. Del. May 30, 2008) (emphasis omitted), *aff'd,* 344 F. App'x 731 (3d Cir. 2009). This, of course, was in

keeping with the Supreme Court's guidance in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers* about how to read such seemingly capacious grants of preemptive authority. *See* 514 U.S. at 656.

Ignoring those limits does not make them go away, and they are fatal to Express Scripts' claim. The FAIR Rx Act carves out "pharmacy services provided pursuant to a contract with the United States," including TRICARE contracts. SB 2040, § 2(j). That exemption is "as much a part of the [Act's] purpose" as every other word in the statute. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018). So, as an initial matter, no federal contract can preempt a statute that does not apply to federal contracts.

3. In arguing otherwise, Express Scripts fights the ghost of a different statute. It argues that "Arkansas Act 624," a statute enjoined last year but under review by the Eighth Circuit, is "very similar" to the Act. Express Scripts Am. Compl. ¶ 11. And while both Arkansas and Tennessee moved to eliminate vertical integration due to the harms that vertical integration between PBMs and pharmacies imposes on patients and independent pharmacies alike, Tennessee's carveout makes this statute different in the only way that matters and is dispositive of Express Scripts' preemption argument. *Compare* Act 624, §§ 1–2, 95th Gen. Assemb., Reg. Sess. (Ark. 2025) *with* SB 2040, § 2(j).

Express Scripts replies that the carveout still fails because the Act "relates to" healthcare delivery. Express Scripts Am. Compl. ¶¶ 140–41 (cleaned up). That again ignores the regulations' limitation to state laws that would otherwise apply to

TRICARE *contracts*. 32 C.F.R. §§ 199.17(a)(7)(ii), 199.21(o)(2). Because the Act does not apply to those contracts, TRICARE does not expressly preempt it.

### B. TRICARE does not impliedly preempt the Act.

Express Scripts also claims implied preemption, claiming the Act "interferes with" its performance obligations under TRICARE because the law reaches its non-TRICARE operations. Express Scripts Am. Compl. ¶ 12. That claim has no merit either.

#### 1. Express Scripts' non-TRICARE business cannot create an impossibility to comply with the terms of its TRICARE contract to preempt the Act.

As discussed, the Act does not apply to pharmacy services offered pursuant to a TRICARE contract. *See* SB 2040, § 2(j). In arguing implied preemption, Express Scripts claims a broad right under TRICARE for its pharmacies to provide services to both TRICARE beneficiaries and to "patients who are not TRICARE beneficiaries." Express Scripts Am. Compl. ¶¶ 103, 140. But several arguments in support of this claim reflect little more than an effort to constitutionalize Express Scripts' business decisions and ownership model and have nothing to do with TRICARE.

For example, Express Scripts says it must serve non-TRICARE patients to be able to serve TRICARE patients because its "business models" depend on economies of scale. *Id.* ¶¶ 140–41. It adds that the TRICARE contract designates Accredo, Express Scripts Pharmacy, and Freedom Fertility (at Express Scripts' request) to mail drugs to TRICARE beneficiaries nationwide, and that those pharmacies would lose vertical-integration efficiencies. *Id.* ¶ 147. None of that shows these entities cannot perform under the TRICARE contract. The federal carveout lets it keep the

same integration for TRICARE beneficiaries—its only TRICARE obligation. It simply cannot use that ownership model to mail drugs to everyone else. Critically, TRICARE does not require it to serve non-TRICARE patients at all. Indeed, non-TRICARE services are irrelevant to the TRICARE contract.

The Amended Complaint never explains how the Act affects TRICARE operations. Instead, it points to Express Scripts' affiliate, Evernorth Federal Services, Inc. (EFS), which was formed in 2025, and to which DoD transferred the TRICARE contract at Express Scripts' request. Express Scripts Am. Compl. ¶ 64. But nothing in the Amended Complaint or the attached contract excerpts requires EFS to be affiliated with a pharmacy in a manner the Act forbids, or to be owned by Cigna or any insurer. *See generally id.*; Express Scripts Am. Compl. Ex. B (No. 3:26-cv-00806, Doc. 23-2). And Express Scripts never explains how a change in EFS's ownership for Express Scripts' non-TRICARE work would destroy the efficiencies it recites.

