**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| IN RE: TENNESSEE SENATE BILL 2040 | Master Case No.:<br>3:26-cv-685<br><br>Consolidated with Case Nos.:<br>3:26-cv-806<br>3:26-cv-816<br>3:26-cv-818<br><br>JUDGE RICHARDSON<br><br>MAGISTRATE JUDGE FRENSLEY |

**PLAINTIFF PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION'S
MOTION TO COMPEL NONPARTY LEGISLATORS TO PRODUCE DOCUMENTS AND MEMORAN-
DUM OF LAW IN SUPPORT**

## STATEMENT OF COMPLIANCE WITH LOCAL RULES 7.01 AND 37.01

Plaintiff Pharmaceutical Care Management Association (PCMA), pursuant to Rule 45(g) of the Federal Rules of Civil Procedure, Local Rule 37.01(a), and section III.D.4 of Magistrate Judge Frensley's Practice and Procedure Manual, hereby moves for an order compelling nonparties Bobby Harshbarger, Shane Reeves, Ferrell Haile, Ken Yager, Rick Scarbrough, and Randy McNally (collectively, the Legislators) to produce all documents in their possession and control responsive to PCMA's subpoenas.

***The discovery in dispute*.** The third-party subpoenas served upon the Legislators are appended to this motion as Exhibits A through F.

***Attempts to resolve the dispute*.** Prior to filing this motion, the parties met and conferred on August 11, 2026, in accordance with Local Rules 37.01 (b) and 7.01(a)(1).

The parties narrowed certain objections during the meet-and-confer process. PCMA clarified that (1) it does not seek privileged attorney-client communications or work product, but it does seek nonprivileged responsive documents even if such documents were transmitted to or held by attorneys on behalf of the Legislators; (2) it seeks documents, not narrative responses concerning oral communications; and (3) it does not seek to impose an indefinite Rule 26(e) supplementation obligation on nonparties but does seek responsive documents existing through the date of compliance.

The parties were unable to resolve the remaining disputes.

***PCMA's position*.** The subpoenas are targeted, not open-ended. Each contains five document requests and covers only documents from June 1, 2025, to the present. The requests focus on drafts, amendments, analyses, intergovernmental and legislative communications, comparison materials related to Arkansas Act 624, and the FAIR-Rx Act's (the "Act") anticipated impact on Tennessee pharmacies. Those documents are central to PCMA's claims, and the Legislators are the only practical source for many of them. The Legislators responded with blanket objections

and refused to produce a single document. PCMA therefore requests an order requiring the Legislators to collect and produce responsive, nonprivileged documents within 14 days of the date of the order.

First, the documents are highly relevant to PCMA's claims under the dormant Commerce Clause because they will show the Act's purpose and effect. The Sixth Circuit and the Supreme Court have held that a law violates the Commerce Clause if it has either a discriminatory purpose or effect. The information sought through the subpoenas is directly relevant to both purpose and effect because it seeks information from key legislators surrounding the drafting, amending, and enacting of the Act.

Second, the Legislators cannot rely on the common-law legislative privilege because any potential privilege is waived due to the Legislators' failure to serve a privilege log, and the legislative privilege does not cover communications with third parties or documents that postdate the Act's enactment. Moreover, even if the privilege were properly asserted, each factor courts use to analyze legislative privilege weighs in favor of production. The requested documents are highly relevant because evidence of discriminatory purpose and discriminatory effects are central to PCMA's constitutional claim. The evidence is not available from other sources because only the Legislators possess the requested communications concerning legislative drafting, amendments, messaging, and purpose. The litigation is serious, as it involves federal constitutional claims and the validity of a state law affecting PCMA's members, the pharmacy-benefits-manager industry, and patient access to prescription drugs. The government's role is central because the challenged Act is state legislation and state officials are defending its validity. And the risk of future timidity is limited because the Legislators are not at risk of liability and the subpoenas are targeted to a specific law, in a specific case, over a defined period. The Legislators and others have already spoken publicly about the Act and its asserted purposes.

Third, the Legislators are not protected by sovereign immunity. PCMA does not seek

coercive relief against the State itself; the subpoenaed nonparties are individual legislators. Sovereign immunity is distinct from legislative privilege, and applying sovereign immunity to state legislators would collapse the doctrines.

Fourth, the subpoenas are proportional and not unduly burdensome. PCMA limited its subpoenas to five document requests, limited them to information about the Act, and limited the relevant time period. Moreover, the issues at stake are important, the Legislators have unique access to the information sought, the Legislators have access to the resources of the State of Tennessee in responding to the subpoenas, discovery is important to resolving the relevant issues, and the likely benefits outweigh any burden.

***The Legislators' position*.** The Legislators' counsel has pointed to their served objections (attached as Ex. G) for their position.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 4

A. PCMA files this suit challenging the Act .......... 4

B. PCMA's subpoenas and the Legislators' responses .......... 5

LEGAL STANDARD .......... 7

ARGUMENT .......... 7

I. The sought-after documents are highly relevant to PCMA's claims .......... 8

II. Common-law legislative privilege does not apply in this case .......... 10

A. The legislative privilege does not cover communications not integral to the lawmaking process itself .......... 10

B. Even as to integral lawmaking documents, the legislative privilege is not available here .......... 11

C. Even if the privilege were available as a theoretical matter, it has been waived .......... 15

III. Sovereign immunity is inapplicable .......... 16

IV. The Subpoenas are proportional and not unduly burdensome .......... 17

CONCLUSION .......... 18

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Woodford*,
544 F. Supp. 2d 1074 (E.D. Cal. 2008) ..... 17

