**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MARLIN BLANE, MELISSA BORUFF, DAVID BROWN, JAKE BYNUM, NICHOLE FOSTER, REBECCA LEINART, SHANEA MCKINNEY, BROOKE MILLS, MATTHEW PHILLIPS, LUCY SHELL, AND JONATHAN SKRMETTI,** ***each in his or her official capacity*****,**<br><br>**Defendants.** | ) | **Master Case No.:**<br>**No. 3:26-CV-00685**<br><br>**Consolidated with Case Nos.:**<br>**3:26-cv-00806**<br>**3:26-cv-00816**<br>**3:26-cv-00818**<br><br>**JUDGE RICHARDSON**<br><br>**MAGISTRATE JUDGE FRENSLEY** |

# LEGISLATORS' OPPOSITION TO MOTION TO COMPEL

## INTRODUCTION

This is a discovery dispute about whether a private trade association may conscript six sitting state legislators into producing the internal record of why they wrote a law. Plaintiff Pharmaceutical Care Management Association ("PCMA") has sued Tennessee officials, seeking to invalidate the FAIR Rx Act on the grounds that it violates the dormant Commerce Clause and is preempted by federal law. To build that case, PCMA served subpoenas duces tecum on six nonparty members of the General Assembly: Lieutenant Governor Randy McNally, Senators Bobby Harshbarger, Shane Reeves, Ferrell Haile, and Ken Yager, and Representative Rick Scarbrough (the "Legislators"). PCMA demands the Legislators' bill drafts, internal analyses, and all communications between two or more persons (including with one another, government staff,

constituents, and even with their attorneys) about the Act that, as PCMA candidly puts it, evidence the legislature's "true intent and motivation" in enacting the Act. Dkt. 79 at 10.

These subpoenas ask the Court to do what courts have long refused: pull lawmakers away from their legislative duties and saddle them with burdensome discovery seeking their motives in passing a law. But the materials sought by PCMA lie at the core of the qualified legislative privilege, which protects the drafting, deliberation, and internal analysis through which legislation is made. The privilege is at its strongest against a demand like this one, whose stated object is the legislators' subjective purpose. Even if the Court employed the outdated five-factor test—rejected outright in many recent court opinions—the balance tips decisively toward the Legislators, who are nonparties and whose candid deliberations would be chilled by compelled disclosure. Comity between a federal court and a coordinate sovereign's legislature points the same way, and the Supreme Court decision PCMA leans on drew its line at criminal cases, not discovery in routine civil cases like this.

PCMA does not need the Legislators' files anyway. Two of its three claims (ERISA and Medicare preemption) turn on the objective text and effect of the Act, not on any legislator's state of mind. And even PCMA's dormant Commerce Clause claim is proven from the statute's text, practical effects, and the extensive public record PCMA has already pleaded—i.e., the Act's preamble, floor statements, and purported parallels to an Arkansas law. Against that record, compelling six nonparty legislators to search and produce vast swaths of documents reflecting their private deliberations and communications is not proportional to the needs of the case.

Sovereign immunity supplies another threshold bar. The subpoenas target sitting legislators in their official capacity and demand the State's own legislative records, even though a substantial and growing body of authority holds that such official-capacity process is barred absent a waiver

Tennessee has never given. PCMA's cited cases to the contrary turned on the State being a disinterested stranger to the litigation—the opposite of this case, where Tennessee's statute is the subject of the suit. The Court should deny the motion.

## BACKGROUND

On June 15, 2026, PCMA filed suit against ten members of the Tennessee Board of Pharmacy Members and Attorney General Jonathan Skrmetti, related to Tennessee's Freedom, Access, and Integrity in Registered Pharmacy Act ("FAIR Rx Act"). Dkt. 1, Case No. 3:26-cv-816.

PCMA subsequently served broad third-party subpoenas duces tecum on the Legislators. The subpoenas seek wide-ranging discovery of the state legislators' materials with any conceivable link to passage of the FAIR Rx Act, with an ongoing obligation of production, and a two-week compliance date. The subpoenas seek (1) All communications and documents related to drafting and amending bills concerning the Act, (2) communications with Tennessee government employees and lawmakers about the Act, (3) notes and analyses of the Act and its amendments, (4) materials comparing the Act to other state laws (such as Arkansas Act 624 and related litigation), and (5) documents regarding the Act's potential impact on pharmacies. Dkt. 79 at 13-14.

But as broad as the descriptions of the requested documents are, PCMA's term definitions render them virtually limitless. For example, "Document" is defined as:

> The term "Document" is used herein in its broadest sense and includes any written or recorded matter of every kind or description, however produced or reproduced, whether draft or final, original or reproduction, in Your custody or control or of Your attorneys or agents and anything which constitutes a document within the meaning of the Federal Rule of Civil Procedure 34(a)(1)(A) ("any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a

> reasonably usable form") and anything falling within the definition of "writing" in Federal Rule of Evidence 1001 ("letters, words, numbers, or their equivalent set down in any form"), in the custody or control of Defendant or Defendant's attorneys or agents. This shall include, but not be limited to, records of Communications in any format, electronic mail or other electronic communications, letters, facsimile, correspondence, contracts, agreements, teletype messages, notes, reports, mechanical and electronic video and/or sound recordings or transcripts thereof, memoranda or minutes of telephone or personal conversations or minutes of conferences in Your possession and/or control or of Your attorneys or agents or known by You to exist.

Dkt. 79-1 at 9-10.[1] "Communication(s)" is defined equally as broadly:

> "Communication(s)" means, without limitation, oral, written, and electronic communications of any kind, including but not limited to emails, letters, text messages, facsimiles, telephone or conference calls, voicemail, notes, conversations, as well as all Documents enclosed or attached to such Communications, or other occurrences where thoughts, opinions, information, or data are transmitted between two or more persons.

*Id.* at 10.

The Legislators served timely written objections based on sovereign immunity, legislative privilege, relevance, undue burden, expense, as well as the continuing nature of the requests, oral communications being sought, and the unreasonable timeline. Dkt. 79-7.