TRICARE's statute, regulations, and contracts do not require Express Scripts to commingle commercial and TRICARE work, to use the same pharmacies and inventory for both, or to deliver TRICARE benefits through PBM-affiliated outlets. Any conflict is of its own making. An intentional decision to commingle TRICARE and non-TRICARE operations cannot manufacture preemption. To hold otherwise would let a contractor evade state law by mixing the two—an invitation to anarchy. That is likely why Express Scripts does not challenge the other Tennessee statutes that regulate PBMs in its amended complaint. *See* Express Scripts Am. Compl. ¶ 115.

To be sure, Congress could have made Express Scripts' business decisions and ownership structure a TRICARE concern. *See Williamson v. Mazda Motor of Am., Inc.,* 562 U.S. 323, 330 (2011) ("a significant federal regulatory objective" can be "the maintenance of manufacturer choice"). But it did not. And since the Act is a "regulation of health and safety matters" that has been "primarily, and historically, a matter of local concern," *Hillsborough County v. Automated Med. Lab'ys, Inc.,* 471 U.S. 707, 719 (1985), there is no reason to assume such an intent either. Thankfully, preemption looks to Congress's purposes, *Ingersoll-Rand*, 498 U.S. at 138, not to Express Scripts' business model and certainly not to its ownership structure.

**2. The Act does not interfere with Express Scripts' ability to fulfill its TRICARE contract.**

At still other times, Express Scripts argues that applying the Act would interfere with its TRICARE contract's requirement to use a "replenishment" model under which it dispenses prescriptions to TRICARE beneficiaries from its own "commercially acquired inventory" and then requests "replenishment" of those same medications from the government's wholesale distributor. Express Scripts Am. Compl. ¶ 70. The Act, it argues, makes it so "the replenishment model cannot properly function" because it cuts off "access to the commercial market." *Id.* ¶ 140. But it never shows that. Express Scripts' affiliated pharmacies are not the exclusive "commercial market." Yet Express Scripts assumes that they will be cut off from the commercial market without showing that the ownership prohibition would cut off its ability to maintain commercially acquired inventory or fulfill replenishment obligations. Express Scripts cannot carry the "high threshold" that "must be met if a

state law is to be preempted for conflicting with the purposes of a federal Act" with such assumptions. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion) (citation omitted).

After all, the Act lets Express Scripts keep performing the TRICARE contract. *See* SB 2040, § 2(j). If that contract requires commercial inventory, the carveout lets Express Scripts obtain it. The carveout facially eliminates the obstacle by exempting the TRICARE contract from the reach of the Act altogether.

#### 3. TRICARE does not preempt the Act even if the Act limits Express Scripts' non-TRICARE business opportunities.

Express Scripts next claims a Hobson's choice, suggesting that the Act will force it to pick between (1) servicing only TRICARE beneficiaries under its current ownership structure and business model and (2) modifying its structure and how it does business, thereby making the performance of its TRICARE contractual obligations less economically advantageous. Express Scripts Am. Compl. ¶ 103. Such a claim, however, does not make it impossible to comply with TRICARE and creates the same kind of non-contractual choice every federal contractor faces when subject to local health and safety laws. Because one option available to Express Scripts is to do nothing and continue providing services under its TRICARE contract uninterrupted by the Act, there can be no preemption. This is so even if by making that decision Express Scripts is limited in other business opportunities. *See California ex rel. Harrison v. Express Scripts, Inc.*, 154 F.4th 1069, 1077–78 (9th Cir.

2025) (rejecting Express Scripts' theory that its federal and non-TRICARE operations cannot be separated).[23]

**4. Even if every state adopted the Act, TRICARE would not preempt those laws.**

Finally, Plaintiffs ask the Court to imagine every state adopting a law like this one. They claim that, "if every state" did, "there would be no out-of-state commercial inventory." Express Scripts Am. Compl. ¶ 145. That assumes away the federal carveout. And they never explain why vertically integrated pharmacies are necessary for commercial inventory. They cannot lose TRICARE inventory they were never required to source from integrated pharmacies, no matter how many States copy Tennessee.