*Am. Beverage Ass'n v. Snyder*,
735 F.3d 362 (6th Cir. 2013) ..... 2, 9

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) ..... 2, 8

*Barnes v. Black*,
544 F.3d 807 (7th Cir. 2008) ..... 17

*Bethune-Hill v. Va. State Bd. of Elections*,
114 F. Supp. 3d 323 (E.D. Va. 2015) ..... 11, 12, 13, 15

*Carlson v. Fewins*,
No. 1:08-cv-991, 2010 WL 11488917 (W.D. Mich. Apr. 9, 2010) ..... 16

*Chemical Waste Mgmt., Inc. v. Hunt*,
504 U.S. 334 (1992) ..... 9

*E. Ky. Res. v. Fiscal Ct. of Magoffin Cnty.*,
127 F.3d 532 (6th Cir. 1997) ..... 8, 9, 10

*Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*,
126 F.4th 476 (6th Cir. 2025) ..... 2, 8, 9

*Express Scripts, Inc. v. Richmond*,
2025 WL 2111057 (E.D. Ark. July 28, 2025) ..... 1, 3, 10

*Favors v. Cuomo*,
285 F.R.D. 187 (E.D.N.Y. 2012) ..... 15

*Foresight Coal Sales, LLC v. Chandler*,
60 F.4th 288 (6th Cir. 2023) ..... 9

*Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*,
988 F.3d 260 (6th Cir. 2021) ..... 7

*IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*,
433 F.3d 600 (8th Cir. 2006) ..... 2, 10

*John B. v. Goetz*,
879 F. Supp. 2d 787 (M.D. Tenn. 2010) ........................................................................ 7

*League of Women Voters of Mich. v. Johnson*,
No. 17-14148, 2018 WL 2335805 (E.D. Mich. May 23, 2018) ..........................................13, 15

*Maltese v. Heastie*,
No. 1:24-cv-1147 (BKS/ML), 2025 WL 1640194 (N.D.N.Y. June 10, 2025) ............................ 17

*Marylanders for Fair Representation, Inc. v. Schaefer*,
144 F.R.D. 292 (D. Md. 1992)........................................................................................... 9

*McNeilus Truck & Mfg., Inc. v. State ex rel. Montgomery*,
226 F.3d 429 (6th Cir. 2000) .........................................................................................2, 9

*In re Modern Plastics*,
890 F.3d 244 (6th Cir. 2018) ......................................................................................... 18

*Nashville Student Org. Comm. v. Hargett*,
123 F. Supp. 3d 967 (M.D. Tenn. 2015) ................................................................. *passim*

*Owen v. City of Independence*,
445 U.S. 622 (1980)..........................................................................................................13, 15

*Page v. Va. State Bd. of Elections*,
15 F. Supp. 3d 657 (E.D. Va. 2014)...............................................................................12, 16

*Reguli v. Woodruff*,
No. 3:24-00694, 2026 WL 2337559 (M.D. Tenn. Aug. 12, 2026)........................................... 17

*S.C. Educ. Ass'n v. Campbell*,
883 F.2d 1251 (4th Cir. 1989) ............................................................................................ 9

*State Farm Mut. Auto. Ins. Co. v. Elite Health Ctrs., Inc.*,
364 F. Supp. 3d 758 (E.D. Mich. 2018)............................................................................... 7

*Texas v. Holder*,
2012 WL 130700060 (D.D.C. 2012)...................................................................................11, 12

*U.S. Dep't of Just. v. Ricco Jonas*,
24 F.4th 718 (1st Cir. 2022)............................................................................................. 17

*United States v. Gillock*,
445 U.S. 360 (1980).......................................................................................................... 13

*United States v. O'Brien*,
391 U.S. 367 (1968) .......... 9

*Wal-Mart Stores v. Tex. Alcoholic Beverage Comm'n*,
2016 WL 5922315 (W.D. Tex. 2016) .......... 11

*Waste Mgmt. Holdings v. Gilmore*,
252 F.3d 316 (4th Cir. 2001) .......... 10

*Waterkeeper v. Frontier Logistics, L.P.*,
488 F. Supp. 3d 240 (D.S.C. 2020) .......... 17

*West Lynn Creamery, Inc. v. Healy*,
512 U.S. 186 (1994) .......... 2, 9

**Statutes**

Tenn. Code Ann. § 63-10-[](b) .......... 5

**Other Authorities**

About TwelveStone, https://perma.cc/ 87DJ-5EMS .......... 6

*Bobby Harshbarger of Kingsport Appointed to Tennessee Pharmacy* Board,
TimesNews (Jul. 16, 2023), https://perma.cc/P8NB-NYTG .......... 6

Fed. R. Civ. P. 26 .......... 7, 8

Fed. R. Civ. P. 26(b)(1) .......... 7, 18

Fed. R. Civ. P. 45 .......... 7, 8

Fed. R. Civ. P. 45(d)(2)(B)(i) .......... 7

Fed. R. Civ. P. 45(e)(2) .......... 16

Fed. R. Civ. P. 45(e)(2)(A)(ii) .......... 16

9A Federal Practice & Procedure § 2464 (3d ed. 2008) .......... 16

*Hearing on SB2040 Before the S. Health and Welfare Comm.*, 114th General
Assembly (Tenn. Feb. 25, 2026) .......... 6

U.S. Const. art. I, § 8, cl. 3 .......... *passim*

## INTRODUCTION

PCMA and three of its member companies filed four now-consolidated lawsuits challenging Tennessee Senate Bill 2040, otherwise known as the FAIR Rx Act, or simply the "Act." The Act forbids a person or entity from controlling or operating a pharmacy, a health insurance issuer, and a pharmacy benefits manager (PBM) at the same time.