## LEGAL STANDARD

Generally, the scope of discovery for a subpoena is the same as that for party discovery. Fed. R. Civ. P. 45, Advisory Commission Notes to 1991 Amendment. Under Rule 26, discovery is restricted in both form and content. *See Grae v. Corr. Corp. of Am.*, 326 F.R.D. 482, 485 (M.D. Tenn. 2018) ("Understandable curiosity . . . is not the standard for discoverability . . . ."). Parties have no right to discover privileged or irrelevant information. Fed. R. Civ. P. 26(b)(1). And even

[1] The subpoenas are identical for each legislator. *See* Dkts. 79-1 through 79-6.

the discovery of relevant information "must" be limited if it is overbroad, unduly burdensome, or disproportionate to the needs of the case. Fed. R. Civ. P. 26(b)(2)(C). A party may not "go fishing," and courts have "discretion" to limit discovery. *In re Ohio Execution Protocol Litigation*, 845 F.3d 231, 236 (2016).

But the Rules do afford extra protection to non-parties. A court "must quash" a subpoena that subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A). Courts "balance the need for discovery against the burden imposed on the person ordered to produce documents." *In re: Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018). To do this, a court must consider relevance, the need of the requesting party, the breadth of the request, the time period covered, and the particularity of the request. *Id.* "[T]he status of that person as a non-party is a factor." *Id.*

## ARGUMENT

### I. Sovereign Immunity Precludes Compliance with the Subpoenas.

States enjoy sovereign immunity from suit. *Alden v. Maine*, 527 U.S. 706, 715 (1999). As an arm of the State, the Legislators enjoy sovereign immunity from all coercive processes of federal judicial tribunals, including subpoenas. *Fox v. Faison*, 668 F.Supp.3d 751, 770 (M.D. Tenn. 2023) ("[T]he claims against [a Tennessee lawmaker] are claims against . . . the State of Tennessee itself."). Significantly, immunity is not restricted to liability; it also protects a state from all the rigors of judicial proceedings, including pretrial matters. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (noting that, where immunity applies, "pretrial matters as discovery are to be avoided if possible, as inquiries of this kind can be peculiarly disruptive of effective government." (cleaned up)). In other words, if immunity precludes PCMA from suing the Legislators for passing the Act, it shouldn't be allowed to drag them into the litigation at all for the same reasons. *See Russell v. Jones*, 49 F.4th 507, 515 (5th Cir. 2022) ("Plaintiffs may not obtain by third-party subpoena what they could not obtain from the [officials] as defendants.").

A growing body of authority holds that sovereign immunity reaches a Rule 45 subpoena served on a state official in an official capacity. The Fifth Circuit has recognized that sovereign immunity "applies to state officials as third parties, not just as defendants." *Id.* at 514. Because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," such immunity generally bars suits against state officials in their official capacities. *Id.* at 513 (citation omitted). The court has thus barred third-party subpoenas, observing "the sovereign's dignity and authority over its prerogatives [] are no less interesting when a sovereign is served with a *subpoena duces tecum* instead of a complaint." *Id.* at 515.

A few years later, a district court in the Tenth Circuit applied the same principle to quash a document subpoena on the Colorado State Patrol, holding that "Eleventh Amendment immunity protects a state from other forms of legal process, and specifically, from answering subpoenas *duces tecum*." *Butler-Moore v. Garcia*, 815 F. Supp. 3d 1206, 1208 (D. Colo. 2025) (citation omitted).

And just this year, the Eighth Circuit confirmed that immunity can bar a third-party subpoena, holding that whether a subpoena is barred by sovereign immunity involves "fact-intensive inquiries that turn on the circumstances of a particular case and the third-party discovery subpoena at issue." *Mick v. Gibbons*, 171 F.4th 1097, 1105 (8th Cir. 2026). A subpoena crosses the line when it "infringes on [the state's] autonomy by subjecting it to the process of a judicial tribunal[ and] interferes with public administration," rather than presenting a "narrow and minimally disruptive third-party request." *Id.* Although *Mick* observed that a *simple* document subpoena can be minimally disruptive, PCMA's subpoenas are far from narrow: they run against six sitting legislators, sweep in "all" communications and documents relating to the Act and—

through broad definitions—demand multi-custodian collection and multi-level review of the legislature's deliberative files. Dkt. 79-1 at 9, 13.

PCMA's contrary authority is distinguishable on its own terms. Cases holding that a nonparty document subpoena is not a "suit" against the state rest expressly on the state's disinterest in the underlying litigation. In *Barnes v. Black*, for example, the court premised its holding on the fact that "the state is not a party to or even remotely interested in the plaintiff's suit, and is not charged with a violation of federal law." 544 F.3d 807, 812 (7th Cir. 2008).[2] In *U.S. Dep't of Just. v. Ricco Jonas*, the court reasoned that the enforcement proceeding there did not involve any claim against the state and the judgment could have no "conceivable effect" on the state's treasury. 24 F.4th 718, 727 (1st Cir. 2022).[3]

Neither premise applies here. This is a direct constitutional and preemption challenge to Tennessee's own statute, in which state officials are defending the Act's validity, and PCMA seeks to prove that the Tennessee legislature acted unconstitutionally. PCMA relies on *Reguli v. Woodruff* to urge the opposite, (Dkt. 79 at 24), but a district-court decision cannot resolve a question the Sixth Circuit has left open, and the official-capacity state-records posture here aligns with *Russell* and *Butler-Moore*, not with the disinterested-nonparty line. *See Russell*, 49 F.4th at 514; *Butler-Moore*, 815 F. Supp. 3d at 1208.

---

[2] Notably, the case also presented a radically different procedural posture in that it involved a state prisoner's appeal of the denial of his request for a writ of habeas corpus ad testificandum to a state prison warden seeking to have himself transported to a federal court to litigate his "run-of-the-mill civil suit" stemming from an automobile accident that occurred before his state imprisonment. *Barnes*, 544 F.3d at 810. The court addressed sovereign immunity only insofar as it was raised in an amicus brief filed by the State of Wisconsin, which argued that the case should have been dismissed outright. *Id.* at 812.