TRICARE, moreover, does not require integrated pharmacies. If every state barred those pharmacies from serving anyone but TRICARE patients, the TRICARE work could still be done. Insurers with integrated PBMs and pharmacies would keep

[23] *California ex rel. Harrison v. Express Scripts, Inc.*, is instructive. There, California filed a nuisance complaint against Express Scripts related to the opioid epidemic. 154 F.4th 1069 (9th Cir. 2025). The state expressly disclaimed any attempt to seek liability based on Express Scripts' TRICARE services and claimed to seek liability only for Express Scripts' non-TRICARE operations. *Id.* at 1075–76. While Express Scripts claimed that its TRICARE and non-TRICARE business operations were inextricably intertwined, the Ninth Circuit rejected that claim: "Defendants' business practices taken on behalf of non-federal clients . . . allegedly contributed to the public nuisance of the opioid epidemic across Los Angeles County. . . . Defendants do not plausibly allege that formulary placement [of opioids] for federal and non-federal clients was inextricably intertwined. On the contrary, Defendants' federal and non-federal work is divisible and can be analyzed independently." *Id.* at 1086. Such is the case here.

performing the contract—just not for non-TRICARE patients under that ownership model.

In short, since Express Scripts (through EFS) can continue to serve TRICARE beneficiaries under the Act with the only possible burden stemming not from its TRICARE obligations but from its business-ownership preferences related to non-TRICARE services, it is unable to show any implied preemption.

## V. The FAIR Rx Act Does Not Constitute a Taking in Violation of the Fifth Amendment.

Finally, CVS and UnitedHealth argue that the FAIR Rx Act constitutes a taking. UnitedHealth Compl. ¶¶ 19, 134–54 (Count IV); CVS Compl. ¶¶ 190–97 (Count IV). UnitedHealth raises multiple theories; CVS alleges only a regulatory taking. Whatever the theory, the Takings Clause claims have no more merit than the others.

The Takings Clause provides that no "private property" shall "be taken for public use, without just compensation." U.S. Const. amend. V. It does not proscribe the taking of property; it proscribes taking without just compensation. *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019). Injunctive relief is therefore unavailable when a property owner can receive just compensation. *Id.* at 201–02.

A taking occurs "when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). A "permanent physical occupation" is enough. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982).

Short of occupation, a regulation is a taking if it "goes too far." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). It goes too far when it deprives the owner of "*all* economically beneficial or productive use" of the property. *Palazzolo*, 533 U.S. at 617 (emphasis added) (quoting *Lucas*, 505 U.S. at 1015). A regulation that falls short of that total wipeout can still be a taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), which considers "the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Palazzolo*, 533 U.S. at 617 (citing *Penn Cent.*, 438 U.S. at 124).

CVS and UnitedHealth have not plausibly alleged a taking under any theory.

**A. The Act does not physically take any property.**

CVS and UnitedHealth fail to allege the "clearest sort" of taking: a physical encroachment or occupation. *Palazzolo*, 533 U.S. at 617. Neither claims that the Act transfers property to the State or that the State will physically invade their pharmacies. The statute prohibits certain ownership structures, SB 2040, § 2(b), but it does not let Tennessee take control of or occupy any of their property. That is not a physical taking. *See Loretto*, 458 U.S. at 427.

*Horne v. Department of Agriculture*, 576 U.S. 350 (2015), and *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), both cited by CVS, are not to the contrary. *See* CVS Compl. ¶ 194. In *Horne*, the United States required vineyards to "physically set aside" a "percentage of [their] crop" "for the account of the Government, free of charge." 576 U.S. at 354. That was a "classic" physical taking because it was

government "appropriation of personal property." *Id.* at 357–58, 367. And in *Cedar Point*, the Supreme Court found that a California law that gave union organizers a right to access certain farms was a *per se* physical taking because it let them "invade the growers' property." 594 U.S. at 162. As shown, the Act requires neither.

Equally misguided is UnitedHealth's reliance on *Blanchette v. Connecticut General Insurance Corps.* (*Regional Rail Reorganization Act Cases*), 419 U.S. 102 (1974). *See* UnitedHealth Compl. ¶ 143. Unlike the statute in *Blanchette*, 419 U.S. at 111, the Act does not divert Plaintiffs' assets to a state-owned entity—or to any buyer—at a fixed, and arguably below-market, price. Nothing in the Act directs a transfer of property or limits what Plaintiffs may sell their pharmacies for. Plaintiffs sell to a buyer of their choosing and retain whatever the market pays. Any shortfall they allege is a consequence of market conditions and their own transaction decisions, not a government appropriation. *Blanchette* therefore does not establish a physical taking either.

### B. The Act does not deprive CVS or UnitedHealth of all economic or productive use of their pharmacies.

CVS and UnitedHealth have also failed to show a regulatory taking, as there is no claim that the Act deprives them of all economic use of their property.