As relevant here, PCMA and its co-plaintiffs allege that the Act's purpose and effect is to expel from Tennessee all pharmacies owned and operated by large out-of-state interests (including all CVS retail pharmacies), so as to protect local independent pharmacies from out-of-state competition. They accordingly assert a violation of the negative or dormant aspect of the Commerce Clause.

Doubtless, these lawsuits were no surprise to lawmakers responsible for the Act. By all appearances, the Act is modeled on Arkansas Act 624, adopted in 2025. Similar to the Tennessee Act challenged here, the Arkansas statute barred pharmacies associated with PBMs from obtaining pharmacy licenses or permits. Shortly after its enactment, the same parties filed similar lawsuits as the one here, and the Eastern District of Arkansas enjoined the law as a likely violation of the dormant Commerce Clause. *See Express Scripts, Inc. v. Richmond*, 2025 WL 2111057 (E.D. Ark. July 28, 2025).

In Arkansas, the legislature made its protectionist purpose explicit, even writing it into the statute's preamble, and the court enjoined the law on that record. The sponsors of the Tennessee Act expressly pursued the same end, using Arkansas as a model, but were more careful about the record they left. They avoided public references to protecting local pharmacies and cast the Act as a public-health measure, even as its central design spared the one in-state PBM while expelling out-of-state competitors. The protectionist purpose did not change. What changed is that, this time, the evidence is less on the face of the law and more in the nonpublic communications the subpoenas seek.

PCMA accordingly served the Legislators with document subpoenas intended to uncover evidence establishing the legislature's true intent and motivation for enacting the Act, as well as to show what exactly lawmakers believed the Act would achieve as a practical matter. Such evidence is manifestly relevant to the dormant Commerce Clause claim—the Supreme Court time and again has held that a "finding that state legislation constitutes 'economic protectionism'" in violation of the Commerce Clause "may be made on the basis of *either* discriminatory purpose . . . *or* discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (emphases added); *accord, e.g.*, *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994) (Commerce Clause analysis is not rigid, but is rather "a sensitive, case-by-case analysis of purposes and effects").

Moreover, an "inquiry into [legislative] purpose is distinct from inquiry into the law's text." *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 491 (6th Cir. 2025). Courts thus routinely consider a wide range of extra-textual evidence on this topic, including legislative history (*e.g.*, *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 371 (6th Cir. 2013)) and communications between legislators and third parties (*e.g.*, *McNeilus Truck & Mfg., Inc. v. State ex rel. Montgomery*, 226 F.3d 429, 443 (6th Cir. 2000)). *See also*, *e.g.*, *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006) ("statements by lawmakers" and "the sequence of events preceding the regulation's adoption" are considered in determining whether a law has a discriminatory purpose).

To that end, PCMA served subpoenas on the Tennessee Legislators most active in drafting and passing the Act: Bobby Harshbarger, Shane Reeves, Ferrell Haile, Ken Yager, Rick Scarbrough, and Randy McNally. These subpoenas are narrow in number and scope: just five requests to each, targeting information about the purpose and effect of the law. These requests go to the heart of PCMA's claims and seek communications that may be exclusively in the Legislators' possession.

The Legislators now resist answering the subpoenas on various grounds. Most striking among them, they assert that no lawmaker involved in the drafting or passage of the Act can be compelled in this federal constitutional lawsuit to produce any documents concerning the Act *at all*, no matter when the communication took place or with whom the communication was made. In the Legislators' view, the legislative privilege protects any and every communication any one of them has ever had concerning the Act. That and the Legislators' other objections lack all merit and should be rejected.

***First***, the requests are relevant. Legislative purpose plays a central role in cases like this. Indeed, the Eastern District of Arkansas enjoined Arkansas Act 624 precisely because the legislature there expressly "disclose[d] the state's avowed purpose to discriminate against interstate goods." *Express Scripts*, 2025 WL 2111057, at *2 (cleaned up).

***Second***, state officials cannot duck their federal constitutional obligations by hiding behind claims of legislative privilege. That conclusion is especially apparent in federal lawsuits of broad public importance like this one. And it is doubly true where, as here, the legislators are not themselves named as defendants and therefore face no threat of personal liability. Courts frequently confront claims of legislative privilege in cases like this and nearly always reject them. The Court should do so here—not least because, on top of all that, the privilege has been procedurally waived.

***Third***, the defense of sovereign immunity is plainly inapplicable here. PCMA served document subpoenas on six individual legislators—it did not file a lawsuit against the State of Tennessee itself. If sovereign immunity applied in this circumstance, civil-rights plaintiffs would virtually never be able to litigate *Ex parte Young* suits involving claims of purposeful discrimination.

***Fourth***, the requests are not unduly burdensome. The subpoenas contain just five tightly focused requests, are limited to the communications related to the Act, and cover a limited time window from June 1, 2025, to the present. When weighed against the substantial relevance of

the information and the Legislators' exclusive possession, the benefit easily outweighs any perceived burden. The motion thus should be granted.

## BACKGROUND

### A. PCMA files this suit challenging the Act

The task of designing and administering prescription-drug benefits on behalf of an employer, insurer, or other benefit sponsor is incredibly complex. *See* Compl. ¶ 1. Sponsors must identify covered drugs, determine how costs are allocated across participants, negotiate rates with manufacturers or wholesalers, contract with thousands of "in network" pharmacies, negotiate reimbursement terms with these pharmacies, develop a system for processing claims at the point of sale, provide legally mandated notices and appeal procedures, and cover a myriad of administrative tasks. *Id.* This is where pharmacy benefit managers (PBMs) come in. PBMs assist with forming and administering a sponsor's prescription-drug benefits by performing all of the tasks just mentioned. *See id.* ¶ 36.