[3] This case, too, is inapposite since it involved a subpoena issued by the U.S. Drug Enforcement Administration to New Hampshire's Prescription Drug Monitoring Program manager seeking prescription drug records of an individual. *Ricco Jonas*, 24 F.4th at 721.

And neither exception to immunity applies. Congress did not abrogate Tennessee's immunity in enacting the Commerce Clause, ERISA, or the Medicare statute, and Tennessee has not waived it. A state waives immunity only by specifying "the State's intention to subject itself to suit in *federal court*." *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305-06 (1990) (emphasis in original). Tennessee made no such clear statement, and it did not bring this suit; it is a defendant under *Ex parte Young*. The Court should therefore decline to enforce the subpoenas.

## II. Legislative Privilege Precludes PCMA's Discovery of the Documents Sought.

An overview of legislative privilege over the last five centuries reveals that it was intended specifically for cases such as this in order to protect legislative functioning, ensure separation of powers, and promote comity. *See* Section II.A. Legislative privilege is available here and applies to the documents sought. *See* Section II.B. Although the Court should adhere to recent persuasive Circuit case law which applies the privilege broadly, even if the Court uses the older balancing test, Legislators are still entitled to the privilege. *See* Section II.C. Finally, the Court may quickly dispense with the argument that Legislators waived the privilege due to the subpoenas' reference to a privilege log. *See* Section II.D.

### A. Legislative privilege safeguards the legislative function, the separation of powers, and comity.

Legislative privilege, which has roots dating back five hundred years, is crucial to legislative function. Both immunity and privilege protect state legislators from the burdens of federal litigation. While the Speech or Debate Clause creates immunity for federal legislators, U.S. Const. art. I, § 6, cl. 1, legislative immunity predates the Constitution. *Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 361-62 (6th Cir. 2022). "The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings

has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). So this longstanding immunity also covers state legislators. *Id.* at 376-78.

Legislative immunity includes a legislative privilege preventing discovery. The privilege emerged from the understanding that "legislators engaged 'in the sphere of legitimate legislative activity,' should be protected not only from the consequences of litigation's results but also from the *burden* of defending themselves." *Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980) (emphasis added). The privilege "'extends to discovery requests' because 'complying with such requests detracts from the performance of official duties.'" *Pernell v. Florida Bd. of Govs. of St. Univ.*, 84 F.4th 1339, 1343 (11th Cir. 2023) (citation omitted). Importantly, it "'applies whether or not the legislators themselves have been sued.'" *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015) (citation omitted). The privilege crucially aids legislative function, as well as furthers principles of separation of powers and comity.

Legislative Function. The privilege shields legislators from both the burdens of discovery and the chilling effect that public disclosure of private conversations would have on internal deliberations. It immunizes lawmakers from "lawsuits that would 'indirectly impair' their freedom to engage in tasks that are 'indispensable ingredient[s] of lawmaking.'" *Kent*, 33 F.4th at 365 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505(1975)); *see also La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 317 (5th Cir. 2024); *In re N. Dakota Legislative Assembly*, 70 F.4th 460, 464-65 (8th Cir. 2023), *vacated as moot sub nom. Turtle Mt. Band of Chippewa Indians v. North Dakota Legis. Assem.*, 144 S. Ct. 2709 (2024) (mem.); *Am. Trucking Associations, Inc. v. Alviti*, 14 F.4th 76, 86-87 (1st Cir. 2021); *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018); *In re Hubbard*, 803 F.3d at 1310; *Bagley v. Blagojevich*, 646 F.3d 378, 396-97 (7th

Cir. 2011) (finding that legislative immunity spared a governor from the burden of a deposition about his legislative actions). The privilege also safeguards private deliberations because "mere disclosure" of documents could deter legislators from "freely engaging in the deliberative process necessary to the business of legislating." *Edwards v. Vesilind*, 790 S.E.2d 469, 478 (Va. 2016) (quoting *Arizona Indep. Redistricting Comm'n v. Fields*, 75 P.3d 1088, 1098 (Ariz. Ct. App. 2003)).

Separation of Powers. Along with protecting legislative function, legislative privilege is "a bulwark in upholding the separation of powers." *Lee v. Virginia State Bd. of Elections*, No. 3:15-cv-357, 2015 WL 9461505, at *2 (E.D. Va. Dec. 23, 2015) (citation omitted); *see also Smith v. Iowa Dist. Ct. for Polk Cnty.*, 3 N.W.3d 524, 534 (Iowa 2024). It "preserve[s] the constitutional structure of separate, coequal, and independent branches of government" by preventing a "risk" of "intrusion" by "the Judiciary into the sphere of protected legislative activities." *United States v. Helstoski*, 442 U.S. 477, 491 (1979) (finding legislative immunity barred admission of evidence about legislative acts in a criminal prosecution). And while the Supreme Court has deemed "federal *criminal* prosecutions" of state legislators outside the privilege's separation-of-powers rationale, *United States v. Gillock*, 445 U.S. 360, 370 (1980) (emphasis added), separation of powers is still foundational for the privilege in federal *civil* litigation, *Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732-33 (1980).

Comity. Finally, the legislative privilege promotes comity by granting Tennessee legislators in federal court the same respect they should receive in state court. *See Mayhew v. Wilder*, 46 S.W.3d 760, 774 (Tenn. Ct. App. 2001) (describing legislative immunity as "sweeping and absolute"); *see also Jaffee v. Redmond*, 518 U.S. 1, 12-13 (1996) ("[T]he policy decisions of the

States bear on the question of whether federal courts should . . . amend the coverage of an existing [privilege].").