1. A per se regulatory taking requires the loss of literally all economic use of the property. *See Lucas*, 505 U.S. at 1015 (collecting cases). *TikTok Inc. v. Garland* is instructive. 122 F.4th 930 (D.C. Cir. 2024), *aff'd*, 604 U.S. 56 (2025). There, Congress barred companies from providing U.S. services to a "foreign adversary controlled application," so TikTok could not operate here without a qualified divestiture. *Id.* at

945–46. The D.C. Circuit rejected TikTok's takings claim because TikTok could sell its assets and keep the proceeds. *Id.* at 969. Since the challenged act "authorize[d] a qualified divestiture before (or after) any prohibitions take effect," TikTok had "a number of possibilities" short of the "total economic deprivation" a regulatory taking requires. *Id.*

So too here. Like TikTok, UnitedHealth and CVS can sell their triply integrated pharmacies and keep the proceeds. *TikTok*, 122 F.4th at 969. Both acknowledge that the property has significant value. CVS Compl. ¶ 79 ("All told, CVS estimates that it contributed over $4.2 billion to the State's economy in 2024, and the company paid nearly $300 million in state and local taxes."); UnitedHealth Compl. ¶ 137 ("multi-million-dollar assets with annual earnings running into the millions of dollars"). They cannot claim a total loss. That is fatal to their *Lucas* claim.

2. UnitedHealth and CVS respond that any sale will be at a depressed value because the statute pressures them as sellers. CVS Compl. ¶¶ 24, 196; UnitedHealth Compl. ¶¶ 136–38. TikTok too "dismisse[d] divestiture as impractical." *TikTok*, 122 F.4th at 969. Claimed depressed value from forced divestiture was not enough there, and it is not enough here. Nothing in the Act requires a sale at a loss, CVS Compl. ¶¶ 24, 190; UnitedHealth Compl. ¶¶ 136–38, the destruction of property, CVS Compl. ¶ 134, or a surrender of title, UnitedHealth Compl. ¶ 140.

A sale at a loss would not suffice in any event. That "regulations . . . prevent the most profitable use of . . . property" has never been dispositive, and the "loss of future profits" is a "slender reed upon which to rest a takings claim." *Andrus v.*

*Allard*, 444 U.S. 51, 66 (1979). As in *TikTok*, neither Complaint alleges a total economic loss, and a potential sale—even if it is for less than what Plaintiffs value their property at—does not constitute a taking under the Constitution.

### C. The Act does not constitute a taking under *Penn Central*.

That leaves *Penn Central* as the only remaining path to a taking. But both groups have fallen short of establishing a *Penn Central* taking.

The *Penn Central* analysis is not meant to break new ground. It "identif[ies] situations that approximate traditional physical takings." *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 456 (6th Cir. 2009). The test considers "(1) '[t]he economic impact of the regulation'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Id.* at 455 (quoting *Penn Cent.*, 438 U.S. at 124). If the law "does not in any way approximate a traditional physical taking," the claim fails. *Id.* at 456. Dismissal is appropriate if Plaintiffs are unable to establish any one of these factors. *Mehaffy v. United States*, 102 Fed. Cl. 755, 764–65 (2012), *aff'd*, 499 F. App'x 18 (Fed. Cir. 2012). Here, neither CVS nor UnitedHealth can establish any of these elements.

#### 1. The Act's economic impact does not support a taking.

CVS and UnitedHealth allege that the FAIR Rx Act will diminish the value of their pharmacy holdings. CVS Compl. ¶ 192; UnitedHealth Compl. ¶ 146. But "the impact of" the Act "is speculative given the existing time" until its effective date. *Tenn. Scrap*, 556 F.3d at 456. And, even if CVS and UnitedHealth had done more than speculate, the Sixth Circuit has made clear that "even a significant loss of

property value, absent more, will not suffice to prove a taking." *Lifestyle Cmtys., Ltd. v. City of Worthington*, 165 F.4th 1013, 1023 (6th Cir. 2026); *accord Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.,* 508 U.S. 602, 645 (1993). Indeed, the Supreme Court has even found regulations that diminish the value of a property by more than 90% are not a taking requiring compensation. *Hadacheck v. Sebastian*, 239 U.S. 394, 405, 411–12 (1915); *accord Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 368, 384 (1926) (75%).