PBMs also often own or have indirect interests in pharmacies. Direct corporate affiliation with pharmacies allows PBMs to provide sponsors of prescription-drug benefits more cost-effective and higher-quality services, which they achieve through economies of scale and greater leverage over drug distribution. *See* Compl. ¶¶ 3, 37–48 (discussing various ways PBMs reduce costs and increase quality). Independent pharmacies often are unable to match these efficiencies and typically charge higher prices for less comprehensive service. *Id.* ¶ 4. Rather than compete on price or quality, independent pharmacies in Tennessee turned to the General Assembly to bar out-of-state, PBM-affiliated competitors from the market. *Id.* The General Assembly obliged by passing the Act. *Id.*

According to the Act's plain terms, no person or entity can directly or indirectly own or control (1) a pharmacy, (2) a health insurance issuer, and (3) a PBM at the same time. *See* Compl. ¶ 53 (citing Tenn. Code Ann. § 63-10-[](b)). The Act appears to be based on, and closely

resembles, a similar law that Arkansas enacted in 2025. The Eastern District of Arkansas notably enjoined enforcement of that Arkansas law on the ground it violated the Commerce Clause. *See* Compl. ¶ 8.

The evident purpose of the Act—which requires PBMs to disaffiliate from pharmacies doing business in Tennessee—is to eliminate out-of-state competition and protect local, independent pharmacists. *See id.* ¶¶ 63–71. The Act impacts only out-of-state companies, and statements about the Act by public representatives suggest that the Act's purpose is protection of local interests. *See id.* ¶¶ 66–68.

Based on the protectionist purpose and effect of the Act, PCMA and three of its members sued for a permanent injunction against enforcement because (among other things) the Act violates the Commerce Clause. *See generally* Compl. ¶¶ 72–107.

### B. PCMA's subpoenas and the Legislators' responses

Shortly after filing suit, PCMA served identical subpoenas on each of the Legislators, the individuals principally responsible for introducing, sponsoring, and promoting the Act. The subpoenas sought the production of five, narrowly targeted categories of communications related to the drafting, purpose, intended effect, and anticipated impact of the Act, as well as its relation to the Arkansas statute:

1. All Communications and Documents related to drafts of bills (including HB1959 and SB2040) concerning the Act and all drafts of amendments to bills concerning the Act.

2. All Communications and Documents with other employees of the government of Tennessee or lawmakers related to the Act, including Communications and Documents with other lawmakers regarding any bills or amendments resulting in the Act (including HB1959 and SB2040).

3. All Communications and Documents related to notes and analyses of the Act, including notes and analysis of the bills and amendments resulting in the Act (including HB1959 and SB2040).

4. All Documents and Communications concerning Arkansas Act 624, the litigation captioned *Express Scripts, Inc. v. Richmond*, or modeling, aligning, or comparing the Act

to the law of any other state, including any analysis of how to draft the Act to avoid the outcome in that litigation.

5. All Documents and Communications related to the Act's potential impact on pharmacies in Tennessee, including, but not limited to, potential closures, layoffs, or increased business.

PCMA limited the subpoenas to just six lawmakers:

- **Senator Harshbarger** introduced the Act as Senate Bill 2040 and was its author and chief proponent. *See* Compl. ¶¶ 49, 65. He also manages his family's independent pharmacy, Premier Pharmacy, in Tennessee. *Id.* ¶¶ 65, 67. *See also Bobby Harshbarger of Kingsport Appointed to Tennessee Pharmacy* Board, TimesNews (Jul. 16, 2023), https://perma.cc/P8NB-NYTG.

- **Senator Reeves** is the Act's co-sponsor and a former pharmacist. He owns and is CEO of TwelveStone Health Partners, a healthcare company that dispenses drugs. *Id.* ¶ 67. *See* About TwelveStone, https://perma.cc/ 87DJ-5EMS. Despite having a direct financial interest in halting out-of-state competition, Senator Reeves accused PBMs of harboring a "conflict of interest." *Hearing on SB2040 Before the S. Health and Welfare Comm.*, 114th General Assembly, 2:15:20–2:15:46 (Tenn. Feb. 25, 2026).

- **Senator Haile** co-sponsored the bill. He was one of its most vocal and "passionate" advocates for its passage and stated that he has "been fighting [PBMs] for a long, long time." *Id.* at 1:53:35–2:00:20.

- **Representative Scarbrough** was the lead House sponsor. His spouse co-owns a local independent drug store. *See* Compl. ¶ 67.

- **Speaker McNally** is a retired pharmacist who co-sponsored the Act and advocated for its passage.

- **Senator Yager** declared that the bill was a "solution to a problem that PBMs created themselves" and urged his colleagues to vote yes on the bill as a "vote for independent pharmacies." *See* Compl. ¶ 66(d).

On July 31, 2026, the Tennessee Attorney General's Office responded on behalf of the Legislators, stating that the Legislators would not produce documents and raising a number of objections. *See* Ex. G. PCMA and the Legislators' counsel held a meet-and-confer discussion regarding the objections. While counsel were able to resolve some objections, counsel for the Legislators stated that the Legislators would not produce any documents without a court order. The objections that remained unresolved during the meet-and-confer call include relevance,

legislative privilege, sovereign immunity, undue burden, and expense.