**B. Legislative privilege is available, applicable, and extends to the requested communications that PCMA seeks.**

To effectively further its multiple purposes, legislative privilege must protect all aspects of the legislative process, regardless of whether Legislators are named defendants. Contrary to PCMA's claims, the applicability of the privilege is not dependent upon a legislator's status as a named defendant or third party and the documents sought are encompassed within the privilege. This rule also encompasses the broad swath of documents it seeks that directly reveal legislators' deliberations and communications made in the course of lawmaking.

**1. The requested documents fall within the scope of legislative privilege.**

From the start, courts have "liberally" construed legislative immunity to cover any actions taken "in the sphere of legitimate legislative activity." *Kent*, 33 F.4th at 363 (quoting *Coffin v. Coffin*, 4 Mass. 1, 27 (1808)); *Tenney*, 341 U.S. at 376). Likewise, the legislative privilege "is necessarily broad" in scope. *La Union Del Pueblo Entero v. Abbott* ("*Hughes*"[4]), 68 F.4th 228, 236 (5th Cir. 2023). Courts have confirmed that the privilege protects a range of actions, communications, and information undertaken, made, and reviewed by legislators in the course of their duties.

All the Legislators' actions related to legislating the Fair Rx Act are covered by legislative privilege. There is little dispute that legislative privilege "extends well beyond the act of voting for or against a particular piece of legislation." *League of United Latin Am. Citizens v. Abbott* ("*LULAC v. Abbot II*"), 708 F. Supp. 3d 870, 877 (W.D. Tex. 2023), *appeal dismissed*, 2025 WL

[4] This decision is often referred to as *Hughes* because Senator Hughes was the first-named non-party legislator appellant who was claiming legislative privilege.

1467462 (5th Cir. May 22, 2025). "It covers material prepared for a legislator's understanding of legislation, lobbying conversations encouraging a vote on pending legislation, and even materials the legislator possesses related to potential legislation—i.e., 'all aspects of the legislative process.'" *Id.* (citing *Hughes*, 68 F.4th at 235); *see also Kent*, 33 F.4th at 363-65 (noting the many actions covered by legislative immunity); *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) (same). The privilege must reach all these activities to secure legislative function. *Almonte*, 478 F.3d at 107; *cf. Kilbourn v. Thompson*, 103 U.S. 168, 204-05 (1880) (hypothesizing that legislative immunity would not apply if a legislature acted outside of its legislative function by, for example, "assuming the function of a court for capital punishment").

The Legislators' communications about the Fair Rx Act's legislative process are covered by legislative privilege. Recent judicial consensus confirms that the legislative privilege includes communications not only within the legislature, but also by or with "persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents." *Hughes*, 68 F.4th at 236 (citation omitted). This coverage of third-party communications is not limited to those persons "acting as the [l]egislators' agents." *Smith*, 3 N.W.3d at 535-36 (adopting the "reasoning of the federal courts"). The privilege extends to "unsolicited" communications or acts by a third party, regardless of its identity. *Id.* That is for good reason. "Meeting with 'interest' groups" and other external third parties "is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider." *Hughes*, 68 F.4th at 236 (citation omitted). So, an exemption that fails to protect such communications would "swallow the [privilege] almost whole." *Id.* Properly understood, it is the "subject of the communication" that "provides the limiting principle" for applying legislative

privilege—not the identity of the speaker. *Smith*, 3 N.W.3d at 536. In sum, if a communication to a legislator is about the legislative process, it is privileged—even if "unsolicited." *Id.*

The information the Legislators possess that informed the legislative process of the Fair Rx Act is covered by legislative privilege. The privilege applies to all categories of documents or recordings relating to the legislative process. That is, the privilege covers "purely factual documents," in addition to those containing a legislator's "motivations and mental impressions." *Pernell*, 84 F.4th at 1343; *LULAC v. Abbott II*, 708 F. Supp. 3d at 877-78. The upshot of this rule is that "the purpose of a subpoena, not what the subpoena seeks . . . determine[s] if the legislative privilege applies." *Pernell*, 84 F.4th at 1343. If a subpoena's "purpose was to support the lawsuit's inquiry into the motivation behind" passing a statute, then a court should quash the subpoena because that "inquiry that strikes at the heart of the legislative privilege." *Id.* (citation omitted).

Again, this rule reasonably reflects legislative reality. "[D]isclosing that [a] legislator relied on or considered some facts, and not others, would inevitably indicate the legislator's deliberations." *LULAC v. Abbot II*, 708 F. Supp. 3d at 878. Thus, any "material the legislator obtained, or declined to obtain, in the decision-making process is privileged" because revealing such information would "inevitably reveal the [legislator's] deliberations." *Id.* at 878 (quoting *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)); *see id.* n.2 (noting that "so long as disclosure of factual material by the legislator would add a brick to the plaintiffs' wall, it falls within the scope" of information that would "inevitably reveal the [legislator's] deliberations").

**2. Legislative privilege applies and is needed in this case.**

The motion to compel should be denied for seeking privileged information. Here, the entire case centers on legislative intent, and PCMA has subpoenaed legislative officials for information about the legislative process. The Legislators are all members of the General Assembly and thus covered by the privilege. *See In re N. Dakota Legislative Assembly*, 70 F.4th at 463. PCMA

demands insight into every stage of the General Assembly's drafting, editing, reviewing, and debating of the FAIR Rx Act, including "[a]ll [c]ommunications and [d]ocuments" "concerning the Act" (as well its drafts and amendments) with, among others, constituents, employees of Tennessee, and Tennessee lawmakers, as well as all "notes and analysis of the Act." *See, e.g.*, Dkt. 79-1 at 13. This (if it exists) was created as part of the legislative process and is privileged. *In re N. Dakota Legislative Assembly*, 70 F.4th at 463-64.