Given these precedents, Plaintiffs' speculative allegations of "depressed" prices and lost revenue weigh against finding a taking as a matter of law. UnitedHealth Compl. ¶ 135; CVS Compl. ¶ 24. Of course, as in *TikTok*, "the causal connection between the Act and the alleged diminution of value is attenuated because the Act authorizes a qualified divestiture before (or after) any prohibitions take effect." 122 F.4th at 969.

#### 2. The Act does not interfere with reasonable investment expectations.

CVS and UnitedHealth fare no better with the second *Penn Central* factor, that the Act interferes with their reasonable investment expectations. CVS Compl. ¶ 193; UnitedHealth Compl. ¶ 147. Subjective expectations are not the benchmark. Plaintiffs must show "more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (cleaned up). Expectations are not reasonable if they ignore the regulatory landscape: "those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Tenn. Scrap*, 556 F.3d at

457 (quoting *Concrete Pipe*, 508 U.S. at 645). Being "'denied the ability to exploit a property interest' previously available" is not a loss of a legitimate investment expectation either. *Id.* at 456–57 (quoting *Penn Cent.*, 438 U.S. at 130). So, the Sixth Circuit found no such harm when Tennessee added regulations to scrap dealing, an industry that "has long been regulated, and has in fact been regulated in Tennessee." *Id.* at 457.

Neither CVS nor UnitedHealth has plausibly alleged that the Act interfered with reasonable investment-backed expectations. First, both acknowledge that pharmacies and PBMs are heavily regulated. CVS Compl. ¶¶ 9, 97–101; UnitedHealth Compl. ¶ 5. Several of those regulations already target the conflict of interest from vertical integration. *E.g.*, Tenn. Code Ann. § 56-7-3118(d) (forbidding PBMs from reimbursing independent pharmacies less than affiliated pharmacies); *id.* § 56-7-3120(b) (forbidding PBMs from incentivizing the use of their pharmacies); Tenn. Code Ann. § 56-7-3206(c)(1), (f) (requiring PBMs to reimburse at least the actual cost of medications and a minimum dispensing fee). It cannot have been a surprise that the General Assembly would follow with "subsequent amendments." *Tenn. Scrap*, 556 F.3d at 457 (quoting *Concrete Pipe*, 508 U.S. at 645).

Second, even if these Plaintiffs could once exploit their pharmacy divisions, that is not a protected expectation. The General Assembly adopted the Act to end a conflict of interest it found harms patients, drives up prices, and squashes competition.

The "regulatory context" thus "undercuts the reasonableness" of their reliance on the status quo and does not "support their takings claim." *Id.* This alone dooms Plaintiffs' takings claim. *Mehaffy*, 102 Fed. Cl. at 765.

**3. Neither the Act's character nor its purpose suggests a taking.**

Nor does the Act's character show a taking. At this final step of the *Penn Central* analysis, courts ask whether a government action "can be characterized as a physical invasion" or otherwise lacks a public purpose. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488–89 & n.18 (1987). They also consider the "'duration of the restriction'—the longer or more indefinite the restriction, the greater the likelihood that it is a taking." *Lifestyle Cmtys.*, 165 F.4th at 1024 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 342 (2002)). Although the Act concededly sets an indefinite restriction on triple integration, that is still not enough since (1) it does not result in a physical invasion and (2) it has a public purpose.

1. The Act is not a "physical invasion," although both CVS and UnitedHealth suggest otherwise. *See* CVS Compl. ¶ 194; UnitedHealth Compl. ¶ 148. Any burden it imposes is a "regulatory burden . . . rather than a physical one." *Tenn. Scrap*, 556 F.3d at 457. Forced divestiture to private entities looks nothing like a physical taking as that term has been used in the past. Far from being the forced "ouster of the owner's possession," *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (cleaned up) (quoting *Lucas*, 505 U.S. at 1014), CVS and UnitedHealth remain free to set the terms of any sale themselves.

2. As to purpose, the Act's public purposes are clear from the statute's text. It is designed to "strengthen the integrity of Tennessee's healthcare delivery system by separating financial control from patient care decisions, improving affordability, and protecting rural and community pharmacy access." SB 2040 (Ex. 1 at 1). That means that the Act is a "public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124. While Plaintiffs dispute those goals, CVS Compl. ¶¶ 11–17, 19, 96–97; UnitedHealth Compl. ¶¶ 71, 80, 86, they are entitled to substantial deference. *Kelo v. City of New London*, 545 U.S. 469, 483–85 (2005). As explained in the section on the Dormant Commerce Clause, legislatively enacted purpose statements are "conclusive as to [the Act's] objectives." *Truesdell*, 80 F.4th at 773.