None of the Legislators' objections can justify their refusal to produce any documents in response to PCMA's narrow subpoenas. PCMA therefore moves the Court to order the Legislators to comply with the subpoenas and produce all responsive documents.

## LEGAL STANDARD

When an individual refuses to produce documents in response to a subpoena, "the serving party may move the court . . . for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i). Although Rule 45 supplies the procedural vehicle for a motion to compel, the scope of non-party discovery is governed by Rule 26. *See State Farm Mut. Auto. Ins. Co. v. Elite Health Centers, Inc.*, 364 F. Supp. 3d 758, 767 (E.D. Mich. 2018) (stating that "the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26").

Under Rule 26, discovery is limited to nonprivileged material relevant to a party's claims or defenses and proportional to the needs of the case, considering as relevant (1) the importance of the issues at stake, (2) the parties' relative access to relevant information, (3) the parties' resources, (4) the importance of the discovery in resolving the issues, and (5) whether the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(1); *Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 274 (6th Cir. 2021). Though the Sixth Circuit has recognized that district courts should limit disproportionate requests (*Helena Agri-Enterprises*, 988 F.3d at 273–74), Rule 26 broadly permits discovery of documents that bear materially on the claims or defenses in the case. *See John B. v. Goetz*, 879 F. Supp. 2d 787, 860 (M.D. Tenn. 2010) (explaining that "relevant" information includes that which is probative to a claim or defense and could "lead to the discovery of admissible evidence").

## ARGUMENT

The subpoenas served on the Legislators are valid, enforceable, and properly served, complying in all respects with the requirements of Rules 45 and 26. *First*, the requested

information is highly relevant because discriminatory intent, discriminatory purpose, discriminatory effect, and anticipated effect are central to PCMA's constitutional claims. *Second*, courts routinely deny claims of state legislative privilege in federal constitutional cases, recognizing that state lawmakers cannot hide behind state legislative privilege to avoid federal judicial scrutiny of credible constitutional claims. *Third*, sovereign immunity does not bar discovery from individual state legislators. *Fourth*, the subpoenas are proportional and not unduly burdensome because they are narrowly tailored in time and scope. The Legislators' blanket objections are not an "adequate excuse" for avoiding the subpoenas, and the motion should be granted.

## I. The sought-after documents are highly relevant to PCMA's claims

We begin with the Legislators' first objection, that the subpoenaed materials are irrelevant because PCMA's Commerce Clause claim turns only on objective effects and not legislative motive or purpose. That is not a defensible position.

As the Sixth Circuit repeatedly has held, there are "three ways a state law can violate the [Commerce Clause's] antidiscrimination rule: facially, purposefully, or in practical effect." *Energy Mich.*, 126 F.4th at 486–87; *accord E. Ky. Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532 (6th Cir. 1997). That follows from the Supreme Court's own cases, which likewise make clear that a "finding that state legislation constitutes 'economic protectionism'" in violation of the Commerce Clause "may be made on the basis of *either* discriminatory purpose . . . *or* discriminatory effect." *Bacchus Imports*, 468 U.S. at 270 (emphases added); *accord Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992) (similar); *West Lynn Creamery*, 512 U.S. at 201 (Commerce Clause analysis is not rigid, but is rather "a sensitive, case-by-case analysis of purposes and effects"). And "judicial inquiry into legislative motive is appropriate where the very nature of the constitutional question requires an inquiry into legislative purpose." *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 304 (D. Md. 1992) (quoting *S.C. Educ. Ass'n v. Campbell*,

883 F.2d 1251, 1259 (4th Cir. 1989), in turn quoting *United States v. O'Brien*, 391 U.S. 367, 383 n.30 (1968)).

To be sure, the Sixth Circuit has recently questioned whether discriminatory purpose alone would support invalidation of a law under the Commerce Clause. *See Foresight Coal Sales, LLC v. Chandler*, 60 F.4th 288, 296 (6th Cir. 2023). But neither the Sixth Circuit nor the Supreme Court has overruled its prior precedents holding that a law's discriminatory purpose is at the least a directly relevant consideration under the Commerce Clause inquiry. Indeed, just last year, the Sixth Circuit affirmed as much. *See Energy Mich., Inc.*, 126 F.4th at 491. Accordingly, whether the Act has a discriminatory purpose is undeniably relevant.

Because legislative purpose is relevant, so too are any documents that may be turned over in response to the subpoenas. While a law's text is persuasive evidence of purpose, courts do not limit their review to the text alone; they also review "the legislative history" and other evidence of "legislative intent." *Snyder*, 735 F.3d at 371. The Sixth Circuit has held that, among other things, a law's purpose can be ascertained from communications between legislators and third parties (*McNeilus Truck & Mfg., Inc.*, 226 F.3d at 443), documents from third parties about the law (*Snyder*, 735 F.3d at 371–72), and documents held by the state officials discussing the law (*E. Ky. Res.*, 127 F.3d at 542).

Other courts broadly agree that internal memoranda and legislative documents are competent to show a discriminatory legislative purpose. *See Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 338–39 (4th Cir. 2001) (considering memoranda from legislators in holding that, as a matter of law, the challenged state statute violated the Commerce Clause); *IESI AR Corp.*, 433 F.3d at 604 ("statements by lawmakers" and "the sequence of events preceding the regulation's adoption" are considered in determining whether a law has a discriminatory purpose).

Evidence from legislators is especially relevant in assessing the Act's purpose because "[w]hen a party seeks to present circumstantial evidence of discriminatory purpose pursuant to

a dormant Commerce Clause challenge, it is the duty of that party to show the effect of that evidence on the challenged statute." *E. Ky. Res.*, 127 F.3d at 542–43. Such a showing is most readily made with communications of lawmakers themselves.