PCMA argues that legislative privilege is available only when legislators face individual liability, relying on a non-binding 2015 case from the Eastern District of Virginia, *Bethune-Hill v. Viriginia St. Bd of Elections*, 114 F. Supp. 3d 323 (E.D. Va. 2015). But *Bethune-Hill* is inapposite.[5] First, *Bethune-Hill* was "vindicating" significant constitutional rights not at issue here—allegations of race-based motives in the passage of laws implicating the right to vote. Second, PCMA conveniently omits that *Bethune-Hill* predated far more recent, relevant, and persuasive precedent. The Eleventh Circuit's 2023 *Pernell* decision and the Fifth Circuit's 2024 *Hughes* decision—where the plaintiffs were likewise alleging racial motives in the passage of laws and, yet, both courts came to the opposite conclusion of *Bethune-Hill*.

In *Pernell*, the Eleventh Circuit flatly rejected the rationale from *Bethune-Hill* (and thus much of PCMA's arguments here), determining, *inter alia*: (1) legislative privilege shields even purely factual information; (2) the inquiry as to whether legislative privilege applies is "over" as

[5] PCMA also cites *Owen v. City of Independence*, 445 U.S. 622 (1980), *Page v. Virginia State Bd. of Elections*, 15 F. Supp. 657 (E.D. Va. 2014), and *Nashville Student Org. Committee v. Hargett*, 123 F. Supp. 967 (M.D. Tenn. 2015), but none support PCMA's contention. *Owen* stood only for the unremarkable principle that a municipality has no immunity from damages liability under Section 1983 flowing from its constitutional violations. 445 U.S. at 657. The thrust of *Page*'s non-binding holding was that "a legislative assistant or aide [must] be directly employed and paid by an individual legislator, a legislative committee, or the legislature as a whole" in order to attain legislative privilege—a principle not at issue here. 15 F. Supp. at 664. Finally, *Hargett*'s likewise nonbinding holding was that, while common law legislative privilege did not preclude plaintiffs from deposing state legislators, legislators could invoke the privilege upon being questioned. 123 F. Supp. 3d at 971-72.

soon as a court determines that the subpoenaed documents are sought for an improper purpose—to wit, "to uncover the legislators' motives in passing the law"; (3) legislative privilege is "insurmountable in private civil actions under section 1983" (the same law PCMA brings its suit under); and (4) even if the privilege could be overcome by "especially compelling civil-rights claims," the privilege will not give way merely because the plaintiffs contend that their "claim depends on proof of legislative intent." 84 F.4th at 1343-45.

In *Hughes*, the Fifth Circuit similarly reached the opposite conclusion from *Bethune-Hill*, determining: (1) there is no reason to differentiate between state and federal lawmakers when determining what counts as "legitimate legislative activity"; (2) legislative privilege only yields for civil cases so extraordinary they are tantamount to federal criminal prosecution and so rare that they would not destroy the privilege; and (3) the privilege "stands fast" even in the face of allegations involving racial animus or First Amendment retaliation. 68 F.4th at 237-38.

This Court should follow the far more persuasive decisions of these recent circuit courts and eschew the dated and cavalier approach to this serious issue represented by PCMA's authority.[6]

If allegations of racial animus and First Amendment retaliation against members of a legislature do not overcome the legislative privilege, then allegations by a lobbyist group that its business model is being obstructed hardly fit the bill. PCMA's Complaint seems to suggest that federal pleading standards allow it to ignore the stated purpose of the passage of the FAIR Rx Act—i.e., to curb anticompetitive practices such as patient steering and uneven drug

---

[6] Notably absent from PCMA's filings is any representation that it will not sue the Legislators in the future. This is significant. If the Court were to accept PCMA's unsupported assertion that legislative privilege applies only when lawmakers are named parties or face individual liability, an enterprising plaintiff could circumvent the privilege altogether. By omitting lawmakers' names from the initial pleading, the plaintiff could obtain documents via subpoena—since, under PCMA's theory, the privilege would not apply—and then amend the pleading to add the lawmakers as defendants, relying on the "unprivileged" documents obtained. The Court should reject this absurd interpretation of legislative privilege that, by its own terms, would effectively eviscerate the privilege by allowing it to be circumvented with such ease.

reimbursements—and thus eschews its burden of alleging a plausible Commerce Clause violation at the pleading stage. Instead, PCMA's Complaint offers only a handful of unrelated actions by the General Assembly and individual legislators, as well as unrelated third parties, that it casts as evidence of the lawmakers' thinly veneered motivation to discriminate against out-of-state businesses:

- Comments by legislators broadly suggesting that the FAIR Rx Act would help keep independent pharmacies in the community, as well as—absurdly—a tweet in support of the Act by Senator Harshbarger's mother, and comments made by a rival trade organization's CEO on a podcast. Dkt. 1 ¶¶ 66(e), (f), Case No. 3:26-cv-816.
- Three General Assembly members involved in the passage of the FAIR Rx Act allegedly "have direct ties to" independent pharmacies. *Id.* ¶¶ 65, 67.
- Tennessee's existing "pervasive regulatory scheme" combined with "the absence of evidence that lawmakers believe the FAIR Rx Act was needed to address a specific regulatory gap." *Id.* ¶ 70.

Plaintiffs like PCMA should not be given unfettered access to the internal workings of the General Assembly. Indeed, if the legislative privilege bars anything, it is PCMA's attempt to backfill its pleading failures with discovery of legislative motive. Here, the Court should reject PCMA's push to narrow this longstanding privilege to the point of obscurity and find that is available, applicable, and covers the documents sought by PCMA's subpoena.

### C. This Court should reject the legislative-privilege balancing test, which PCMA fails regardless.

Against the weight of recent authority recognizing the bright-line nature of legislative privilege, some district courts have previously employed a multi-factor balancing test to weigh whether legislative privilege should apply in a given case. *See Rodriguez v. Pataki*, 280 F. Supp.