UnitedHealth's private-use allegation therefore fails. *E.g.*, UnitedHealth Compl. ¶¶ 134, 141. Since it may sell its pharmacies to anyone, at any negotiated price, nothing in the Act confers a "benefit on a *particular* private party." *Id.* ¶ 141 (emphasis added).

UnitedHealth's reliance on *Kelo v. City of New London, see* UnitedHealth Compl. ¶¶ 134–35, 141–42, thus cuts the other way. *Kelo* only applies when (unlike here) there is a taking to begin with. There, the Court allowed a city to take private property for economic-development measures benefiting both private and public interests. *Kelo*, 545 U.S. at 473–74. That means that Tennessee may end vertical integration of health insurance companies, PBMs, and pharmacies for the benefit of Tennessee citizens even if certain private businesses will also benefit from the ban.

Further, *Kelo* emphasized that governments need not establish "reasonable certainty" that the means chosen will work. *Id*. at 487–89. Thus, even if the Act were a misguided way to help the public, that would not matter.

CVS and UnitedHealth have thus failed to show that any of the three *Penn Central* factors weighs in favor of finding a taking.

* * *

In short, CVS and UnitedHealth have failed to show a traditional physical taking, a regulatory taking resulting in the loss of all economic benefit, or a taking under *Penn Central*. Their takings claims should be dismissed.

### D. Whatever the merits of the Takings claim, UnitedHealth is not entitled to injunctive relief.

Independently, UnitedHealth's takings claim seeks the wrong remedy: injunctive relief. UnitedHealth Compl. ¶¶ 150, 152. The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. *Knick*, 588 U.S. at 185. That requirement arises only after a taking is effectuated. *Id.* at 201–02. Equitable relief therefore "is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus*, 467 U.S. at 1016 (footnote omitted).[24]

---

[24] UnitedHealth cites this term's decision in *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S.Ct. 1114 (2026), to claim that because they have no legal remedy for damages in federal court due to sovereign immunity, they are entitled to injunctive relief. UnitedHealth Compl. ¶¶ 152–53. Such a claim is misplaced. *First Choice* concerned the enforcement of a subpoena for donor records to a pro-life women's crisis pregnancy center being targeted by the state over the center's speech

*Knick* reaffirmed the point. Although it allowed takings plaintiffs to seek compensation in federal court without first litigating in state court, the Court held that "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick*, 588 U.S. at 201. Because "nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable." *Id.*; *accord Laborers' Int'l Union of N. Am. v. Neff*, 29 F.4th 325, 335 (6th Cir. 2022).

As UnitedHealth acknowledges, Tennessee provides the required compensation remedy. UnitedHealth Compl. ¶¶ 150–51. The Tennessee Claims Commission may award relief for an "[u]nconstitutional taking of private property," Tenn. Code Ann. § 9-8-307(a)(1)(V), defined to include "the taking of private property by government action such that compensation to the owner of that property is required by either: (A) The fifth or fourteenth amendment to the Constitution of the United States; or (B) The Constitution of Tennessee, Art. 1, § 21." Tenn. Code Ann. § 12-1-202(3).

Even if the divestiture requirement were a taking, which it is not, *Ruckelshaus* and *Knick* would still bar injunctive relief. UnitedHealth's preference for a federal damages award it cannot obtain because of sovereign immunity does not make

---

and religious views. 146 S.Ct. at 1119–20. The only question before the Court was whether there was an injury-in-fact such that federal courts had jurisdiction over the claim. *Id.* at 1121–22. The issue here is not "whether [the case] may proceed", *id.* at 1121, but whether the sole remedy sought is available. It is not. *See Knick*, 588 U.S. at 201.

Tennessee's compensation remedy inadequate. As the Supreme Court has made clear, UnitedHealth is not entitled to an injunction.

## CONCLUSION

No plaintiff states a claim on which relief can be granted. This Court should grant Defendants' motion to dismiss.

August 21, 2026

Respectfully submitted,

*<u>/s/ Edward H. Trent</u>*
Edward H. Trent (BPR# 30045)
Gene C. Schaerr (*pro hac vice*)
Joshua J. Prince (*pro hac vice*)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
etrent@schaerr-jaffe.com

*Counsel for Defendants*