The requested documents are thus highly relevant to both the purpose of the Act and its anticipated effect. Requests 1, 2, and 3 seek documents related to the Act, including external and internal communications and internal memoranda. *See* Exs. A–F. Request 4 seeks documents related to an Arkansas law that, by all appearances, was the model for the Act and already has been enjoined as a violation of the Commerce Clause. *See Express Scripts*, 2025 WL 2111057, at *2–3. Request 5 seeks documents showing the impact, or effect, of the Act, which the Legislators admit is relevant. *See* Exs. A–F (asserting "effects" of Act are relevant under Commerce Clause). All of these requested documents are directly relevant to PCMA's dormant Commerce Clause claim.

## II. Common-law legislative privilege does not apply in this case

The Legislators claim they need not respond to the subpoenas because their communications are protected by a common-law legislative privilege. But that privilege does not apply in this case—not even arguably for many of the requested documents not integral to the lawmaking process itself (though we can't know which ones). And even if it did apply, the Legislators have waived the privilege.

### A. The legislative privilege does not cover communications not integral to the lawmaking process itself

To start, the Legislators' categorical assertion of the privilege is improper because the privilege does not apply to all communications that happen to be in their possession. The legislative privilege "must be strictly construed and accepted only to the very limited extent." *Nashville Student Org. Comm. v. Hargett*, 123 F. Supp. 3d 967, 969 (M.D. Tenn. 2015). It applies at most to documents "concerning [the Legislators'] legislative activity" itself, and not to documents outside that limited context. *Id.*

Notably, "communications between legislators and constituents, lobbyists, and interest groups" are not integral parts of legislative activity and therefore "are not entitled to protection under a legislative privilege." *Texas v. Holder*, 2012 WL 13070060, at *2 (D.D.C. June 5, 2012); *accord Wal-Mart Stores v. Tex. Alcoholic Beverage Comm'n*, 2016 WL 5922315, at *5 & n.4 (W.D. Tex. Oct. 11, 2016) ("permit[ting] the discovery of lobbying communications from both parties and non-parties when a statute's purposes are in issue") (collecting cases). Instead, only the "deliberative and communicative processes by which [legislators] participate in committee and [legislature] proceedings with respect to the consideration and passage or rejection of proposed legislation" are covered. *Bethune-Hill v. Virginia State Board of Elections*, 114 F. Supp. 3d 323, 331–32 (E.D. Va. 2015) (quotation omitted).

Put more generally, the legislative privilege does not apply to "documents or communications shared with, or received from, any individual or organization outside the employ of the legislature." *Bethune-Hill*, 114 F. Supp. 3d at 343. It also "does not extend to commentary or analysis following the legislation's enactment." *Id*. It protects only communications bearing directly on "'integral steps' in the legislative process." *Id*.

Here, the documents sought include many that are not part of the "integral steps" of the legislative process. The requests are for *all* communications related to the Act: those internal and external, and those before and after enactment. As a matter of law, the legislative privilege cannot apply to all such documents and communications. *See, e.g.*, *Holder*, 2012 WL 13070060, at *2. Accordingly, at a minimum, the Legislators should be ordered to (1) furnish a privilege log and (2) produce any documents and communications that cannot under any circumstance be covered by the legislative privilege.

### B. Even as to integral lawmaking documents, the legislative privilege is not available here

**1.** Even with respect to documents integral to the lawmaking process (i.e., those to

which the legislative privilege could apply), the privilege does not apply here. "Testimonial and evidentiary privileges" like the state legislative privilege "exist against the backdrop of the general principle that all reasonable and reliable measures should be employed to ascertain the truth of a disputed matter." *Page v. Va. State Bd. of Elections*, 15 F. Supp. 3d 657, 660 (E.D. Va. 2014). "[T]he legislative privilege, like all evidentiary privileges, must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Hargett*, 123 F. Supp. 3d at 969 (quotation marks omitted).

The "public good" associated with the state legislative privilege is well settled: The privilege "'provides legislators with the breathing room necessary to make [important] choices in the public's interest' without fear of undue judicial interference or personal liability." *Bethune-Hill*, 114 F. Supp. 3d at 332–33. The manner in which the state legislative privilege applies in federal litigation thus "depends upon the nature [not only] of the claim [but also of] the defendant." *Id*. at 335. When the person asserting privilege is not a defendant in the action, "[t]he inhibiting effect [of the threat of liability] is significantly reduced, if not eliminated." *Owen v. City of Independence*, 445 U.S. 622, 656 (1980). "[T]here is," in other words, "little to no threat to the 'public good' of legislative independence when a legislator is not threatened with individual liability" by being named a defendant in a suit for damages. *Bethune-Hill*, 114 F. Supp. 3d at 335.

It follows that the privilege is at its apex in the context of civil actions for damages brought by individual plaintiffs against individual lawmakers, where "the threat of personal monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process." *Id.* at 333–35 (quoting *United States v. Gillock*, 445 U.S. 360, 372 (1980); *Owen*, 445 U.S. at 655). But the state legislative privilege is at its nadir in cases like this one, where individual lawmakers are not themselves named as defendants and thus face no threat of personal liability, where the request for relief is injunctive and not for monetary damages, and where the privilege

"stands as a barrier to the vindication of important federal interests and insulates against effective redress of public rights." *Bethune-Hill*, 114 F. Supp. 3d at 334.