2d 89, 100-01 (S.D.N.Y.), *aff'd*, 293 F. Supp. 2d 302 (S.D.N.Y. 2003); *Nashville Student Org. Comm. v. Hargett*, 123 F. Supp. 3d 967, 970 (M.D. Tenn. 2015). Under this approach, courts faced with a legislative-privilege dispute must evaluate: (1) relevancy, (2) availability of other evidence, (3) seriousness of litigation, (4) role of government in litigation, and (5) purposes of the privilege. *Bethune-Hill*, 114 F. Supp. 3d at 337-38. PCMA also relies on this test. Dkt. 79 at 21-23. Like the courts in *Pernell* and *Hughes*, this Court should reject PCMA's proposed balancing-of-the-interests approach—or, if it applies, hold that it bars discovery here.

**1. The Court should reject the legislative-privilege balancing test.**

The balancing test conflicts with Supreme Court guidance and uniform circuit authority, which have not overridden legislative privilege outside the criminal context. *See* Section II.B.2; *United States v. Gillock*, 445 U.S. 360, 372-73 (1980). Indeed, every circuit court to consider the *Rodriguez* test—or balancing more generally—has rejected it. *Pernell*, 84 F.4th at 1344-45; *In re N. Dakota Legislative Assembly*, 70 F.4th at 464-65; *Hughes*, 68 F.4th at 237-40 (disregarding the *Rodriguez* test even though the district court had applied it below); *see also Lee*, 908 F.3d at 1188 (rejecting a categorical exception to the privilege in cases implicating governmental intent).

Moreover, the balancing approach is unpredictable at best and "manipulable" at worst. *Pernell*, 84 F.4th 1339, 1344 (11th Cir. 2023). And "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1206 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)); *Jaffee*, 518 U.S. at 18 (same). The reason? The confidence to communicate freely exists only if legislators remain free from even "the apprehension that a court might order their confidential communications involuntarily disclosed." *In re Itron, Inc.*, 883 F.3d 553, 561 (5th Cir. 2018) (citation omitted). This Court should join with other courts in finding the "*Rodriguez* analysis is no longer relevant."

*Mississippi State Conf. of NAACP v. State Bd. of Election Commissioners*, No. 3:22-cv-734, 2023 WL 8360075, at *4 (S.D. Miss. Dec. 1, 2023).

**2. Even if the legislative-privilege balancing test is applied, PCMA's discovery should not proceed.**

Relevancy. Much of the information PCMA demands is irrelevant. *First*, PCMA seeks documents that might reveal the Legislators' motivation either directly in writing and by public statements or indirectly by their communications with each other and others. Dkt. 79-1 at 13.

But for five of the subpoenaed lawmakers—Senators Reeves, Haile, and Yager, Lieutenant Governor McNally, and Representative Scarbrough—it is unclear what relevant information PCMA thinks they would possess. While PCMA says that all the subpoenaed legislators have "exclusive possession" of relevant information, (Dkt. 79 at 12), all it cites in support is their status as a co-sponsor of the bill, their alleged ties to independent pharmacies, and their support for the Act.[7] Two lawmakers, Senator Haile and Lieutenant Governor McNally, are not even referenced in the complaint and, according to PCMA's motion, Senator Yager was subpoenaed because he "declared that the bill was a 'solution to a problem that PBMs created themselves' and urged his colleagues to vote yes on the bill as a 'vote for independent pharmacies.'" Dkt. 79 at 14 (quoting Dkt. 1 ¶ 66, Case No. 3:26-cv-816). But PCMA still subpoenaed these individuals, speculating that they might know or possess something of value to its case.

Of crucial importance here, proof of the Legislators' individual intent says nothing about the General Assembly's intent as a whole. The Sixth Circuit has noted that this type of evidence is irrelevant to a Commerce Clause claim: "[T]he Commerce Clause concerns itself with protectionist

---

[7] Despite the Act's dozens of co-sponsors, including thirty-four Representatives in the House, PCMA only selected the six Legislators, evidently because it believes they possess special insight due to their alleged ties to independent pharmacies. *See* https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=HB1959&ga=114.

effects, not motives, and thus does not require courts to investigate the subjective mindsets of the legislators who passed the law. This disclaimer follows from the [Supreme] Court's longstanding caution against trying to deduce a single 'intent' behind legislation enacted by a body of individuals." *Truesdell v. Friedlander*, 80 F.4th 762, 772-73 (6th Cir. 2023) (cleaned up); *see also Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." (citation omitted)). Moreover, the Sixth Circuit has long expressed "wary[ness] of relying on individual legislator's statements" as establishing legislative intent "because individual statements are often contradicted or at least undermined by other statements in the legislative record." *Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 784-85 (6th Cir. 2003). Nor can one attribute the intent of one legislator to the entire legislative body. *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *In re N. Dakota Legislative Assembly*, 70 F.4th at 464-65.

*Second*, PCMA seeks all documents and communications "concerning Arkansas Act 624." Dkt. 79-1 at 13. Documents about how PCMA and Big Pharma conduct business in Arkansas have nothing to do with their conduct, and the necessity for a law, in Tennessee and are irrelevant.

<u>Availability of Other Evidence</u>. PCMA seeks documents available from other sources: public websites, public legislative discussions, public comment, and members of the public identified in the public record for information relating to the Act, some of which PCMA acknowledges it already has. Dkt. 1 ¶¶ 64-66, Case No. 3:26-cv-816. PCMA can also look to committee rules, memos, and guidelines. Yet PCMA implies that it requires more evidence only available from the Legislators because, thus far, the evidence it has obtained from other sources has not sufficiently revealed discriminatory intent. Dkt. 79 at 13 ("[S]tatements about the Act by public representatives *suggest* that the Act's purpose is protection of local interests." (emphasis

added)). This reasoning perversely grants the broadest discovery to PCMA despite the sparsest support for its claims. If PCMA cannot obtain what it seeks from any source, it only underscores that it is probing core legislative deliberations—the documents legislative privilege protects most. Dkt. 79 at 21-22.