**2.** Because legislative privilege cannot be invoked in blanket fashion, it "can be overcome where important federal interests are at stake." *League of Women Voters of Michigan v. Johnson*, No. 17-14148, 2018 WL 2335805, at *3 (E.D. Mich. May 23, 2018) (collecting cases). In assessing whether privilege is overcome, courts consider "([a]) the relevance of the evidence sought to be protected; ([b]) the availability of other evidence; ([c]) the 'seriousness' of the litigation and the issues involved; ([d]) the role of the government in the litigation; and ([e]) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Hargett*, 123 F. Supp. 3d at 970; *see also Johnson*, 2018 WL 2335805, at *4. The proponents of the privilege have the burden of establishing its applicability. *Bethune-Hill*, 114 F. Supp. 3d at 344.

Here, the balancing of factors clearly favors compelling disclosure of the evidence that PCMA seeks: the evidence sought is highly relevant; no other evidence would be as probative of unlawful motive as the evidence sought; the federal constitutional issues in this litigation are gravely serious; government officials played a direct, central, and essential role in the constitutional violations here; and compelling disclosure of the evidence sought will not conflict with the purposes of the privilege.

***a. The evidence is relevant.*** As already shown, the sought-after evidence is highly relevant to determining the State's discriminatory purpose.

***b. No other evidence would be as probative as the evidence sought.*** Although PCMA and its co-plaintiffs will rely on various sources of evidence to prove up their claims, we are not presently aware of any other source of documents or communications directly demonstrating the considerations the Legislators took into account when drafting and advancing the Act. Public sources do not suffice. After all, "officials seldom, if ever, announce that they are pursuing a

course of action because of an invidious discriminatory intent." *Hargett*, 123 F. Supp. 3d at 970. Only the Legislators possess documents showing directly the considerations that motivated their drafting and adopting of the Act.

***c. The issues in this litigation are serious.*** The case involves a substantial constitutional issue: whether the Tennessee legislature passed the Act in direct violation of the Federal Constitution's Commerce Clause. As we have noted, another district court already has enjoined a similar statute enacted by Arkansas. And the stakes are not only legally significant, but practically so: If Tennessee begins enforcing the Act, it will lead to the closure of hundreds of Tennessee pharmacies and the loss of tens of thousands of Tennessee jobs, and it will affect where millions of Tennesseans may obtain prescription drugs. *See* Compl. ¶¶ 5, 7. In short, this case involves questions of serious constitutional importance affecting the daily lives of millions of Tennesseans.

***d. The government's role is central to this case.*** The fourth factor is satisfied because "the government is a direct participant in this action." *Johnson*, 2018 WL 2335805, at *5. PCMA's core theory is that the Tennessee legislature passed a discriminatory Act, and it seeks to enjoin the Tennessee Board of Pharmacy and the Attorney General from enforcing the Act. "The government's conduct is [thus] squarely at issue." *Hargett*, 123 F. Supp. 3d at 971. In these circumstances, where the legislature's "decision-making [is] at the core of the plaintiffs' claims," "the legislature's direct role in the litigation supports overcoming the privilege." *Bethune-Hill*, 114 F. Supp. 3d at 341 (quoting *Favors v. Cuomo*, 285 F.R.D. 187, 220 (E.D.N.Y. 2012)).

***e. The narrowly tailored requests will not chill legislative activity.*** The legislative privilege is intended to reduce the chilling effect that civil liability and the distraction of discovery may have on legislative activity. But as the Supreme Court has explained, that consideration is out of place when discovery is sought from nonparties like the Legislators. *See Owen*, 445 U.S. at 656; *see also Bethune-Hill*, 114 F. Supp. 3d at 335.

The only potential interest relevant to legislative privilege is the "legislator's interest in

being free from the distraction of compulsory process." *Bethune-Hill*, 114 F. Supp. 3d at 335. But the Tennessee legislature is not presently in session, and it will not again reconvene for at least several months. Moreover, PCMA has served five narrowly drafted requests on just six legislators, substantially limiting any claim of undue distraction from the legislative role.

In sum, all five factors show that legislative privilege cannot shield the Legislators from the subpoenas in this case, even with respect to communications that are arguably "integral" to the lawmaking process. On the contrary, each factor shows that the privilege does not apply. Because the Legislators have made no effort to carry their burden to prove otherwise, the Court should order the production of all responsive documents that the Legislators have withheld.

**C. Even if the privilege were available as a theoretical matter, it has been waived**

Even if there were a basis for asserting legislative privilege in this case (there is not), the Legislators have waived the privilege by failing to produce a privilege log or any other factual basis to support their assertion.

Without exception, the Legislators have asserted the privilege in an unexplained, unsupported, and blanket manner as to each and every request, without offering a single statement of fact or article of evidence to support their objection. That is fatal, because when subpoena recipients withhold documents on the basis of an evidentiary privilege, Rule 45(e)(2) requires them to produce a privilege log "describ[ing] the nature of the withheld documents, communications, or tangible things in a manner that . . . will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(ii).

"Courts consistently have held that [a subpoenaed] party is required to produce a document index or privilege log, and that the failure to produce a log of sufficient detail constitutes a waiver of the underlying privilege." *Carlson v. Fewins*, No. 1:08-cv-991, 2010 WL 11488917, at *1 (W.D. Mich. Apr. 9, 2010) (quoting 9A Federal Practice & Procedure § 2464 at 524–25 (3d ed. 2008)). It is essential that "the proponent of a privilege must 'demonstrate specific facts showing

that the communications were privileged.'" *Page*, 15 F. Supp. 3d at 661. If courts were to countenance "[a] conclusory assertion of privilege," it would allow subpoena recipients to entirely avoid their production duty without actually having "to establish a privilege's applicability to a particular document." *Id*.