"Seriousness" of Litigation. No constitutional challenge is trivial, but this lawsuit does not come close to containing any of the three elements—unique federal interests, similarity to criminal prosecution, and rare allegations—that might result in a lawsuit so extraordinary that legislative privilege must yield. *See supra* Section II.B.2; *Abbott*, 93 F.4th at 323-24. First, Plaintiffs allege no federal interests beyond constitutionality. Dkt.1 ¶¶ 73-83, Case No. 3:26-cv-816. Second, this is a routine Commerce Clause suit brought by a powerful and well-funded lobbyist group, taking action to protect its members' financial interests, with no similarity to a criminal prosecution. *Id.* ¶¶ 15-45. Third, claims of this kind are *far* from infrequent. Indeed, PCMA has filed several similar cases. *See, e.g.*, *Pharm. Care Mgmt. Ass'n. v. Gerhart*, 852 F.3d 722 (8th Cir. 2017); *Pharm. Care Mgmt. Ass'n v. Rutledge*, 4 F. Supp. 3d 951 (E.D. Ark. 2017); *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 796 F. Supp. 2d 93 (D.D.C. 2011); *Pharm. Care Mgmt. Ass'n v. D.C.*, 477 F. Supp. 2d 86 (D.D.C. 2007); *Pharm. Care Mgmt. Ass'n v. Gerhart*, No. 4:14-cv-345, 2015 WL 10767327 (S.D. Iowa 2015); *Pharm. Care Mgmt. Ass'n v. Rowe*, No. CIV. 03-153-B-H, 2005 WL 757608 (D. Me. 2005), *aff'd*, 429 F.3d 294 (1st Cir. 2005). It would be premature to treat such a commonplace civil case as extraordinary when the Supreme Court and circuit courts have yet to do so. *See Gillock*, 445 U.S. at 373; *Abbott*, 93 F.4th at 323; *Lee*, 908 F.3d at 1188.

Role of Government. This factor is "somewhat neutral" given the many ways courts can spin it to work for or against the parties. *Hobbs*, 682 F. Supp. 3d at 788. Some courts have declared this factor "inapt in the legislative privilege context" because "there would be no point in deposing

[or in this case subpoenaing]. . . the Legislators" if the state were not involved. *Id.* at 789 (citation omitted). Some treat this factor as favoring state defendants if it is a "private lawsuit." *Cuomo v. New York State Assembly Judiciary Comm.*, 683 F. Supp. 3d 258, 276 (E.D.N.Y. 2023). By that standard, because this is a private lawsuit with no governmental plaintiff, this factor should weigh against PCMA.

Purpose of the Privilege. Forcing the Legislators to comply with PCMA's discovery demands would disrupt the purposes of the privilege. *See supra* Section I. It would burden the legislative process. *Hobbs*, 682 F. Supp. 3d at 788. It would "chill future witnesses' willingness to participate in important legislative inquiries." *Cuomo*, 683 F. Supp. 3d at 276; *Hobbs*, 682 F. Supp. 3d at 788. It would improperly subject the legislative branch to "judicial scrutiny." *Virginia State Bd. of Elections*, 2015 WL 9461505, at *2. And it would ignore the "sweeping" protections that Tennessee's constitution affords state legislators. *Mayhew*, 46 S.W.3d at 774.

**D. The Legislators have not waived their legislative privilege by failing to produce a privilege log to PCMA.**

PCMA imaginatively argues that legislative privilege is waived automatically and entirely where six members of the Tennessee General Assembly, currently in adjournment *sine die* and geographically located throughout the state of Tennessee, failed to coordinate, craft, and produce a detailed privilege log for the thousands of requested documents from "all" sources, within the fourteen days allotted for compliance, merely because PCMA's subpoenas referenced the creation of a privilege log. Dkt. 79-1 at 12-13. This argument verges on the absurd, but the Legislators nonetheless respond as follows.

First, legislative privilege does not support requiring the Legislators to compile burdensome privilege logs. Because PCMA's core claims turn on legislative intent, "none of the information sought could have been outside the privilege." *See In re Hubbard*, 803 F.3d at 1311

(rejecting privilege-log request). Moreover, an itemized log would show the documents that individual legislators and staff retained as part of the legislative process, which would impermissibly and "inevitably reveal the [legislator's] deliberations." *LULAC v. Abbot*, 708 F. Supp. 3d 870, 878 & n.2. (quoting *In re Sealed Case*, 121 F.3d at 737). PCMA's privilege-log argument errs by analogizing the legislative privilege to the attorney-client privilege. Dkt. 79 at 24. This is a faulty comparison because "the legislative privilege is distinct from other recognized privileges in that, as discussed, its animating purpose is not limited to the maintenance of confidentiality." *Mi Familia Vota v. Hobbs*, 682 F.Supp.3d 769, 781 (D. Ariz. 2023). Indeed, forcing the Legislators to produce a privilege log would "work against one of the primary purposes of the privilege": to protect the legislative process from the time drain of discovery. *Mississippi State Conf. of NAACP*, 2023 WL 8360075, at *4.

Second, PCMA is wrong as a matter of procedure. In support of its outlandish argument, PCMA unsurprisingly can point only to a single unreported sixteen-year-old case[8] which did not contemplate legislative privilege. *See Carlson v. Fewins*, No. 1:08-cv-991, 2010 WL 11488917 (W.D. Mich. 2010). As noted below, *infra* Section IV, even where the subpoena itself contemplates a privilege log, the appropriate course is not simply to compel production but to let the withholding party create a privilege log so that privilege issue can be later determined. *See Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 335 F.R.D. 115, 120-21 (N.D Ohio 2020). This argument must be rejected outright.[9]

---

[8] PCMA cites one other case in this section of its brief, addressed *supra* note 5, which does not support this proposition. *See* Dkt. 79 at 23-24 (citing *Page*, 15 F. Supp. 3d at 661).

[9] This interpretation of legislative privilege should also be rejected because of the absurd results it would produce. Under PCMA's theory, a subpoenaing party can request an unlimited amount of documents—with no restrictions on scope or volume—from a non-party lawmaker and, as long as the subpoena simply references the magic words "privilege log" somewhere within the document, legislative privilege will be waived when the subpoenaed lawmaker inevitably cannot comply within the fourteen days provided under Rule 45. An interpretation of a rule that would allow such ready abuse and weaponization of subpoenas cannot be countenanced by the Court.