Here, the Legislators made a conclusory assertion of legislative privilege without providing PCMA with a privilege log or any other index describing the withheld information or substantiating the asserted privilege. Thus, even if the legislative privilege could have applied, it has been waived.

**III. Sovereign immunity is inapplicable**

The Legislators broadly claim that "[a]s an arm of the State," they enjoy sovereign immunity from subpoena compliance. *See* Ex. G at 1. That is not the law. As a starting point, sovereign immunity does not apply to third-party subpoenas because, unlike suits against the State, a subpoena is "neither a suit, nor one against" a sovereign. *U.S. Department of Justice v. Ricco Jonas*, 24 F.4th 718, 727 (1st Cir. 2022); *see also Barnes v. Black*, 544 F.3d 807, 812 (7th Cir. 2008) (same); *Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240, 248 (D.S.C. 2020) (same). As courts have recognized, if sovereign immunity applied to mere subpoenas for documents, it would lead to the "ludicrous" result that a plaintiff suing "a state official in his individual capacity, a lawsuit specifically authorized by the United States Supreme Court" would "never [be] able to prove his or her case, if any required proof is in the hands of the State's custodian of records." *Allen v. Woodford*, 544 F. Supp. 2d 1074, 1079 (E.D. Cal. 2008). While some courts have applied sovereign immunity to nonparty subpoenas, courts in this circuit have found those cases unpersuasive. *Reguli v. Woodruff*, No. 3:24-00694, 2026 WL 2337559, at *3 (M.D. Tenn. Aug. 12, 2026).

Moreover, even supposing sovereign immunity could bar responses to subpoenas (as opposed to actual lawsuits against the State), immunity is unavailable to individual legislators. *See Maltese v. Heastie*, No. 1:24-cv-1147 (BKS/ML), 2025 WL 1640194, at *3 (N.D.N.Y. June 10, 2025)

(holding sovereign immunity is "inapplicable" to legislators). Were it otherwise, there would be no need for the common-law legislative privilege, which presumes susceptibility to compulsory process.

## IV. The Subpoenas are proportional and not unduly burdensome

Finally, the Legislators assert that the subpoenas are disproportionately burdensome. The Court need not dwell on this point—the subpoenas are unusually narrow, and compliance will not impose any significant burden.

Under Rule 26(b)(1), a subpoena must be proportional and not unduly burdensome. Fed. R. Civ. P. 26(b)(1). Proportionality is analyzed by "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*; *see In re Modern Plastics*, 890 F.3d 244, 251–52 (6th Cir. 2018). The undue-burden inquiry is case-specific and considers factors including relevance, the requesting party's need for the documents, the breadth of the requests, the time period covered, the particularity with which the documents are described, and the burden imposed on the subpoena recipient. *In re Modern Plastics*, 890 F.3d at 251. The analysis thus overlaps substantially with the privilege test, and both support compelling the Legislators to comply.

First, the issues at stake are important. The Act violates the Commerce Clause, impacts the jobs of tens of thousands of Tennesseans, and will disrupt access to prescription drugs for millions of others. *See* Compl. ¶¶ 5, 7.

Second, the Legislators have unique access to the sought-after information. PCMA cannot obtain their communications with each other, staff, lobbyists, industry groups, or legislative insiders by other means (in part because we do not know who all of those third parties are). Nor can PCMA obtain such information from the party defendants. The Legislators alone possess all

nonpublic communications about drafts, amendments, talking points, strategy, anticipated effects, and modeling on other states' laws.[1]

Third, the Legislators have access to state resources in responding to the subpoenas. They are represented by the Attorney General's office and are not personally burdened by having to retain or pay an attorney to assist with responding.

Fourth, the discovery is highly relevant to the purpose and effect of the Act, essential to proving a Commerce Clause violation. *See supra* Section I.

Fifth, the likely benefit outweighs any burden. The subpoenas contain just five focused requests, are limited to the Act and specified related materials, and cover a short time frame, from June 1, 2025, to the present. When weighed against the high relevance of the information and the Legislators' exclusive possession, the benefit easily outweighs any perceived burden.

## CONCLUSION

For these reasons, PCMA respectfully requests that the Court grant this Motion to Compel, overrule the Legislators' objections, and order production of responsive nonprivileged documents within fourteen days of this order.

---

[1] To be sure, PCMA and other Plaintiffs are seeking some communications with legislators from other third parties, but these third parties do not possess all responsive documents held by the Legislators. And, in any event, they too are resisting discovery. *See* Dkt. No. 73.

Dated: August 27, 2026

Respectfully submitted,

**WINSTON TAYLOR LLP**

By: /s/ *Michael B. Kimberly*

Michael B. Kimberly (*pro hac vice*)
Linda M. Blair (*pro hac vice*)
WINSTON TAYLOR LLP
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5000
Michael.Kimberly@winstontaylor.com
Linda.Blair@winstontaylor.com

Nathan R. Lee (*pro hac vice*)
WINSTON TAYLOR LLP
2121 North Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Nathan.Lee@winstontaylor.com

Todd Presnell
Timothy A. Rodriguez
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
Telephone: (615) 252-2355
tpresnell@bradley.com
trodriguez@bradley.com

*Attorneys for Plaintiff Pharmaceutical Care Management Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, August 27, 2026, I served a true and correct copy of the foregoing instrument on Defendants' attorneys of record via the Court's CM/ECF filing system and on the Legislators' counsel, Matthew Kubicek, via email.

/s/ *Michael B. Kimberly*
Michael B. Kimberly