## III. The Requested Discovery Is Irrelevant to PCMA's Claims.

Independent of privilege, the subpoenas exceed the scope of Rule 26(b)(1). PCMA's own claims define what is relevant, and all three causes of action turn on the objective operation of the Fair Rx Act, not on any legislator's state of mind. *See* Section II.C.2

Preemption Claims. As to its ERISA and Medicare preemption causes of action, PCMA alleges those laws preempt the FAIR Rx Act, either completely or as applied to certain plans. Dkt. 1 ¶¶ 84-107, Case No. 3:26-cv-816. But those preemption claims turn on the objective text and effect of the Act, not on the Legislators' subjective purpose. As the Supreme Court has explained, "pre-emption claims turn on Congress's intent," and the purpose of a state law is relevant only as it relates to the scope of the state law Congress understood would survive or to the nature of the effect of the state law on ERISA plans. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324 (2016) (internal quotation marks omitted). That is how the Sixth Circuit applies that test—asking whether the provisions require a plan to be structured in a particular way, govern a central matter of plan administration, or interfere with nationally uniform plan administration— without any inquiry into why the Tennessee legislature enacted them. *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 263-64 (6th Cir. 2026). In other words, these are pure questions of law that have no relation to the inner workings of the Tennessee General Assembly.

Commerce Clause. As argued above in Section II.C.2, the Sixth Circuit is unequivocal: "[T]he Commerce Clause concerns itself with protectionist 'effects, not motives,' and thus does not require courts to investigate the subjective mindsets of the legislators who passed the law." *Truesdell*, 80 F.4th at 772-73 (cleaned up). Indeed, the Sixth Circuit is "skeptical" that a state legislature could even intend to discriminate against interstate commerce without making that purpose clear in the statute. *Foresight Coal Sales, LLC. v. Chandler*, 60 F.4th 288, 296 n.1 (6th Cir. 2023). In short, a Commerce Clause claim does not depend on a legislator's intentions,

communications, personal beliefs, or motivations in supporting or voting on a bill. The subpoenas seek exactly that from the Legislators, which is irrelevant to PCMA's claims.

## IV. The Subpoena's Burdens Are Disproportionate to the Needs of PCMA's Case.

This Court should also deny PCMA's motion because the subpoenas unduly burden the Legislators. The bounds of discovery are plain and dictated by reason. A party is only entitled to discover information that is "nonprivileged," "relevant" to a claim or defense, and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Proportionality goes a step beyond relevance, requiring the Court to consider "the importance of the discovery in resolving the issues" and "whether the burden . . . outweighs its likely benefit." *Id.* And even when a party demonstrates threshold relevance and proportionality, "good cause" justifies "forbidding" that discovery "to protect a party or person from . . . undue burden." Fed. R. Civ. P. 26(c)(1).

The scales tip even farther against a party that seeks discovery via subpoena from a non-party. The issuing party is required to "take reasonable steps to avoid imposing undue burden or expense" on a non-party. Fed. R. Civ. P. 45(d)(1). And a court "must quash or modify a subpoena" that unduly burdens a non-party. Fed. R. Civ. P. 45(d)(3)(A)(iv). To assess undue burden, courts consider "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *In re: Modern Plastics Corporation*, 890 F.3d at 251. Here, the burdens far outweigh any benefit to PCMA.

PCMA's litigation conduct to date confirms the disproportionate burden on the Legislators to the needs to this case. For one, PCMA moved to compel a week after the Defendants moved to dismiss all claims. Dkts. 76, 79. PCMA insists on production of what would likely amount to thousands of pages of documents and communications exchanged between dozens, if not

hundreds, of individuals beginning June 1, 2025, and continuing on an ongoing basis until trial, all while its case faces dismissal for failing to state a claim. *See* Dkt. 79-1 at 12, 13. What is more, PCMA desires to move this litigation at a breakneck speed, having requested production within just fourteen days, even though the FAIR Rx Act will not take effect until July 1, 2028, with an available extension until December 31, 2028. Dkt. 1 ¶¶ 16, 58, Case No. 3:26-cv-816.

They also demand "all" communications and documents related to the Act, its drafting, its analyses, the Arkansas comparison, and its anticipated impact, (Dkt. 79-1 at 13), and the subpoenas' definitions extend that reach to the Legislators' employees, agents, consultants, attorneys, and other representatives, multiplying the custodians who must search their files. *Id.* at 9-10. That breadth—in the number of categories, the reach of each, and the temporal span—is the hallmark of an unduly burdensome subpoena. *In re: Mod. Plastics Corp.*, 890 F.3d at 251. Balanced against the irrelevant value of the information sought, and the Legislators' status as nonparties, the burden of this discovery outweighs its benefit.

## CONCLUSION

For these reasons, the subpoenas should not be enforced. They target the core of the legislative privilege—the drafting, deliberation, and motive behind the FAIR Rx Act—and that privilege is strongest against a demand aimed at the Lawmakers' subjective purpose. PCMA needs none of it: its preemption claims turn on the Act's text and effect, and its Commerce Clause theory is provable from the public record. Compelling six nonparty legislators to produce their private files is neither proportional nor consistent with comity, and sovereign immunity independently bars this official-capacity process. The Court should deny the motion to compel.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*/s/Matthew W. Kubicek*
MATTHEW W. KUBICEK BPR 040774
Senior Assistant Attorney General
Law Enforcement and Special
Prosecutions Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
Office: 615-741-4349
Fax: 615-532-4892
Email: matthew.kubicek@ag.tn.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2026, a true and correct copy of the foregoing was filed and served via CM/ECF, upon the following:

Michael B. Kimberly
Linda M. Blair
Nathan R. Lee
Todd Presnell
Timothy Rodriguez

*/s/Matthew W. Kubicek*
Senior Assistant Attorney General